**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALLEY CAT ALLIES INCORPORATED,

              Plaintiff,

   v.

UNITED STATES NATIONAL PARK
SERVICE, an agency of the U.S.
Department of the Interior, CHARLES F.
SAMS III, in his capacity as Director of the
U.S. National Park Service, MARK FOUST,
in his capacity as the Regional Director of
the South Atlantic-Gulf region of the U.S.
National Park Service, DEB HAALAND, in
her capacity as U.S. Secretary of the Interior,
and MYRNA PALFREY, in her capacity as
Superintendent of the San Juan National
Historic Site,

              Defendants.

No. 1:24-cv-876

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.     This lawsuit is brought by Alley Cat Allies Incorporated ("ACA")—a global non-profit organization whose mission is to protect and improve cats' lives through advocacy, education, and action—in order to prevent the unlawful, misguided, and cruel roundup and likely extermination of scores of cats from federal land in Puerto Rico by the National Park Service ("NPS").

2.     Cats have lived in Puerto Rico for centuries and are a recognized and treasured part of its historic culture and contemporary community. These community cats[1] live throughout

---

[1] NPS's administrative materials refer to the community cats in the Paseo as "free-ranging" cats. The two terms are used interchangeably in this Complaint.

Old San Juan, including in and around the Paseo Del Morro National Recreational Trail (the "Paseo") at the San Juan National Historic Site (the "Park").

3.      Community cats have lived in the area that is now the Paseo long before that area came under federal jurisdiction, and the cats are beloved by residents and tourists alike. Despite these facts, the NPS has arbitrarily decided to pursue an unattainable, unnecessary, and inhumane goal: the complete eradication of cats within the Paseo.

4.      Prior to its recent plan, NPS partnered with a non-profit organization to manage the health, welfare, and population of the community cats through a Trap-Neuter-Return ("TNR") program, whereby cats are trapped, neutered, eartipped, vaccinated and given veterinarian care, and returned to the Park. This program has improved the cats' lives and allowed them to thrive in their natural outdoor home in a community that cares about them.

5.      Now, after all of this time and despite the cats being valued community members who cause no harm and who are being actively spayed or neutered and vaccinated through a TNR program, NPS has arbitrarily decided it will end the TNR program and take "a phased approach to management of [community] cats, which will include continued trapping and removal efforts by an animal welfare organization [if one is found suitable, and otherwise by a removal agency], removal of all feeding stations in the park, monitoring, and additional removal efforts if deemed necessary"; and NPS will "euthanize"[2] or cause the "euthanasia" of any removed cats that are deemed unsuitable for adoption or that cannot be placed in animal shelters due to limited space (the "Plan"). NPS claims the Plan is necessary to: 1) improve the safety of Park visitors and employees; 2) protect Park resources and reduce impacts to native

_____

[2] Euthanize/euthanasia is placed in quotations because an animal is only euthanized when they are suffering from being terminally ill or untreatably injured. Under NPS's Plan, healthy cats from the Paseo cats will be killed, not "euthanized."

wildlife species associated with "free-ranging cats"; 3) alleviate nuisance issues and align the visitor experience with the purpose of the Park; and 4) bring the Park into compliance with existing authorities for invasive species.

6.     NPS's espoused justifications for its Plan are transparently pretextual. NPS has provided no evidence that the community cats pose any danger to humans, has not demonstrated that the cats in the Paseo prey upon or harm any native species or wildlife, has not provided support for and appears to exaggerate the nuisance allegedly caused by the cats, and makes no attempt to explain why existing authorities for managing invasive species— assuming the cats can be classified as an invasive species—are suddenly a paramount concern after nearly two decades of an active TNR program which has contributed to a harmonious coexistence between cats, the community, and tourists.

7.     In addition, NPS fails to acknowledge, much less address, the fact that removing the cats will not solve what NPS claims is a problem—*i.e.,* cats in the Paseo—because even with NPS's proposed Plan, community cats will continue to live in the area surrounding the Paseo and frequent cat abandonments in and around the Paseo will continue to occur. While the cats in the Paseo are currently being fed, vaccinated, spayed or neutered, and treated with veterinary care, the new cats that will inevitably be introduced into the Paseo will not be. NPS's plan to remove the cats and discontinue the management plan will actually create and exacerbate problems.

8.     Moreover, in pursuit of its unattainable goal of ridding the Paseo of community cats, NPS utilized a flawed process that does not comply with the requirements of the National Environmental Policy Act ("NEPA") of 1969, 42 U.S.C. §§ 4321 *et seq.*, and arrived at a "solution" that will result in the needless killing of potentially hundreds of healthy cats. NPS

attempts to appear as if it considered various alternatives for managing the community cat population within the Paseo, but, in reality, the stated purpose and justification of the project excluded any alternative besides removal.

9.     In developing the Plan, NPS failed to take the "hard look" at alternatives required by NEPA, and NPS's plan fails to account for, among other things, the practical realities of the Paseo; specifically, that the Paseo is situated in an urban area that is home to thousands of community cats and has a persistent cat-abandonment issue that requires active humane programs to curtail. While the number of cats across Old San Juan far outnumbers that currently in the Paseo, NPS only has jurisdiction to remove the community cats within the Paseo itself, meaning (i) whatever issues NPS believes community cats are causing in the Paseo (which, for the reasons explained below, are either non-existent or being addressed by the TNR program) will continue to exist all around the site, and (ii) due to the "Vacuum Effect,"[3] the community cats removed from the Paseo are highly likely to be replaced by community cats from neighboring colonies. Therefore, the cats currently inhabiting the Paseo will be killed only to be replaced by cats who are less likely to have been spayed or neutered and vaccinated through a TNR program. The population will thus quickly rebound or even surpass the number of cats currently on federal lands. And because TNR will be discontinued in favor of eradication, there will be no recourse against an endless cycle of removal and killing.

10.     Had NPS meaningfully considered alternatives as NEPA requires, it would have placed more emphasis on addressing the underlying cause of the growth in the cat population in the Paseo—abandonment by local residents and the growth of the broader community cat population in Old San Juan—and would have aimed its efforts at addressing and mitigating

---

[3] NPS's Free-Ranging Cat Management Plan Environmental Assessment cites Plaintiff ACA as an authority on TNR programs and the Vacuum Effect. *See* Ex. B, pp. 17, 46.

that issue, primarily by funding and improving the efficacy of the TNR program currently underway at the Park and in Old San Juan.

11.     Simply put, NPS's plan lacks the rational basis necessary to pass muster under NEPA because there is no rational way to do the impossible. The Plan is motivated by an obviously unattainable goal and justified by pretextual rationale, resulting in a Plan that mandates a course of action that is as inhumane as it is ineffective. Accordingly, NPS's plan should be declared violative of both NEPA and the Administrative Procedure Act and NPS should be enjoined from removing and ultimately killing the community cats in the Paseo, at least until NPS has conducted and issued a supplemental Environmental Assessment or Environmental Impact Statement, one that analyzes the site-specific impact of community cats within the Paseo and the environmental impact of ceasing the TNR program and removing cats from the Park.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the Administrative Procedure Act, 5 U.S.C. §§ 701 – 706 ("APA") because this action arises under the federal laws of the United States and involves a final agency action.

13.     The Court may grant relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 – 2202, and 5 U.S.C. §§ 701 – 706.

14.     There exists between the parties an actual, judiciable controversy within the meaning of the Declaratory Judgment Act, 28 U.S.C. §§ 2201 – 2202.

15.     Venue lies in this judicial district by virtue of 28 U.S.C. § 1391(e) as the National Park Service is an agency of the United States and is headquartered in this district.

**PARTIES**

16.     Plaintiff Alley Cat Allies Incorporated is a global non-profit organization whose mission is to protect and improve cats' lives through advocacy, education, and action. ACA empowers and mobilizes individuals, advocates, grassroots groups, shelters, veterinary professionals, and elected officials across the United States and around the world to improve their communities for cats through nonlethal, evidence-based approaches. ACA is the leading expert and a pioneer of cat TNR and has decades of experience partnering with localities to implement successful TNR programs. ACA's supporters are a discrete group of individuals, worldwide, who share a common interest in supporting the health and well-being of community cats all over the world and donate to ACA because ACA is institutionally committed to that mission. That commitment extends to Puerto Rico, where ACA has hundreds of supporters and has expended money and manpower to promote the health and well-being of community cats within the Commonwealth. Specifically, ACA has provided grant funding for cat food, TNR, and other needed veterinary care for community cats living along the Paseo and has met with, advised, and spoken at length with local advocates, local animal welfare organizations and stakeholders, and plans to continue to expand education and advocacy efforts to defend and improve the lives of community cats in the Paseo and in Old San Juan. ACA has standing because NPS's Plan will injure and impede its ability to carry out its mission in Old San Juan and has already forced ACA to divert resources to resist the Plan being carried out. ACA also has standing because it has supporters in Puerto Rico and all over the world who cherish and visit the cats along the Paseo in Old San Juan. NPS's Plan will injure ACA's supporters' recreational and aesthetic interests in viewing and enjoying the cats within the Paseo, and ripple effects from the Plan, such as the knowledge that the federal government is

enacting a deadly campaign against community cats who are simply living in peace in their natural home, threatens ACA's supporters' general enjoyment of the Paseo. Lastly, ACA has standing because NPS, in violation of NEPA, has harmed ACA by failing to collect and/or make public information relating to any harm caused by cats in the Paseo or the potential harms that will be generated by removing the cats and ending the TNR program. By enacting NEPA, Congress intended to avoid such informational deprivations. *See Protect Our Aquifer v. Tennessee Valley Auth.*, 554 F. Supp. 3d 940, 958 (W.D. Tenn. 2021).

17.     Defendant United States National Park Service is an agency within the Department of the Interior and was created by Congress to preserve, unimpaired, the natural and cultural resources and values of the National Park System for the enjoyment, education, and inspiration of this and future generations. NPS manages the San Juan National Historic Site and the resources and species found within it, including the free-ranging cats.

18.     Defendant Mark Foust, Regional Director of the South Atlantic-Gulf region of the National Park Service, is responsible for the strategic planning and direction, policy oversight, and assistance in public involvement, media relations, and programs for parks within the region, including the San Juan National Historic Site. On November 21, 2023, he signed the National Park Service's Finding of No Significant Impact Free-Ranging Cat Management Plan. He is sued in his official capacity.

19.     Defendant Charles F. Sams III, Director of the National Park Service, heads the National Park Service, which manages all national parks, most national monuments, and other natural, historical, and recreational properties, including the San Juan National Historic Site. He is sued in his official capacity.

20.     Defendant Deb Haaland, United States Secretary of the Interior, heads the United States Department of the Interior, which is charged with stewarding public lands, increasing environmental protections, and pursuing environmental justice. She is sued in her official capacity.

21.     Defendant Myrna Palfrey, Superintendent of the San Juan National Historic Site, manages all Park operations and programs, including NPS's Plan. On November 8, 2023, she signed the National Park Service's Finding of No Significant Impact Free-Ranging Cat Management Plan. She is sued in her official capacity.

## STATUTORY BACKGROUND

*National Environmental Protection Act*

22.     Congress enacted NEPA in 1969, directing all federal agencies to assess the environmental impacts of proposed actions that significantly affect the quality of the human environment. NEPA's public disclosure goals are twofold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action and (2) to ensure that the public has sufficient information to review (and challenge if necessary) the agency's action.

23.     The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA. Those regulations are found at 40 C.F.R. §§ 1500–1508 and are binding on all federal agencies.

24.     NEPA requires federal agencies to prepare a "detailed statement" of probable environmental effects before pursuing "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Specifically, NEPA requires an agency to prepare an Environmental Impact Statement ("EIS") after conducting an Environmental Assessment ("EA"), in which the agency must "specify the underlying purpose

and need to which the agency is responding" and "[e]valuate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination." 40 C.F.R. §§ 1502.13, 1502.14.

25.     In reviewing an EA, "the Court must assess whether the agency took a hard look at the alternatives and explained its reasons for rejecting them." *Gov't of the Province of Manitoba v. Salazar*, 691 F. Supp. 2d 37, 46 (D.D.C. 2010), *clarified on denial of reconsideration sub nom. Gov't of Province of Manitoba v. Salazar*, No. CV 02-2057 (RMC), 2010 WL 11595314 (D.D.C. June 17, 2010).

26.     If after the EA, the agency makes a Finding of No Significant Impact ("FONSI"), then, pursuant to 40 C.F.R. § 1501.6(a), it may forego preparation of a full EIS.

27.     The scope of NEPA review is broad and includes describing the purpose and need for the proposed project, disclosing and considering all reasonable alternatives, *id.* § 1502.14(a), and direct, indirect and cumulative impacts on "ecological . . . , aesthetic, historical, cultural, economic, social, or health" interests. *Id.* § 1508.8. NEPA documentation must provide the decision maker and the public with adequate information, evidence, and analysis to fully assess the potential impacts of the proposed actions. *Id.* § 1502.1.

28.     The requirement to evaluate all reasonable alternatives is not simply procedural; CEQ has stated that the alternatives analysis is "the heart" of the NEPA analysis. *Id.* § 1502.14; *see also* 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1507.2(d). The federal agency must "evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated;" and "[d]evote substantial treatment to each alternative considered in detail including the proposed action[.]" *Id.* § 1502.14(a)–(c).

29.     To satisfy NEPA's "hard look" requirement, a federal agency must present the environmental impacts of the proposed action and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among the options by the decision maker and the public. *Id.* § 1502.14. Because the purpose and need statement required by 40 C.F.R. § 1502.13 defines the scope of reasonable alternatives, an agency may not narrowly construe the purpose and need so as to define away competing reasonable alternatives and foreclose consideration of a reasonable range of alternatives.

*Administrative Procedure Act*

30.     The APA provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

31.     Only "final agency actions" are reviewable. 5 U.S.C. § 704. A final agency action is one that marks the consummation of the agency's decision-making process and one by which rights or obligations have been determined or from which legal consequences flow.

32.     Under section 706 of the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

33.     The APA provides a cause of action to challenge any final agency action where there is no other adequate remedy in court. 5 U.S.C. § 704. NEPA contains no specific judicial review provisions, so federal agency actions governed by these laws, including the Free-Ranging Cat Management Plan at issue here, are subject to judicial review under the APA. *Gov't of the Province of Manitoba*, 691 F. Supp. 2d at 40 n. 1.

## FACTUAL BACKGROUND

*The Cats' Safe Existence in the Community Prior to NPS's Current Plan*

34.     Puerto Rico is home to a very large and cherished community cat population. Community cats occupy a significant place in the culture of Puerto Rico. In fact, the cats are so popular that their images are regularly featured on souvenirs.

35.     Community cats have lived in the area that is now the Paseo for decades and throughout Old San Juan for centuries, predating the existence of the Paseo, which was paved in 1999, replacing a dirt path constructed four years earlier. The Paseo became a national recreation trail in 2001.

36.     After the Paseo was created, community cats already in the area quickly made their home along the new path—an inevitable result given that cats were already living on those grounds and in the area and given the number of community cats in Puerto Rico.

37.     In December 2003, the United States Department of Agriculture ("USDA"), the Animal and Plant Health Inspection Service ("APHIS"), and Wildlife Services ("WS"), published an environmental assessment proposing various alternatives to manage the cat population in the Paseo (the "2003 EA"). The agencies' stated reasons for action were the following:

> 1) the sheer abundance of cats in some areas, 2) the unpleasant site of cat corpses, or of individuals in poor condition, 3) the profusion of kittens, often in poor health—a female may produce 2 or 3 litters of up to 10 kittens per year, 4) annoying caterwauling, 5) nocturnal fighting, 6) trampling on, digging up, or defecating on gardens, vegetable patches, etc., 8) [sic] disturbing rubbish bins and scattering litter, 9) they will often enter homes and other buildings uninvited, 10) they will occasionally kill or scare birds, fish or other animals, 11) risk of attacks on babies in prams (baby carriage), children, or other pets, 12) the possible health risks from the transmission of various diseases from cats to pets or humans (particularly children); including ringworm, cat

scratch fever and toxoplasmosis,[4] 13) they may be breeding grounds for fleas, and 14) the foul smell and maggots/flies resulting from the excess food left around for feral cats by over-enthusiastic cat lovers.

Ex. E, United States Department of Agriculture, Animal and Plant Health Inspection Service, Wildlife Services, "Management of Feral and Free-Ranging Cat Populations to Reduce Threats to Human Health and Safety and Impacts to Native Wildlife Species In the Commonwealth of Puerto Rico," p. 3 (2003).

38.     In 2005, NPS entered a Memorandum of Understanding with Save A Gato, a local volunteer animal welfare organization (the "2005 MOU"). The 2005 MOU granted Save A Gato unlimited access to the Paseo to establish a TNR program, supported by limited funding from NPS to provide traps and materials to aid the initial trapping effort and five feeding stations to feed the cats returned to the Park after they were neutered, eartipped, and evaluated by a veterinarian pursuant to the TNR program.

39.     In 2006, NPS promulgated the NPS *Management Policies*,[5] Section 4.4.4 of which, *Management of Exotic Species*, details the policies under which NPS declared it would manage alleged invasive species within federally managed parks and public lands like the Paseo. Importantly, the management plan states:

> The decision to initiate management should be based on a determination that the species is exotic. For species determined to be exotic and where management appears to be feasible and effective, superintendents should (1) evaluate the species' current or potential impact on park resources; (2) develop and implement exotic species management plans according to established planning procedures; (3) consult, as appropriate, with federal, tribal, local, and state agencies as well as other interested groups; and (4) invite public review and comment, where appropriate.

NPS *Management Policies* (2006), Section 4.4.4.2, *Removal of Exotic Species*.

---

[4] The government has yet to demonstrate any evidence of disease transmission between community cats in the Paseo and Paseo visitors despite alleging this was a concern since 2003. Importantly, the 2003 EA **does not** classify the community cats as an invasive species.
[5] Available at: https://www.nps.gov/subjects/policy/upload/MP_2006.pdf.

40.     In 2008, consistent with the 2006 *Management Policies* and premised in large part on the success of the TNR program in managing the community cat population in the Paseo, NPS and Save A Gato entered into another Memorandum of Understanding, extending Save A Gato's unlimited access to the Park and increasing the number of feeding stations to eight. NPS also pledged continued material support to Save A Gato's TNR efforts, which was critical given that Save A Gato is powered entirely by the efforts of motivated volunteers.

41.     Since the 2005 MOU, almost two decades ago, the TNR management plan has successfully managed the cat population, addressing many of the issues cited in the 2003 EA by reducing procreation and mating behavior among the cats, including yowling, spraying, and fighting, and preserving the species' historical, social, and cultural role within the Park and in the broader Puerto Rican community.

42.     The current population of cats in the Paseo is alleged by NPS to be approximately 200 cats—though local animal welfare organizations like Save A Gato dispute this estimate. Under NPS's illogical and inhumane Plan, these cats who happen to live on federal property— and have since even before it was federal property—are now susceptible to being removed from their home and killed. The same cruel fate will undoubtedly meet hundreds more cats when the numerous cats around Old San Juan and Puerto Rico move in to take advantage of the resources that sustained the initial Paseo cats, and that new cat population reproduces back to capacity. This scientific phenomenon is known as the Vacuum Effect.

*NPS's New Plan to Eradicate the Cat Population in the Paseo*

43.     In the fall of 2022, NPS began the public scoping comment period to determine a new cat management plan for the Paseo. The comment period was open from October 20 to December 12, 2022, and public meetings occurred on November 2 and 3, 2022. In total, 2,511

13

comments were received. The overwhelming majority of the comments expressed substantially the same message: *please do not remove or kill the cats, the Park is their home, and the community and visitors love them*. Ex. A, National Park Service, United States Department of the Interior, "San Juan National Historic Site Free-Ranging Cat Management Plan Public Scoping Correspondences" (2022).

44.    NPS thereafter drafted an environmental assessment. On August 4, 2023, NPS announced the alternatives purported to be under consideration:

> The draft Free-Ranging Cat Management Plan/Environmental Assessment evaluates three alternatives for management of the free-ranging cats in the park. Under the no-action alternative (alternative 1), no changes would be made to the current management of free-ranging cats. Under the original proposed action (alternative 2), the NPS would enter into an agreement with an organization(s) or agency(s) to remove the cats from the park. Following analysis of the public scoping comments, the NPS added an alternative that revised the original proposed action. The revised proposed action (alternative 3 / NPS preferred alternative) would allow an animal welfare organization six months to trap and remove cats from the park with the use of the current feeding stations, after which time the feeding stations would be permanently removed from the park.[6]

In its environmental assessment, for the first time, and in a reversal of its prior position, NPS claimed that the existing TNR program was inconsistent with "existing authorities," identifying Executive 36 C.F.R. § 2.2, which governs wildlife protections on federal lands, and its own 2006 *Management Policies*, both of which were in existence and known to NPS at the time of the 2008 MOU which expanded the TNR program established by the 2005 MOU. NPS attempts to reconcile this contradiction by stating that "the feeding stations have been allowed at the park for management of the free-ranging cats through the TNR program with the intent to reduce and ultimately eliminate both the cats and feeding stations from the park." Ex. B,

---

[6]    https://www.nps.gov/saju/learn/news/san-juan-national-historic-site-announces-public-meeting-to-present-draft-free-ranging-cat-management-plan-and-environmental-assessment.htm.

National Park Service, United States Department of the Interior, "Free-Ranging Cat Management Plan Environmental Assessment" (EA), p. 12 (2023). Eliminating all cats from the Park was, is, and will continue to be an unrealistic and unachievable goal. By narrowly construing the purpose of the project as such, NPS violated NEPA by defining away the ability to consider any alternatives other than the removal of the cats.

45.   NPS acknowledges that shelters and animal welfare facilities have limited capacity and that few of the cats that will be removed may be eligible for adoption. *See* Ex. C, National Park Service, United States Department of the Interior, "Free-Ranging Cat Management Plan Public Scoping Newsletter," p. 5 (2022). Therefore most, if not all, of the cats who are "removed" pursuant to alternative 3 will likely be exterminated. NPS claims it created alternative 3 to address concerns raised by residents and tourists that the cats would be killed, but the reality of the limited shelter space and opportunity for these cats to be housed and/or adopted means the actual consequence of alternative 3 will be the killing of many of these cats—the exact consequence NPS purports alternative 3 was designed to avoid. This means that when NPS represented to the public that the no-action alternative was a viable option or that it would create another alternative to avoid "euthanasia," it was knowingly misleading the public, directly contradicting NEPA's aims of accountability and informed public participation.

46.   Moreover, alternative 3 is substantially identical to alternative 2 (NPS's initial proposed action), with the nominal change that the initial removal efforts will be undertaken by an animal welfare organization instead of a removal agency (though, if the animal welfare organization is unsuccessful or one cannot be identified, a removal agency will still be utilized). *See* Ex D, National Park Service, United States Department of the Interior, "Finding

of No Significant Impact Free-Ranging Cat Management Plan" (FONSI), pp. 3, 5. Thus, despite representing that the EA objectively assessed three alternatives, as required by NEPA, NPS only *truly* considered and presented one option: removal of the cats.

47.     Attempting to explain why it is pursuing a complete eradication of community cats within the Paseo, NPS asserts, without any evidence or support, that forcibly removing the cats from the Paseo will protect native species and help prevent the introduction of diseases into the human and aquatic environment. *Id*. at pp. 26, 32-33. NPS reached this conclusion despite its acknowledgment that "***there are no site-specific studies documenting cats preying on wildlife in the park or contributing to T. gondii [or any other disease] in the environment***." *Id*. at p. 33 (emphasis added).

48.     NPS's lack of evidence that the cats are causing any identifiable harm is no small detail. Indeed, NPS states the goal of its Plan is to "bring the park into compliance with existing authorities for ***invasive species***, reduce human health and safety concerns, align the visitor experience with the purpose of the park, protect park resources, alleviate nuisance issues, and reduce impacts on native wildlife species associated with free-ranging cats." *Id*. at p. i (emphasis added). The federal definition of invasive species is "an alien species whose introduction does or is likely to cause economic or environmental harm or harm to human health." Exec. Order No. 13112, 64 FR 6183 (1999). Moreover, guidance from the Department of the Interior's ("DOI") own Invasive Species Advisory Committee explains that determining whether a species is invasive requires "comparing negative effects caused by a non-native organism to its potential societal benefits." Invasive Species Advisory Committee, Invasive Species Definition Clarification and Guidance, p. 2 (April 27, 2006).[7]

---

[7] Available at https://www.doi.gov/sites/doi.gov/files/uploads/isac_definitions_white_paper_rev.pdf.

49.     NPS declares that "[t]he free-ranging cat is an invasive species in any habitat" but fails to cite to any authority for that conclusion, does not identify any harm actually caused by the cats in the Paseo, and fails to demonstrate that any such harms outweigh the societal, cultural, and historical benefits of the cats. Nor does NPS acknowledge or address the fact that cats have been in Puerto Rico for centuries, long before Puerto Rico became a U.S. Territory and obviously long before the creation of the Paseo. Thus, NPS's designation of the community cats in the Paseo as an invasive species is not legally sound.

50.     At a minimum, NPS should not be allowed to proceed with its Plan until it has demonstrated that community cats are *actually* contributing to or causing any of the hypothetical dangers it claims the cats *may* contribute to or cause in an EIS which measures any identifiable harm caused by community cats and evaluates measures to reduce those harms against the social and cultural harms that will result from those measures.

*NPS Finding that Removing the Cats in the Paseo Will Have No Significant Impact*

51.     NPS accepted public comments on the draft Free-Ranging Cat Management Plan/Environmental Assessment from August 7 through September 5, 2023. During that period, 552 comments were received and analyzed, with responses included in the FONSI released toward the end of the year.

52.     In November 2023, NPS released its Finding of No Significant Impact ("FONSI") which announced the selected action NPS had chosen to manage the community cat population in the Paseo. Just like the comments received during the 2022 public scoping period, the comments on the EA included in the FONSI were dominated by protests against the Plan, expressions of love for the community cats, and pleas that NPS consider alternatives other than

cat removal and killing. Indeed, one need look no further than Concern Statement 1 in the FONSI:

> The process for this plan has been disingenuous for a variety of reasons. During the scoping period, the no-action alternative was presented as a viable option, but the EA stated that the National Park Service would not be able to select the no-action alternative for implementation. Additionally, one commenter noted that [NPS] promised that euthanasia would not be a part of the plan, but both action alternatives lean heavily on euthanasia for management of the cat colony at the park. Some members of the planning team do not speak Spanish or live in Puerto Rico, limiting their understanding of the culture. It appears that [NPS] has already decided how the cats at the park will be managed and that the feelings or desires of the local residents or tourists who support the cats in all of Old San Juan were not taken into consideration. The meeting for the review of the EA was held during hurricane season at a hotel, rather than at the park, and without notice to the Spanish press. The way this process has been handled reinforces locals' mistrust of the federal government.

Ex. D, p.11.

53.    Unmoved, NPS predictably selected alternative 3, *i.e.*, "a phased approach to management of [community] cats, which will include continued trapping and removal efforts by an animal welfare organization, removal of all feeding stations in the park, monitoring, and additional removal efforts if deemed necessary"; and NPS will kill or cause to be killed any removed cats that are deemed unsuitable for adoption or that cannot be placed in animal shelters due to limited space. *Id.* at 3, 10.

54.    If a suitable animal welfare organization cannot be identified, is not able to remove the cats quickly enough in NPS's opinion, or if there is a "sustained presence of cats inside the park," then the EA and FONSI make clear that "a removal agency other than the animal welfare organization would be employed to remove the cats." Ex. B, p. 16. As explained, it is unreasonable to expect cats to be completely eradicated from the Paseo given the size of the broader cat population in Puerto Rico and the inevitable results of the Vacuum Effect. NPS,

by building in these defaults, completely undermines the point and purposes of pledging to utilize an animal welfare organization in the first instance.

55.     Alternative 3 was selected instead of: (i) a no-action alternative, which would have upheld the status quo of cats living peacefully in the Park while allowing for continued and expanded efforts to trap, neuter, eartip, vaccinate, and return the cats back into the Park, while maintaining TNR-critical feeding stations; and (ii) alternative 2, which is substantially the same plan as alternative 3. The FONSI states that NPS could not select the no-action alternative because "it violates NPS regulations and policies related to invasive species, abandonment, and feeding wildlife within the park." Ex. D, p. 6. Thus, in NPS's own words, the no-action alternative was defined out of consideration by NPS's chosen purpose and need statement. Notably, this alternative that NPS now claims it could not consider because it violates regulations is the practice that has been in place for eighteen years, since just after the Paseo came into existence.

56.     In other words, rather than consider in earnest alternatives to removing and killing the community cats, NPS pretextually narrowed the "alternatives" to three, one of which it dismissed out of hand as inconsistent with existing authorities, and the other two "alternatives" only varied in a single detail: who would remove the cats. By proceeding from a misleading and unreasonably narrow starting point, NPS violated NEPA by failing to *actually* consider any alternative other than removal.

57.     NPS also violated NEPA by concluding that the existing TNR program is unsuccessful, both misinforming the public as to the efficacy of TNR and failing to consider ways to bolster the existing program to further the benefits it provides.

58.     The EA states that "[e]mploying a long-term TNR program as a stand-alone tactic would require that the feeding stations remain in use, and based on recent counts showing an increasing population, the cats would persist in the park and may even continue to increase in abundance[,]" concluding that "[t]he TNR program on its own is unable to bring the park into compliance with existing authorities for invasive species, wildlife, and feeding animals within the park." *See* Ex B, p. 17. In other words, NPS concluded that only eliminating the population of cats in the Paseo would bring the Park into compliance with "existing authorities."

59.     NPS takes the position that the existing TNR-oriented cat management plan has been unsuccessful based exclusively on the fact that under the current TNR program, the modest community cat population in the Paseo has allegedly increased from 120 cats to approximately 200 cats **over the course of eighteen years**. *Id.*

60.     By focusing on the size of the community cat population within the Paseo as the exclusive metric for determining the success of the existing TNR program and insisting the only acceptable outcome is the complete eradication of the community cat population within the Paseo, NPS ignores both reality and the clear value the TNR program provides. Specifically, TNR reduces mating behavior, assists in stabilizing the cat population, and decreases the already extremely unlikely possibility of any disease transmission between cats and humans or other species within the Park[8] (and, in fact, NPS has found no such transmissions). Ex. D, p. 33. By these other measures, the TNR program has been, and continues to be, immensely successful, and only stands to enjoy further success if TNR funding and community cat education efforts are increased. Were NPS to implement its Plan, cat abandonments are all but certain to persist; the benefits detailed above, including neutering to

---

[8] *See* https://www.alleycat.org/resources/why-trap-neuter-return-feral-cats-the-case-for-tnr/ (accessed March 25, 2024).

alter behavior and prevent reproduction, will cease; and cats far less likely to be sterilized will move into the newly-vacated territory and quickly breed back to capacity. NPS is very likely implementing a Plan that will result in a larger and less stable cat population within the Park.

61.     Nor is this feared outcome speculative—NPS itself acknowledges this reality. In dismissing alternative 1, NPS also noted that "[i]n a population that is not isolated, such as the one at the park, TNR is not effective. **New cats come into the colony from other populations and from being abandoned by owners**." Ex. B, p. 17 (emphasis added). Herein lies the irrationality inherent in NPS's reasoning, *i.e.*, even if the existing cat population is trapped and removed (and likely "euthanized") as NPS proposes, new cats will continue to come into the Park "from other populations and from being abandoned by owners."

62.     NPS's own scientists observed that twenty-six cats within the Paseo "are pregnant or were recently pregnant." *Id*. Given that the TNR program emphasizes neutering to decrease both reproduction and mating behavior among the cats, the existence of so many pregnant cats strongly suggests that those cats recently came in from other populations and/or were recently abandoned because, as NPS acknowledges, "[c]ompanion animals that are abandoned are often not spayed or neutered, and those animals contribute to the cycle of reproduction and unwanted pets." Thus, if NPS believes TNR must end because it cannot eradicate cats in the Paseo, then removal, by the same logic, is not viable because it will also fail to eradicate cats in the Paseo; worse yet, it will result in a larger population of unneutered and unvaccinated cats who are able to reproduce.

63.     NPS notes that there is scientific literature both supporting and refuting the Vacuum Effect and acknowledges the potential for cats in Old San Juan to move into the Park after the existing colony is removed. However, NPS states it intends to incorporate a variety of

management techniques in addition to removal efforts, "including removal of feeding stations,[9] habitat modification, exclusion devices, repellents, and denning. This integrated approach is intended to reduce the potential for a new colony forming at the park. Following the removal actions by the animal welfare organization, park staff will continue to monitor the park for a sustained presence of cats and initiate additional removal efforts if deemed necessary." Ex. B, pp. 17, 34.

64.   New cats will enter the Park and additional removal efforts will continue to be necessary. Indeed, through its Plan, NPS is pledging that in pursuit of its arbitrary goal to eradicate cats (that NPS has not demonstrated are causing any harm) in the Paseo, it will perpetually remove and kill cats that find their way onto this 0.75-mile strip of federal property.

65.   NPS also claims it will "reduce the potential for pet abandonment in the park" by continuing "to close the entrance to the Paseo at night" and having "security guards present when the Paseo is open (under an agreement with the Department of Tourism)[,]" and providing "additional security" by "installing a new lighting system along the Paseo." Ex. D, p. 3. NPS states it will also "increase educational efforts through additional messaging, addressing the reasons cats cannot be abandoned in the park, and noting that the park does not provide food for abandoned cats." *Id.*

66.   Despite a brief description of suggested alternatives, NPS's cursory treatment of those alternatives is telling. The FONSI summarily rejects the "no-action" (continued TNR) alternative based on its conclusion that TNR, by itself, would not eliminate the cat population in the Paseo, stating that under the TNR program by itself, "the cats would persist in the park

---

[9] Community cats were present in the Paseo before feeding stations existed because there are other sources of food. Feeding stations allow volunteers doing TNR to know where the cats are at a given time, making it easier to trap them for spaying and neutering, and to direct cats away from walking paths. If feeding stations are removed and regular feeding is ceased, cats will still come into the area but will instead roam further around the area to find food.

and may even continue to increase in abundance." Ex. B, p. 17. This conclusion does not meaningfully engage with the viability of TNR to manage the cat population if other measures are also utilized such as increased security and education and messaging to reduce cat abandonment—the exact measures NPS recognizes it must couple with its removal Plan. These measures in conjunction with the existing TNR program should have been considered as an alternative but were not; that failure alone is fatal to NPS's Plan under NEPA.

67.     Thus, NPS's NEPA process was deficient for the additional reason that it does not consider alternatives in combination which may better achieve the stated goal of the Plan.

68.     Plaintiff, hoping to work with NPS to arrive at a better solution than what NPS's deficient NEPA process produced, sent a letter to NPS on February 23, 2024, highlighting issues with its NEPA process and offering to assist in the long-term management of cats in the Paseo. NPS declined to work with ACA, leaving judicial relief as ACA's only option.

## FIRST CLAIM FOR RELIEF

*The EA's stated purpose and need are improper and violate NEPA*

69.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs into each of the counts set forth below.

70.     NPS violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and NEPA's implementing regulations, specifically in relation to the agency's identified purpose and need which resulted in a flawed menu of alternatives and a premature FONSI.

71.     CEQ's implementing regulations for NEPA require an agency's NEPA analysis to include a purpose and need section which "briefly specif[ies] the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."

40 C.F.R. § 1502.13. An agency may not adopt a purpose and need statement which "necessarily and unreasonably constrains the possible range of alternatives." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).

72.     The EA incorporates a purpose and need statement which claims to focus on "protect[ing] park resources," "reduc[ing] impacts to native wildlife species associated with free-ranging cats," "alleviat[ing] nuisance issues and align[ing] the visitor experience with the purpose of the park," and "bring[ing] the park into compliance with existing authorities for invasive species." In truth, as demonstrated by NPS's response to comments received on its EA, "bring[ing] the park into compliance with existing authorities" consumes all other purposes and needs stated. *See* Ex. D, pp. 11-30. NPS's treatment of a range of feasible suggested alternatives makes clear that even if an alternative course of action could protect Park resources, reduce impacts to wildlife, and alleviate any alleged nuisance issues, those alternatives were not and would not be considered if they did not "bring the park into compliance with existing authorities"—the same authorities that have existed for almost two decades.

73.     This also explains why NPS conducted no site-specific studies. NPS saw no need to establish that there was any harm actually being caused by the cats because the removal of the cats to bring the Park "into compliance" was a *fait accompli*.

74.     As noted above, NPS could obviate any need—actual or perceived—to kill or remove community cats by adopting better security measures and bolstering the TNR program—which has already been demonstrated to stabilize the community cat population—by providing meaningful funding which has never been present. *See* Ex. D, p. 17 ("[t]o date,

the National Park Service has only spent money on this NEPA process, and no other money has been set aside specifically for cat management at the park").

75.     Instead, NPS's purpose and need statement necessarily and unreasonably constrained NPS's consideration of any alternative that would not accomplish a complete eradication of the cat population within the Paseo, and NPS has not demonstrated that the selected action responds to an actual need.

76.     In the absence of an up-to-date document that articulates a proper need and purpose and satisfies NPS's responsibility under NEPA to assess the environmental impact of its actions and assess alternative means of managing cats in the Paseo, NPS's improperly narrow purpose and need statement is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

*NPS failed to consider mitigation and preventative measures*

77.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs into each of the counts set forth below.

78.     NPS violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and NEPA's implementing regulations, specifically in relation to the agency's August 2023 Free-Ranging Cat Management Plan Environmental Assessment and its November 2023 Finding of No Significant Impact.

79.     After NPS implements the Plan, new cats are certain to enter the Paseo. NPS's selected alternative is inadequate to address cat abandonment or the Vacuum Effect, where new cats will move into spaces previously occupied by other cats after the initial cats have been removed.

80.     This replenished population is less likely to be sterilized and will quickly breed back to and beyond the current cat population of the Paseo. NPS failed to take a hard look at mitigation and preventative measures to decrease the environmental consequences that will result from its Plan or to address the identified purpose and need if its Plan is unsuccessful.

81.     As such, NPS's Plan is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

**THIRD CLAIM FOR RELIEF**

*NPS failed to consider a reasonable range of alternatives in violation of NEPA*

82.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs into each of the counts set forth below.

83.     NPS violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and NEPA's implementing regulations, specifically in relation to the agency's August 2023 Free-Ranging Cat Management Plan Environmental Assessment, which fails to assess a range of reasonable alternatives, including combinations of alternatives.

84.     NEPA mandates that an agency "shall to the fullest extent possible" use the environmental impact assessment process "to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the environment." 40 C.F.R. § 1500.2(e). Reasonable alternatives include those that substantially meet the agency's purpose and need.

85.     NPS has violated and is violating NEPA and its implementing regulations because it has failed to conduct a site-specific, up-to-date, thorough environmental analysis that examines the environmental impacts of the current TNR program, and which includes an

analysis of an adequate range of alternative means to improve management of the community cat population within the Paseo.

86.    NPS refused to consider any alternative that it believed would not result in a cat-free Paseo. Further, the narrow range of alternatives considered in NPS's EA will likely create or exacerbate some of the exact issues NPS cites as the purpose and need for a new management plan, *i.e.*, the continued growth of the cat population and increased visibility of cats on federal lands, which are significantly more likely to occur absent TNR.

87.    NPS's EA presents the false appearance of three alternatives. However, NPS defined the purpose and need of the project narrowly to exclude the no-action alternative altogether, and the remaining two alternatives are essentially the same, in that both involve removal and "euthanasia."

88.    NEPA requires NPS to analyze a wider range of alternatives in its EA, such as improving security measures while bolstering the TNR management program, that better address the underlying causes of the increasing cat population within the Paseo. NPS could have satisfied its NEPA obligations by: (a) evaluating the impact of increased security and education on cat abandonments, (b) evaluating the impact of bolstered TNR programming, and (c) completing an adequate and up-to-date EIS analyzing both the actual impacts of the current cat population in the Paseo and the efficacy of the TNR management program currently in place to determine whether the purpose and need for the proposed Plan was accurate, *e.g.*, whether the cats are rightly designated as an invasive species and whether TNR in the Paseo is stabilizing the population, improving cat and community health, and enabling cats to peacefully coexist with visitors to the Paseo (as demonstrated by their popularity).

89.     NPS's failure to consider a reasonable range of alternatives, either in the EA or in its FONSI, is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, in violation of 5 U.S.C. §706(2)(A).

## FOURTH CLAIM FOR RELIEF

*NPS failed to assess the consequences of its proposed action and misinformed the public*

90.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs into each of the counts set forth below.

91.     NPS violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and NEPA's implementing regulations, specifically in relation to the agency's August 2023 Free-Ranging Cat Management Plan Environmental Assessment and its November 2023 Finding of No Significant Impact.

92.     NEPA's implementing regulations require that NEPA documentation provide the decision maker and the public with adequate information, evidence, and analysis to fully assess the potential impacts of the proposed actions. 40 C.F.R. § 1502.1; *see also Mountaineers v. U.S. Forest Serv.*, 445 F. Supp. 2d 1235, 1250 (W.D. Wash. 2006) ("NEPA requires consideration of the potential impact of an action before the action takes place").

93.     The EA acknowledges it has conducted no site-specific studies to determine the impact of the cats in the Paseo or the impact of the current plan in place to manage them. This omission necessarily deprives both NPS and the public of the evidence and information necessary to evaluate whether the purpose or need identified by NPS is necessary, and whether the selected alternative will beneficially address the need identified. *See Mountaineers*, 445 F. Supp. 2d at 1249-50 (finding the Forest and Wildlife Service violated NEPA by not conducting site-specific studies and only providing the public with a "general level of analysis").

94.    NPS further misinformed the public by presenting the false appearance of three alternatives while defining the purpose and need of the project narrowly to exclude the no-action alternative altogether; and the remaining two alternatives are essentially the same, in that both involve removal and "euthanasia."

95.    By failing to conduct site-specific studies and misleadingly representing it was considering multiple alternatives, NPS violated NEPA and its implementing regulations which require NPS to assess the consequences of its proposed action and provide full, complete, and accurate information to the public.

96.    NPS's failure to assess the impacts of the selected action and inform the public adequately and accurately in either its EA or in its FONSI is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, in violation of 5 U.S.C. §706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against the Defendants and the following relief:

A.    an order directing NPS to prepare a supplemental EA or an EIS evaluating the environmental consequences of its Plan and comparing those findings to an analysis of the current efficacy of the TNR program;

B.    an order directing NPS to prepare a supplemental EA or an EIS which considers a reasonable range of alternatives, including in combination, which contemplate preventative measures and mitigation;

C.    a declaratory judgment that the actions, conduct, and practices of Defendants violate the National Environmental Protection Act and the Administrative Procedure Act;

D.    permanent equitable and injunctive relief; and

29

E.    an award of costs, expenses, attorneys' fees, and such other and further relief as the Court may deem just and proper.

Dated: Washington, D.C.
        March 27, 2024

                                    _/s/ Addy R. Schmitt_____
                                    HARRIS ST. LAURENT &
                                    WECHSLER LLP
                                    Addy R. Schmitt, Esq.
                                    (DC Bar No. 489094)
                                    Yonaton Aronoff, Esq.
                                    (*pro hac vice* admission pending)
                                    1775 Pennsylvania Avenue, NW
                                    Suite 650
                                    Washington, DC 20006
                                    aschmitt@hs-law.com
                                    yaronoff@hs-law.com
                                    Telephone: (202) 617 5791
                                    Fax: (212) 202-6206

                                    -and-

                                    Eduardo S. Garcia, Esq.
                                    (DC Bar No. 1028040)
                                    STEIN SPERLING BENNETT
                                    DE JONG DRISCOLL PC
                                    1101 Wootton Parkway, Suite 700
                                    Rockville, Maryland 20852
                                    (301) 340-2020 (phone)
                                    (301) 354-8326 (facsimile)
                                    egarcia@steinsperling.com

                                    *Attorneys for Plaintiff*
                                    *Alley Cat Allies Incorporated*