**UNITED STATES DIRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALLEY CAT ALLIES INCORPORATED,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES NATIONAL PARK SERVICE, *et al.*,<br><br>*Defendant.* | Civil Action No. 24-876 (RDM) |
| SAVE-A-GATO, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES NATIONAL PARK SERVICE, *et al.*,<br><br>*Defendant.* | Civil Action No. 25-1873 (RDM) |

**MEMORANDUM OPINION**

These consolidated actions challenge the United States National Park Service's Free-Ranging Cat Management Plan ("2023 Plan" or "Plan"), which establishes a process for removing about 200 free-ranging cats that live along the Paseo del Morro National Recreation Trail ("Paseo"), a .75-mile trail that runs along the western fortification walls in Puerto Rico's only national park, the San Juan National Historic Site ("Site"). As adopted, the 2023 Plan includes three (possible) phases. First, the National Park Service ("NPS") would publish a request for letters of interest from animal welfare organizations interested in assisting with the humane removal of the cats for a six-month period. An approved organization would then be

permitted to trap and remove cats and transfer those cats suitable for adoption to adoptive or foster homes, animal shelters, or animal welfare organizations and would use its best professional judgment to determine the appropriate outcome for unsocialized or unhealthy cats, including euthanasia. To the extent this process was making progress, the Plan authorized the NPS to consider a six-month extension. Second, the NPS would monitor and assess the Site for a growing population of cats. Third, if monitoring indicated a sustained presence of cats, the NPS would engage the animal welfare organization or an animal removal "agency" to conduct further removal efforts. If no legitimate animal welfare organization applied, the NPS would enter into an agreement with the animal removal agency to manage the humane removal of the cats. Cats suitable for adoption will be relocated as appropriate, but this will be dependent on the availability of new homes or facilities, and those cats that are unadoptable (due to lack of space or health or behavioral concerns) will be euthanized.

In the end, however, the first phase of the Plan was not to be. Because the NPS did not receive a statement of interest from any animal welfare organization, it proceeded to the last phase of the Plan and contracted with the Animal and Plant Health Inspection Service ("APHIS") of the U.S. Department of Agriculture to serve as the designated removal agency. The NPS has represented that the APHIS will not commence the removal of any cats from the Site until after May 15, 2026, but that it reserves the right to begin removing the cats after that.

Plaintiffs are two animal welfare organizations, Alley Cat Allies Incorporated ("ACA") and Save-A-Gato Inc. ("SAG"). SAG has worked with the NPS since 2005 to administer a predecessor program, known as the Trap-Neuter-Return ("TNR") program, which was intended to reduce the free-ranging cat population along the Paseo through sterilization and natural attrition. ACA, in turn, worked with SAG to support the TNR program. Under that program,

2

SAG attracted the cats to "feeding stations" placed on the Paseo and then "live trapped, . . . spayed or neutered, [and] vaccinated" them before they were "either put up for adoption . . . or released to the location where they were trapped." *Alley Cat Allies, Inc. v. United States Nat'l Park Serv.*, No. 25-cv-4269, 2026 WL 221343, at *1 (D.D.C. Jan. 28, 2026). When SAG began administering the TNR program in 2005, the cat population at the Site was about 120. Although the population saw an initial dip in the early years of the program, the NPS estimates that the population has since risen to about 200 cats.

Plaintiffs now challenge the 2023 Plan, which would replace the TNR program, along with the Plan's related assessments and findings, under the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"). *See generally* Dkt. 54 (Am. Compl.). Because the free-ranging cat population is concentrated along the Paseo, where the feeding stations are currently located, the Plan focuses on the Paseo, although it applies more broadly to the entire Site. J.A. 855.[1] Like the Plan itself, Plaintiffs' challenge focuses on the Paseo. First and foremost, Plaintiffs allege that the NPS exceeded its statutory authority in adopting the Plan because, on their telling, the Paseo lies outside the Site's boundaries, and the National Trails System Act thus precludes the NPS from regulating the area without first consulting with Puerto Rico, San Juan, and other Puerto Rican state entities. Plaintiffs also allege that the NPS violated NEPA by failing to prepare an Environmental Impact Statement ("EIS") and by preparing an inadequate Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI").

---

[1] The Court notes that the parties significantly consolidated the Administrative Record ("A.R.") in submitting a Joint Appendix ("J.A."), and most of the voluminous Administrative Record is not in the Joint Appendix, although the Joint Appendix does not contain any materials that are not in the Administrative Record. For ease of reference and navigation, the Court will cite to the Joint Appendix throughout this opinion. Where relevant, however, the Court will cite to studies contained in the Administrative Record using "A.R." cites.

Finally, Plaintiffs allege that the NPS violated the APA when it failed to explain its change in policy regarding the TNR program, to address Plaintiffs' corresponding reliance interests, or adequately to respond to public comments regarding the 2023 Plan's efficacy, the Paseo cats' cultural value, or the Plan's compliance with Puerto Rican laws.

For the reasons explained below, the Court concludes that the NPS did not exceed its statutory authority in managing the Paseo and that it complied with the requirements of NEPA and the APA when it adopted the Plan. The Court, accordingly, will **DENY** Plaintiffs' motion for summary judgment and will **GRANT** Defendants' cross-motion for summary judgment.

## I. BACKGROUND

### A.      Statutory and Regulatory Background

1.      *The National Environmental Policy Act*

NEPA requires federal agencies to take a "hard look" at environmental consequences before carrying out federal actions. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373–74 (1989). The statute accomplishes this by imposing procedural requirements that serve "twin aims." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). "First, [NEPA] 'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.' Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision[-]making process." *Id.* (citation omitted) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)). "Where NEPA analysis is required, its role is primarily information-forcing. . . . NEPA is not a suitable vehicle for airing grievances about the substantive policies adopted by an agency, as NEPA was not intended to resolve fundamental policy disputes." *Mayo v. Reynolds*, 875 F.3d 11, 15–16 (D.C. Cir. 2017) (citation modified).

NEPA imposes different procedural requirements depending on whether an action is expected to have "significant" effects. For a "major Federal action[] significantly affecting the quality of the human environment," NEPA requires the lead agency to prepare an EIS, which is "a detailed statement" that describes the project's environmental impacts and that considers "a reasonable range of alternatives." 42 U.S.C. § 4332(C)(iii). To determine whether a proposed action will significantly affect the environment, thus requiring preparation of an EIS, agencies must prepare an EA, which is a "concise public document" that considers the proposed action's environmental impacts as well as alternatives to the proposed action. 40 C.F.R. §§ 1508.1(h), 1501.3(a)(2), 1501.5 (2023).[2] When an EIS is not required, the agency must prepare a "finding of no significant impact," *id.* §§ 1508.1(l), 1501.6(a) (2023), which "includes or summarizes the EA and briefly explains why the agency believes the action will not have a significant effect on the environment." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015). "Each form of NEPA analysis—EA/FONSI or EIS—requires public notice and comment, and each is subject to judicial review." *Id.* (citations omitted).

The Court reviews NEPA challenges under the APA, so its role is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and

---

[2] Although the Council on Environmental Quality ("CEQ") recently issued a final rule rescinding its regulations implementing NEPA, that rule did not take effect until January 8, 2026, and was premised on Executive Order 14154, which was issued on January 29, 2025. Removal of National Environmental Policy Act Implementing Regulations, 91 Fed. Reg. 618, 618–19 (Jan. 8, 2026). Because the agency action at issue here occurred in 2023, *see, e.g.*, J.A. 1089; because CEQ itself instructed agencies to "continue to rely on the version of CEQ's regulations that was in effect at the time that the agency action . . . was completed," Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10610, 10614 (Feb. 25, 2025); and because neither party has so much as mentions the recission, much less argues that it should alter the Court's analysis, the Court will apply the then-existing CEQ regulations for purposes of resolving the pending motion. But, in any event, the CEQ regulations are not dispositive.

that its decision is not arbitrary or capricious." *Sierra Club v. FERC*, 867 F.3d 1357, 1367–68 (D.C. Cir. 2017) (citation modified).  The Court must assess whether the "deficiencies are significant enough to undermine informed public comment and informed decision[-]making," but "should not flyspeck an agency's environmental analysis, looking for any deficiency no matter how minor." *Id.* at 1368 (second citation modified).

The Supreme Court recently "reiterate[d] and clarif[ied] [that] . . . the central principle of judicial review in NEPA cases is deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 179 (2025).  As the Court instructed, "when assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting [EA].  Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 182–83.  And "[e]ven if an [EA] falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the [EA]." *Id.* at 185.  The D.C. Circuit has acknowledged the "recent 'course correction' directed by the Supreme Court in *Seven County*." *Sierra Club v. FERC*, 153 F.4th 1295, 1305 (D.C. Cir. 2025) (citation omitted) (quoting *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 184).

> 2.  *The National Park Service*

The existence and role of the NPS dates back to the enactment of the National Park Service Organic Act of 1916 ("NPS Organic Act"), *see* Act of August 25, 1916, Pub. L. No. 64-235, 39 Stat. 535; *see also* 16 U.S.C. § 1 *et seq.*, President Roosevelt's transfer of the authority to administer additional parks and national monuments, including domestic parks under the extant

authority of the then-denominated War Department, in 1933, *see* Exec. Order No. 6166 (June 10, 1933), https://perma.cc/85MG-M6G5, and the enactment of the Historic Sites, Buildings, and Antiquities Act in 1935 ("Historic Sites Act"), *see* Act of August 21, 1935, ch. 593, 49 Stat. 666; *see also* 16 U.S.C. § 461 *et seq.* More recently, however, Congress consolidated and codified the NPS's various duties and authorities in the National Park Service and Related Programs Act of 2014 ("National Park Service Act"). *See* Pub. L. No. 113-287, 128 Stat. 3094 (2014); *see also* 54 U.S.C. § 100101 *et seq.* (recodifying the NPS Organic Act); 54 U.S.C. § 320101 *et seq.* (recodifying the Historic Sites Act). Although the relevant statutory provisions have been reenacted in the National Park Service Act, the parties at times invoke their historical pedigree and refer to what was once the NPS Organic Act and what was once the Historic Sites Act. For simplicity, the Court will follow their lead with respect to this nomenclature but will cite to the corresponding provisions of the extant code.

Under the NPS Organic Act, the Secretary of the Interior, "acting through the Director of the [NPS]," is charged with "promot[ing] and regulat[ing] the use of the National Park System by means and measures that conform to the fundamental purpose of the System." 54 U.S.C. § 100101(a). That purpose is "to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." *Id.* The National Park System, in turn, consists of "any area of land and water administered by the Secretary, acting through the Director, for park, monument, historic, parkway, recreational, or other purposes." *Id.* § 100501. Each such area is referred to as a "unit" of the National Park System. *Id.* § 100102(6). Under the Historic Sites Act, the Secretary of the Interior, "acting through the Director" of the NPS, is also charged with administering and

7

managing national historic sites, *see id.* § 320102, including the San Juan National Historic Site, *see* Nat'l Park Serv., *National Park System: National Historic Sites*, https://perma.cc/5HUK-WVYF.  These national historic sites are also treated as "units" of the National Park System.  *Id.*

Under the NPS Organic Act, the Secretary of the Interior is required to "prescribe such regulations as [he] considers necessary or proper for the use and management of System units." *Id.* § 100751(a).  Similarly, under the Historic Sites Act, the Secretary is required to "perform any and all acts and [to] make regulations not inconsistent with this chapter that may be necessary and proper to carry out this chapter," 54 U.S.C. § 320102(l), and is authorized to "contract and make cooperative agreements with States, municipal subdivisions, corporations, associations, or individuals, with proper bond where considered advisable, to protect, preserve, maintain, or operate any historic or archeologic building, site, or object, or property used in connection with the building, site, or object, for public use, regardless whether the title to the building, site, object, or property is in the United States," *id.* § 320102(f); *see also id.* § 320103(a) ("The Secretary may cooperate with and may seek and accept the assistance of any Federal, State, or local agency, educational or scientific institution, patriotic association, or individual.").

"Because the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion on how to implement his statutory mandate." *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000) (Appendix, Friedman, J.).  To that end, the Department of the Interior has promulgated regulations governing the national parks.  36 C.F.R. § 1.1 *et seq.* These regulations define the "boundary" of a national park unit to include "the limits of lands or waters administered by the [NPS] as . . . published or posted by the [NPS]."  *Id*. § 1.4(a).  The NPS has also issued Management Policies ("2006 Management Policies"), which constitute the

8

NPS's "official guide to managing national parks." Nat'l Park Serv., 2006 Management Policies (U.S. Government Official Edition Notice), https://perma.cc/66NW-85YH. The NPS's Management Policies "are intended only to improve the internal management of the" NPS, but "they are not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person." *Id.* at 14 (Compliance, Accountability, and Enforceability). They offer, in short, "nonbinding" guidance, which "inform[s] Park Service managers and staff," and are not "judicially enforceable at the behest of members of the public who question the agency's management." *Wilderness Soc'y v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) (pertaining to 2001 Management Policies).

   3.   *National Trails System*

In 1968, Congress enacted the National Trails System Act to "institut[e] a national system of recreation and scenic trails " and to "prescrib[e] the methods by which, and standards according to which, additional components may be added to the [National Trails] system." National Trails System Act, Pub. L. No. 90–543, 82 Stat. 919, 919 (1968). The Secretary of the Interior (along with the Secretary of Agriculture) has significant responsibilities in administering and managing the National Trails System. *See* 16 U.S.C. §§ 1241–51. "The system includes four types of trails: (1) national scenic trails . . . , which display significant physical characteristics of U.S. regions; (2) national historic trails . . . , which follow travel routes of national historical significance; (3) national recreation trails . . . , which provide outdoor recreation accessible to urban areas; and (4) connecting or side trails, which provide access to the other types of trails." Mark K. DeSantis, Cong. Rsch. Serv., R43868, *The National Trails System: A Brief Overview* 2 (2023); *see* 16 U.S.C. § 1242(a). Although "only . . . Congress" can "authorize[] and designate[]" "[n]ational scenic and national historic trails," 16 U.S.C. § 1244(a),

9

"[t]he Secretary of the Interior, or the Secretary of Agriculture where lands administered by him are involved, may establish and designate national recreation trails, with the consent of the Federal agency, State, or political subdivision having jurisdiction over the lands involved, upon finding that . . . (i) such trails are reasonably accessible to urban areas, and, or (ii) such trails meet the criteria established in this chapter and such supplementary criteria as he may prescribe," *id.* § 1243(a). The Secretary of the Interior has delegated the Department's responsibility for administering recreation trails to the NPS. DeSantis, *The National Trails System* at 9.

As with the National Park System, the Secretary—and the NPS by delegation—has broad authority over national recreation trails. The National Trails System Act provides in relevant part:

> The Secretary charged with the administration of a national recreation . . . trail shall [1] provide for the development and maintenance of such trails *within federally administered areas* and [2] shall cooperate with and encourage the States to operate, develop, and maintain portions of such trails which are *located outside the boundaries of federally administered areas*. When deemed to be in the public interest, such Secretary may enter written cooperative agreements with the States or their political subdivisions, landowners, private organizations, or individuals to operate, develop, and maintain any portion of such a trail either within or outside a federally administered area. . . . The appropriate Secretary shall also initiate consultations with affected States and their political subdivisions to encourage—
>
> > (A)    the development and implementation by such entities of appropriate measures to protect private landowners from trespass resulting from trail use and from unreasonable personal liability and property damage caused by trail use, and
> >
> > (B)    the development and implementation by such entities of provisions for land practices, compatible with the purposes of this chapter,
>
> for property within or adjacent to trail rights-of-way. After consulting with States and their political subdivisions under the preceding sentence, the Secretary may provide assistance to such entities under appropriate cooperative agreements in the manner provided by this subsection.

16 U.S.C. § 1246(h)(1) (emphases added).

10

The Secretary is authorized to issue regulations "governing the use, protection, management, development, and administration of trails of the national trails system" and "may also utilize authorities related to units of the national park system or the national forest system, as the case may be, in carrying out his administrative responsibilities for such component."[3]  *Id.* § 1246(i).  "Although the Secretar[y] of [the Interior] ha[s] authority to promulgate National Trails System and trail-specific regulations, few such regulations have been developed."  Nat'l Park Serv., Reference Manual 45: National Trails System § 7.2 (2019), https://perma.cc/9JGA-CCNY ("Reference Manual 45").  Trail administration and management is largely the product of internal guidance documents.  *See* 2006 Management Policies; Reference Manual 45; Nat'l Park Serv., Director's Order No. 45: National Trails System (2013), https://perma.cc/9H45-6FU7 ("Order No. 45").

"Several components of the National Trails System [that] are administered by the Service[] have been designated as units of the national park system" and are "therefore managed as national park areas."  2006 Management Policies § 9.2.2.7 (National Trails).  The NPS's website lists six scenic trails as "units" of the Park System.  *See* Nat'l Park Serv., *National Park System: National Scenic Trails*, https://perma.cc/5HUK-WVYF.  The remaining trails, including

---

[3] Before promulgating regulations under 16 U.S.C. § 1246(i), the Secretary is required to obtain "the concurrence of the heads of any other Federal agencies administering lands through which a national recreation . . . trail passes" and to consult "with the States, local governments, and organizations concerned."  *Id.* § 1246(i).  It is unclear whether this obligation to consult with States, local governments, and organizations applies to trails located within federally administered areas, under what circumstances a State, local government, or organization is "concerned" for purposes of the consultation requirement, and whether the consultation requirement applies to agency action that does not involve prescriptive rules.  Because Plaintiffs do not invoke 16 U.S.C. § 1246(i) in support of their contention that the NPS failed to "consult" with the governments of Puerto Rico and San Juan, and because none of the parties have raised or briefed whether or how Section 1246(i) applies in this context, the Court need not (and ought not) reach these questions.

11

all recreation trails, administered by the NPS "are in or adjacent to park units" and are "not [considered] units of the national park system." 2006 Management Policies § 9.2.2.7 (National Trails); *see United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 613–19 (2020) (concluding that trails administered by the NPS but within the federal jurisdiction of another federal agency do not become part of the National Park System or a system "unit").  The NPS's regulations, Chapter I of Title 36, parts 1–5, however, do "apply to trail corridors where the lands and waters underlying such corridors are[] [f]ederally owned and administered by the NPS[] or . . . [i]n State or local ownership, or privately owned, and administered by the NPS for trail purposes pursuant to an agreement with the landowner, to the extent that such regulations are consistent with the agreement."  Order No. 45 § 3.12 (Regulations).

    4.    *Wildlife Management*

The National Park Service Act, two Executive Orders, and the NPS regulations address the NPS's treatment of "exotic" or non-native, non-endangered wildlife in the Park System.

Under the National Park Service Act, "[t]he Secretary may provide for the destruction of such animals and plant life as may be detrimental to the use of any System unit."  54 U.S.C. § 100752; *see Davis*, 202 F.3d at 365.  Executive Order 13112 and Executive Order 13751 (which amended Executive Order 13112), in turn, impose affirmative obligations on federal agencies with respect to "invasive species."  Exec. Order No. 13112, 64 Fed. Reg. 6183 (1999); Exec. Order No. 13751, 81 Fed. Reg. 88609 (2016).  An "'[i]nvasive species'" is "a non-native organism whose introduction causes or is likely to cause economic or environmental harm, or harm to human, animal, or plant health" "with regard to a particular ecosystem."  Exec. Order No. 13751, 81 Fed. Reg. at 88610.  Executive Order 13112 directs federal agencies, to "the extent practicable and permitted by law" to "use relevant programs and authorities" to "respond rapidly to and control populations of such species in a cost-effective and environmentally sound

manner." Exec. Order No. 13112, 64 Fed. Reg. at 6184. Executive Order 13751 amends the prior Executive Order but maintains a policy of "prevent[ing] the introduction, establishment, and spread of invasive species" and "eradicat[ing] and control[ling] populations of invasive species that are established." Exec. Order No. 13751, 81 Fed. Reg. at 88609–10. The more recent Executive Order also directs federal agencies that take "actions [that] may affect the introduction, establishment, or spread of invasive species" to "prevent the . . . spread of invasive species" and to "detect and respond rapidly to eradicate or control populations of invasive species in a manner that is cost-effective and [that] minimizes human, animal, plant, and environmental health risks." *Id.* at 88610.

Although the NPS regulations do not expressly address invasive or exotic species, they prohibit the introduction of "wildlife . . . into a park area ecosystem" and the "feeding, touching, teasing, frightening or intentional disturbing of wildlife nesting, breeding or other activities." 36 C.F.R. §§ 2.1(a)(2), 2.2(a)(2). The NPS's 2006 Management Policies provide further guidance on NPS's "exotic species" management. They define "exotic species" as "those species that occupy or could occupy park lands directly or indirectly as the result of deliberate or accidental human activities. Exotic species are also commonly referred to as nonnative, alien, or invasive species." 2006 Management Policies § 4.4.1.3 (Definition of Native and Exotic Species). "All exotic plant and animal species that are not maintained to meet an identified park purpose will be managed—up to and including eradication—if (1) control is prudent and feasible" and if, among other things "(2) the exotic species . . . interferes with natural processes and the perpetuation of natural features, native species or natural habitats, or disrupts the genetic integrity of native species, or disrupts the accurate presentation of a cultural landscape, or damages cultural

resources, or significantly hampers the management of park or adjacent lands."  2006

Management Policies § 4.4.4.2 (Removal of Exotic Species Already Present).

**B.      Factual and Procedural Background**

1.      *Paseo Del Morro*

The Paseo is a .75-mile national recreation trail between the San Juan Bay and the

western fortification walls of the Site and which runs from the San Juan Gate to the northern

front of the Castillo San Felipe del Morro.  J.A. 1090 (2023 FONSI).  The following Google

Maps screenshot of the Paseo and the Site reflects the general layout of the area and shows the

Paseo running along the western shore from Old San Juan to the northern tip of the peninsula.

*See United States v. Burroughs*, 810 F.3d 833, 835 n.1 (D.C. Cir. 2016) (taking judicial notice of

a Google Map because it is a "source[] whose accuracy cannot reasonably be questioned, at least

for the purpose of identifying . . . the general layout of the block." (citation modified)).

14



The Paseo emerged from a series of maintenance-related pathways developed on the shoreline. "At the turn of the 20th century, the waters of the San Juan Bay interacted directly with the southern fortification wall." *Alley Cat Allies*, 2026 WL 221343, at *2; *see also* J.A. 1111–12. In 1977, the NPS placed "rip-rap"—that is, "rock or other hard, heavy, unconsolidated material used to protect shoreline structures against scour and water, wave, or ice erosion"[4]—in

---

[4] Riprap,
https://en.wikipedia.org/wiki/Riprap#:~:text=Common%20rock%20types%20used%20include%20granite%20and,structures%20called%20tetrapods%20or%20similar%20concrete%20blocks (Dec. 26, 2025, 7:20 AM) [https://perma.cc/JA34-YESM].

front of the Santa Elena Bastion and created a "Jeep Trail" along the western wall between the

San Juan Gate and the Santa Elena Bastion as a maintenance access road.  J.A. 314.  "In the early

1990s, NPS continued to place rip-rap below the walls to expand access."  Dkt. 70-1 at 16 (citing

J.A. 854, 1111–12).  Then, in 1995, the NPS constructed a maintenance dirt path, and, in 1999,

the path was paved "with funds from the Puerto Rico Tourism Company," a public corporation

of the Commonwealth of Puerto Rico, pursuant to "a cooperative agreement between the agency

and the [NPS]."  J.A. 854.  Finally, in 2001, the NPS designated the Paseo as a national

recreation trail.  J.A. 854.

2.    *San Juan National Historic Site*

Although the Paseo is of relatively recent vintage, the setting is not.  In the early sixteenth

century, the Spanish built many of the fortifications in San Juan.  J.A. 121.  At the end of the

Spanish-American War, Spain ceded the Island of Puerto Rico, which was then under Spanish

sovereignty, to the United States under the Treaty of Paris.  *Treaty of Peace*, Kingdom of Spain-

U.S., art. II, Dec. 10, 1898, 30 Stat. 1754.  In implementing the Treaty of Paris, Congress

subsequently authorized the President to make . . . such reservation of public lands and buildings

belonging to the United States in the island of P[ue]rto Rico, for military, naval, light-house,

marine-hospital, post-offices, custom-houses, United States courts, and other public purposes, as

he may deem necessary."  Act of July 1, 1902, ch. 1383, 32 Stat. 731, 731 ("Act of 1902").  The

Act of 1902 further provided that "all the public lands and buildings, not including harbor areas

and navigable streams and bodies of water and the submerged lands underlying the same, owned

by the United States in said island and not so reserved be, and the same are hereby, granted to the

government of P[ue]rto Rico."  *Id.*; *see also* 48 U.S.C. § 746.

Pursuant to the Act of 1902, President Theodore Roosevelt reserved various public lands

within Puerto Rico on June 30, 1903.  As relevant here, he reserved the land from

16

> the most northerly corner of the San Antonio Bastion near the westerly end of the cemetery; thence N. 34* E. 100 feet *to the sea*; thence westerly and southerly *along the sea* and San Juan Bay passing Morro Castle, Santa Elena Battery, San Augustine Battery to an angle in the scarf wall which is about 100 feet northerly from the western gate of the City of San Juan.

Dkt. 70-3 at 4 (General Order No. 97 at 3 (1903)) (emphasis added).  In 1943, the Department of the Army ("Army") officially designated this reserved land and the fortifications as "Fort Brooke," which "became [an] integral part[] of the U.S. military post in the Caribbean" during World War II.  J.A. 266.  After the war, then-Secretary of the Interior J.A. Krug issued a Secretarial Order designating the fortresses, fortification walls, and other areas as the San Juan National Historic Site pursuant to the Historic Sites Act.  J.A. 306 (Designation of San Juan National Historic Site, Puerto Rico, 49 Fed. Reg. 1402 (Feb. 24, 1949)).[5]  Because the land was still under the jurisdiction of the Army, however, "a cooperative agreement [was] made between the Secretary of the Interior and the Secretary of the Army providing for the preservation of the ancient fortifications of San Juan and their designation as a national historic site."  J.A. 306 (Designation of San Juan National Historic Site, Puerto Rico, 49 Fed. Reg. 1402 (Feb. 24, 1949)).

The 1960s brought additional changes to the Site.  First, in 1966, the Army declared "5.84 acres of land . . . comprising a portion of the Fort Brooke Military Reservation" and "described in Exhibits A and B" "as excess to the needs of . . . the Army."  Dkt. 70-4 at 2.  Then, in 1968, the General Services Administration ("GSA"), transferred that excess property to the NPS pursuant to the Federal Property and Administrative Services Act of 1949, and the

---

[5] Although the Secretary of the Interior was authorized to designate historic sites at the time, 16 U.S.C. § 461 *et seq.*, "this authority was limited in 1992 by an amendment to the Historic Sites Act stipulating that Congress must authorize the appropriation of any funds used to carry out secretarial designations (P.L. 102-575).  Since then, only Congress has established national historic sites."  Mark K. DeSantis, Cong. Rsch. Serv., R45800, *The Federal Role in Historic Preservation: An Overview* 20 n.c (2024).

transferred property was to "become part of the San Juan National Historic Site." *Id.* at 2–3.

The transferred property is "described in Exhibits A and B" to the GSA's letter. *Id.* at 2. As

relevant here, "Exhibit B" describes the transferred land as extending from "the shoreline of San

Juan Bay located . . . 92.00 feet from Point No. 27 . . . , thence with the meanders of the

shoreline of San Juan Harbor . . . to the point on the shoreline of the San Juan Harbor at the

intersection of the prolongation of the fortress fortification wall." *Id.* at 4. "Exhibit A" is a map

reflecting the 1968 transfer, and it also shows the transferred land following the shoreline of San

Juan Bay on the westside of the Site. *Id.* at 6. As shown below, the transferred land (shown in

diagonal hatching) abuts and follows the bay on the westside of the Site:



*Id.*

In 1976, Acting Secretary of the Interior Kent Frizzell issued Secretarial Order 2994, redesignating the Site pursuant to the Historic Sites Act.  41 Fed. Reg. 51669 (1976) ("Redesignation Order").  The Redesignation Order designates "the fortresses of El Morro and San Cristobal, . . . and all adjacent land described in 'Exhibit A,' and shown in the diagram marked 'Exhibit B' annexed hereto and made a part thereof, to be a National Historic Site, having the name 'San Juan National Historic Site.'"  *Id.* at 51670 (footnote omitted).  Exhibit B shows the "Historic Site Boundary," which once again follows the shoreline along the Bay of San Juan.  Dkt. 70-7 at 6.

In 1984, the NPS created a "Boundary Establishment Drawing" of the Site.  Dkt. 70-9 at 2.  That drawing once again uses diagonal hatching to show the "area property of the National Park Service" as the entire area up to a line identified as the "approximate shore line."  *Id.* at 3.  The Court includes both the full map and an enlarged screenshot, which shows the southern starting point of the Paseo and the reference to the "shore line."





21



*Id.*

The Site is the only national park unit in Puerto Rico.  J.A. 854.  In 1985, pursuant to 54 U.S.C. § 100502, the NPS issued its Final General Management Plan for the Site, J.A. 9–144, which "provide[s] for the preservation and maintenance of cultural resources and for the expansion of the interpretive program, while allowing passive recreational activities in appropriate areas," J.A. 21.

3.      *The NPS's Cat Management Efforts*

A population of free-ranging cats began living along the Paseo shortly after its construction.  J.A. 1111.  "Free-ranging cats are those that spend time outside with the ability to roam freely and may or may not have an owner."  J.A. 854.  In 2001, the same year that the Secretary designated the Paseo as a national recreation trail, the Site and the APHIS entered into a cooperative agreement "to establish a general framework for cooperation and participation between the agencies in all aspects of wildlife damage management to protect human health and

safety and [NPS] property."  J.A. 146.  The NPS agreed to pay the APHIS $13,000, J.A. 147, and

to provide "access to portions of the . . . Site," J.A. 146, for the APHIS to assess the cat

population and to trap and to remove the cats, including by using traps, hand-capture, catch-

poles, and air rifles, J.A. 150.  *See* J.A. 146–51, 160.  The aim was "to maintain a cat-

free . . . environment."  J.A. 151.

In 2003, the APHIS, in cooperation with the NPS and the City of San Juan, completed an

EA and issued a FONSI on a range of alternative wildlife management programs, which included

lethal and nonlethal methods of controlling the free-ranging cat population in Puerto Rico.  J.A.

173–249, 858.  Then, in 2004, the NPS and the APHIS "began discussions regarding a free-

ranging cat management program at the park," and the Puerto Rico Tourism Company agreed to

cover "most of the cost" of removing the cats from the Site.  J.A. 858; *see also* J.A. 166–72

(addendum to the Site's cooperative agreement with the APHIS to continue population

assessment, trap, and removal efforts).  Due to public concerns, however, the NPS did not move

forward with these removal efforts.  J.A. 858.

Instead, a group of community animal welfare organizations, including Plaintiff SAG,

"developed a plan to work together to implement a [TNR] program for the management of free-

ranging cats at the Paseo."  J.A. 858; *see* J.A. 1356–406.  TNR is a method of feral cat

management that aims to stabilize and reduce cat populations.  J.A. 858.  "Through TNR,

community cats are humanely trapped, spayed or neutered, vaccinated, eartipped for

identification, and returned to" the outdoors.  J.A. 1130.  Kittens and socialized cats are removed

and made available for adoption, while sterilization of the remaining population prevents further

reproduction and causes population decline.  J.A. 858.  "TNR programs often involve the

23

development of feeding stations because feeding the cats can help volunteers trap the cats and monitor the population." J.A. 858.

In 2005, the NPS and SAG entered a Memorandum of Understanding ("MOU") to implement a TNR program along the Paseo. J.A. 250–52. At the time, the "population count of feral cats along the Paseo [was] one hundred twenty (120) cats," and that number was used as the baseline for the parties' agreement. J.A. 251. The NPS agreed to "purchase six traps and two pair[s] of gloves in support of [SAG's] on-going trapping activities." J.A. 251. SAG was allowed to maintain five feeding stations along the Paseo, and it agreed to remove 12 cats from the Paseo in the first year, "immediately" to remove and tag cats that had not yet been tagged, to conduct quarterly population surveys, and to submit written reports to the NPS. J.A. 251–52. The NPS, in turn, agreed to "allow unlimited access to members of [SAG] for activities related to feeding, trapping, and population surveys." J.A. 251.

By 2008, the free-ranging cat population count in the Paseo had declined to 95. J.A. 253. That year, the NPS and SAG entered into a second MOU to continue "[t]he reduction of the feral cat population in the Paseo [which] has been and will be attained by natural attrition." J.A. 253. SAG agreed "not [to] introduce new feral cats in the Paseo," to continue to conduct quarterly population surveys and submit written reports, and to remove untagged cats along the Paseo. J.A. 253. The NPS, in turn, agreed to continue to allow "unlimited access to members of [SAG] for activities related to feeding and trapping cats, and for population surveys" and to "continue to support [SAG] with cages and/or other equipment to facilitate the program." J.A. 253. SAG was permitted to increase the number of feeding stations to eight. J.A. 253. "At the request of the [NPS], SAG has since removed feeding station #8 at the western-most point of the Paseo, leaving seven feeding stations currently." J.A. 858–59.

Pursuant to these agreements and with the assistance of ACA, SAG has managed the TNR program in the Paseo since 2005. Dkt. 69-1 at 16. In addition to their trapping, neutering, and adoption efforts, SAG and ACA have provided vaccinations and veterinary care for the free-ranging cats in the Paseo. *Id.* at 15.

4.      *2023 EA/Free-Ranging Cat Management Plan*

"After many years of TNR efforts along the Paseo," the "NPS determined that TNR efforts had proven ineffective at achieving the intended goal of reducing the cat population to zero." Dkt. 70-1 at 18. Specifically, in the summer of 2021, the NPS conducted a camera trap survey in the Paseo, which revealed "nearly 200 individual cats," including several unneutered male cats, kittens, and pregnant or recently pregnant cats. J.A. 859. Because "the [cat] population is not decreasing," J.A. 859, in October 2022, the NPS began a public scoping process to develop a cat management plan for the Site, J.A. 896. On November 2 and 3, 2022, the NPS held two public meetings at the Site, including a hearing-style meeting where participants could offer public remarks in addition to submitting written remarks. J.A. 896. Under the original proposal presented to the public during the scoping process—what eventually became Alternative 2 in the 2023 Plan/FONSI, J.A. 865—the NPS proposed to "enter into an agreement with a removal agency for the management of free-ranging cats in the park" through a "phased" approach, J.A. 867. First, the removal agency would use a variety of removal strategies like live trapping, denning, and exclusion devices to "humanely remove the free-ranging cats from the park;" it would "assess the health and adoptability of the cats;" it would then make suitable cats available for adoption or would relocate them, depending on availability and space in shelters and other animal welfare facilities, and it would "humanely euthanize[]" the remaining cats. J.A. 866–67. Second, after the completion of trapping and removal in a particular area, feeding stations would be "removed in that area to concentrate the remaining cats

25

for trapping and removal," thereby gradually eliminating the feeding stations.  J.A. 868.  Finally, the NPS would monitor the Site for "the presence, absence, and trends of any remaining cats within the park" and would institute "additional removal efforts" by the removal agency, as necessary.  J.A. 868.

The NPS invited written comments through its initial scoping process until December 12, 2022.  J.A. 896.  It received 2,511 comments from across and outside the United States.  J.A. 896.  In light of concerns expressed "about the fate of the cats" under the original proposed action, J.A. 865, the NPS developed Alternative 3, which ultimately became the revised, proposed action and the NPS's preferred alternative, J.A. 865–66; *see also* J.A. 896.

Under Alternative 3, the NPS "would publish a request for letters of interest from any animal welfare organization interested in working with the park to perform cat removal."  J.A. 868.  The selected animal welfare organization would then trap and remove the cats using the existing feeding stations for a six-month period.  J.A. 868.  Each month within the six-month period, a feeding station would be removed until no more feeding stations remain.  J.A. 868.  Suitable cats would be placed for adoption or in animal welfare facilities with space.  J.A. 869.  The animal welfare organization would use its "best professional judgment" to "determine the appropriate outcome for unsocialized, under-socialized, or unhealthy cats," and all relocation or euthanizing activities would comply with Puerto Rican animal welfare and invasive species laws.  J.A. 868–69.

Alternative 3 also permitted the NPS to extend the animal welfare organization removal process for an additional six months, if it concluded that the participating organization was "making substantial progress with removing the cats from the park."  J.A. 869.  If, on the other hand, no animal welfare organization responded to the NPS's request for letters of interest, J.A.

868, or if the participating animal welfare organization failed to meet deadlines or to demonstrate progress, J.A. 869, the NPS would proceed to the last phase of Alternative 3, which requires employing a removal agency to remove the cats from the Site in accordance with Alternative 2. J.A. 868–69.  Thereafter, the NPS would continue to monitor the Site for the presence of free-ranging cats and would undertake additional removal efforts as needed.  J.A. 869.

On August 4, 2023, the NPS issued its 2023 EA/Plan.  J.A. 849–50.  The stated purpose for the plan is to:

> address free-ranging cat populations within San Juan National Historic Site to [1] improve the safety of its visitors and employees, [2] protect park resources and reduce impacts to native wildlife species associated with free-ranging cats, [3] alleviate nuisance issues, [4] align the visitor experience with the purpose of the park, and [5] bring the park into compliance with existing authorities for invasive species.

J.A. 854.  The 2023 EA analyzed Alternatives 2 and 3, discussed above, and it also considered—and rejected—a no-action alternative, which would have permitted SAG to continue its TNR efforts and would have left the feeding stations in place (Alternative 1).  J.A. 864–69.  The NPS concluded that it "is unable to select [that] alternative . . . because it [would] violate[] NPS regulations and policies related to invasive species, wildlife, and feeding animals within the park."  J.A. 865.  Specifically, the NPS noted that the cats are an invasive species, J.A. 854, and it concluded that "TNR is most effective in a closed system" and with "exceptionally high" sterilization rates, J.A. 870.  "In a population that is not isolated, such as the one at the park, TNR is not effective," since "[n]ew cats come into the colony from other populations and from being abandoned by owners."  J.A. 870.  In light of the increase in the Paseo cat population, the NPS concluded that "[t]he TNR program on its own is unable to bring the park into compliance with existing authorities for invasive species, wildlife, and feeding animals within the park."  J.A. 870.  The NPS also considered a range of other possible approaches in the EA, but it

27

rejected each for a variety of reasons, including ineffectiveness, cruelty, ecological harm, lack of authority, and potential harm to the historic structure, the public, pets, or other wildlife.  J.A. 869–73.

The NPS solicited public feedback and written comments on the EA until October 5, 2023, J.A. 849–50, 845, 847–48, 1090–91, and it held a public meeting on August 23, 2023 in San Juan, which Defendant Myrna Palfrey, the Site's Superintendent, and one of two officials who signed the FONSI, attended, and at which the NPS gave a presentation on the 2023 Plan, listened to public comments, and answered questions, Dkt. 70-1 at 19–20; *see* J.A. 931–1053. The NPS also translated the EA into Spanish and published that version.  J.A. 1090.

On November 21, 2023, the NPS issued its FONSI, which selected Alternative 3.  J.A. 1089–125.  The FONSI "made no substantive changes" to the 2023 Plan, J.A. 1094, and it concluded that the selected action would result "in both beneficial and adverse impacts" on the visitor experience, wildlife and wildlife habitat, and public health and safety, thus obviating the need to complete an EIS, J.A. 1095–98.  The NPS also summarized and provided responses to substantive comments received during the EA comment period.  J.A. 1099–119.

"On August 21, 2024, NPS issued a solicitation for letters from animal welfare organizations interested in working with NPS to implement Alternative 3 of the 2023 Plan." *Alley Cat Allies*, 2026 WL 221343, at *4.  Although the "NPS held the request open for thirty days," it "did not receive any statements of interest."  *Id.*  Plaintiff SAG informed the NPS that it would not be applying for consideration.  *Id.*; *see also* Dkt. 75 at 27 n.11.  At oral argument, counsel for Defendants indicated that the NPS has entered into a contract with the APHIS to proceed with removal activities described in the EA and FONSI and that the APHIS was

prepared to implement the last phase of Alternative 3—that is, agency removal of the cats—after May 15, 2026.  *See* Apr. 30, 2026 Hrg. Tr. (Rough at 50).

     5.       *Procedural History*

In March 2024, Plaintiff ACA filed the first action in these consolidated cases, naming the NPS, the Director of the NPS, the Secretary of the Interior, the Regional Director of the NPS's South Atlantic-Gulf Region, and Superintendent Palfrey as Defendants.  *See* Dkt. 1.[6]  In August 2024, ACA moved for a temporary restraining order and a preliminary injunction.  *See* Dkt. 22.  By early September, however, ACA agreed to withdraw that motion in exchange for Defendants' representation that they would not authorize a removal agency or animal welfare organization to remove the cats from the Site prior to the earlier of (1) a ruling on the parties' cross-motions for summary judgment, which the parties proposed to brief on an expedited schedule, or (2) March 14, 2025, provided Defendants give Plaintiffs and the Court at least 30 days prior notice before undertaking the challenged actions.  Dkt. 23 at 1–3.

ACA and Defendants concluded a first round of summary judgment briefing by the end of January 2025.  *See* Dkts. 26–31, 35–36.  But due to disputes regarding supplementations to the administrative record, the parties moved to vacate further deadlines, *see* Dkt. 45, and this Court ordered ACA to "file a motion to govern further proceedings."  Min. Order (Mar. 28, 2025).  ACA subsequently moved for leave to file an amended complaint, in light of changes in the administrative record, and it sought leave to join SAG as a Plaintiff.  *See* Dkt. 47.  Defendants opposed that motion.  *See* Dkt. 50.  The Court granted the motion to promote "efficiency" and

---

[6] Pursuant to Federal Rule of Civil Procedure 25(d), Doug Burgum, the current Secretary of the Interior, Jessica Bowron, the Acting Director of the NPS, and Darrell Echols, the NPS's Acting Regional Director of the South Atlantic-Gulf Region, are automatically substituted for Deb Haaland, Charles Sam, and Mark Foust, respectively, as the official-capacity defendants.

"in fairness to the plaintiffs," who were entitled to address the changes in the administrative record.  Dkt. 53 at 20.  In particular, the Court granted Plaintiffs leave "either [to] file an amended complaint, adding [SAG] or to file . . . a new case in which [SAG] is the plaintiff," and the Court further granted ACA leave to amend its existing "complaint at the same time."  Dkt. 53 at 17.  The Court explained that it was providing ACA with the option of adding SAG to the existing action or bringing a new, related action on behalf of SAG because it was unclear whether it is possible to "cure a jurisdictional defect by amending or filing a supplemental complaint or whether [a plaintiff] actually ha[s] to file a new complaint" to do so.  *Id.*  Consistent with the Court's ruling, ACA filed an amended complaint in this originally filed action, *see* Dkt. 54 (Am. Compl.), and SAG filed a nearly identical complaint in a separate, related action, *see* Compl., *Save-A-Gato, Inc. v. Nat'l Park Serv.*, No. 25-cv-1873 (D.D.C. June 13, 2025), ECF. No. 1.  ACA and SAG, then, moved to consolidate the related cases.  *See* Dkt. 57.

Both complaints assert four claims under the APA and NEPA.  Dkt. 54 at 44–49 (Am. Compl. ¶¶ 144–72).[7]  Count I alleges that the NPS violated the APA by acting "in excess of [its] statutory jurisdiction, [or] authority" when it "attempt[ed] to regulate the Paseo" because the NPS lacks "the power or authority to regulate the Paseo [which] is outside of the [Site's] boundaries."  *Id.* at 44 (Am. Compl. ¶¶ 145, 147) (citation modified).  Count II alleges that the 2023 EA and the corresponding FONSI were inadequate because Defendants' "purpose and need statement . . . constrained NPS'[s] consideration of" reasonable alternatives and because Defendants failed to address public comments regarding the "foreseeable impacts of the 2023 Plan," in violation of NEPA and the APA.  *Id.* at 46–47 (Am. Compl. ¶¶ 156–58, 160).  Count III

---

[7]  For ease of reference, the Court cites only to the amended complaint filed in the ACA case. The complaint filed in the SAG case, however, is indistinguishable in relevant respects.

alleges that Defendants' failure to prepare an EIS violated NEPA and the APA. *Id.* at 47 (Am. Compl. ¶ 162). Finally, Count IV alleges that the 2023 Plan violates the APA because the NPS "fail[ed] to provide a reasoned explanation for [its] about-face from its decades-long administration and sanctioning of the TNR program" and failed to consider Plaintiffs' "significant reliance interests." *Id.* at 48–49 (Am. Compl. ¶¶ 169–70, 172).

On August 19, 2025, the Court consolidated the cases pursuant to Federal Rule of Civil Procedure 42(a) in light of "the overlapping questions of law and facts presented by the cases and the cases' similar and early procedural postures." Min. Order (Aug. 19, 2025). The parties then filed cross-motions for summary judgment, Dkts. 69–75, and the Court heard oral argument on those motions, *see* Min. Entry (Apr. 30, 2026). The motions are now ripe for resolution.

## II. LEGAL STANDARD

"[W]hen a party seeks review of agency action under the APA[,] the district judge sits as an appellate tribunal." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (citation modified). The general standard for summary judgment set forth in Federal Rule of Civil Procedure 56 does not apply to a review of agency action. But summary judgment nonetheless "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing *Richards v. Immigr. & Naturalization Serv.*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)). In other words, "[t]he entire case on review is a question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). Judicial review of NEPA claims is available pursuant to section 706 of the APA. *See Bennett v. Spear*, 520 U.S. 154, 175 (1997); *Mayo*, 875 F.3d at 19.

31

A court must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting 5 U.S.C. § 706). In contrast, with regards to claims challenging the agency's reasoned decision-making, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The arbitrary and capricious standard is deferential; it requires that agency action simply be reasonable and reasonably explained." *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014) (citation modified); *see also Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954 (D.C. Cir. 2007) ("[The] standard of review under the arbitrary and capricious test is only reasonableness, not perfection."). "[A] court is not to substitute its judgment for that of the agency" if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Airmotive Eng'g Corp. v. Fed. Aviation Admin.*, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (second and third alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"The Court's review, however, must be 'searching and careful.'" *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 199 (D.D.C. 2012) (quoting *Nat'l Env't Dev. Ass'n Clean Air Project v. EPA*, 686 F.3d 803, 810 (D.C. Cir. 2012)). "An agency decision is arbitrary and capricious if it 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Cablevision Sys. Corp. v. FCC*, 649

32

F.3d 695, 714 (D.C. Cir. 2011) (quoting *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43). Just as the Court may not "substitute [its] judgment for that of the agency" to set aside an agency action, *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009), it also typically may not "affirm an agency decision on a ground other than that relied upon by the agency," *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

## III.  ANALYSIS

### A.    Standing

The Court begins, as it must, with Article III standing. To establish Article III standing, a plaintiff must demonstrate a "concrete and particularized" injury that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016) (citation modified). The extent and nature of that burden varies at each "successive stage[] of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the summary judgment stage, the moving party faces a demanding standard and "must establish that there exists no genuine issue of material fact as to [standing]." *U.S. Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999); *see also Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 83 (D.D.C. 2019).

Defendants contend that ACA lacks standing to challenge the 2023 Plan, Dkt. 70-1 at 23–29, and that "[t]he Court should address ACA's standing even though Defendants do not . . . contest Plaintiff SAG's standing," *id.* at 29. In pressing this argument, Defendants acknowledge that it is ordinarily sufficient for a court to find that at least one plaintiff has Article III standing to pursue each claim and form of relief at issue. *Id.* at 30–31; *see also In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012). But they posit that this case is different because Plaintiffs elected to file two separate complaints only to seek consolidation after the fact.

Dkt. 70-1 at 30–31.  The Court agrees with Defendants that SAG has standing but disagrees with their contention that the Court should—and must—decide whether ACA also has standing.

**1.**

The Court considered the issue of standing in the context of consolidated cases in *Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018).  That consolidated action started with two separate suits, one brought by two students and one brought by a coalition of 19 states, challenging the Department of Education's delay in implementing regulations aimed at protecting student loan borrowers from deceptive practices.  *Id.* at 82–83, 87.  Like Defendants in this case, the Department did not dispute that one group of plaintiffs—there, the two students—had standing but argued that the other group—the 19 states—lacked standing.  *Id.* at 88.  The Court agreed that the two students had standing, *id.* at 88–89, and the Court recognized the "well-settled" principle that "[f]or each claim, if constitutional and prudential standing can be shown for at least one plaintiff, [the Court] need not consider the standing of the other plaintiffs to raise that claim," *id.* at 88 (alterations in original) (citing *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).  The only remaining question, then, was the same question posed here:  Whether that "well-settled" principle applies to consolidated actions or only to multiple plaintiffs joined in a single action?

In addressing that question, the Court started by noting that the Supreme Court's decision in *Hall v. Hall* recognized "that when actions are consolidated under Rule 42(a) of the Federal Rules of Civil Procedure—as was the case here—each 'retains its independent character' in at least some respects."  *Id.* at 90 (citing *Hall v. Hall*, 584 U.S. 59, 66 (2018)).  In the words of the *Hall* Court, the Supreme Court has long "understood consolidation not as completely merging the constituent cases into one, but instead as enabling more efficient case management while

34

preserving the distinct identities of the cases and the rights of the separate parties in them," 584

U.S. at 67, and Rule 42(a) incorporated this "settled understanding of consolidation"—that is,

"that separate actions do not merge into one" when they are consolidated, *id.* at 75.  As a result,

"*Hall* might be read to call into question the application of the general rule that as long as '[a]t

least one plaintiff . . . ha[s] standing to seek each form of relief requested in the complaint,' the

case may proceed."  *Bauer*, 325 F. Supp. 3d at 90 (alterations in original) (quoting *Town of

Chester, N.Y. v. Laroe Estates, Inc.*, 81 U.S. 433, 439 (2017)).

In *Bauer*, this Court "nevertheless applie[d] that well-established rule . . . for two

reasons."  *Id.* at 91.  "First, *Hall* acknowledged that none of the [Supreme] Court's discussion of

the meaning of consolidation means that district courts may not consolidate cases for all

purposes in appropriate circumstances, leaving open the possibility that, in some situations,

consolidated cases may be treated as a single action."  *Id.* (citation modified) (quoting *Hall*, 584

U.S. at 77).  And *Bauer*, the Court continued, was "a prime candidate for that treatment; the

parties raise[d] only questions of law that [could] be decided on the administrative record, and

the two complaints (and two summary judgment motions) [were] mirror images of one another

that could easily have been filed in the first instance as a single action (or as a single motion for

summary judgment)."  *Id.*  Second, this Court noted that it must follow binding D.C. Circuit

precedent until it has been overruled, and "[w]ith respect to the question presented here—

whether proof of one plaintiff's standing may suffice for purposes of Article III standing in an

action consisting of consolidated cases—numerous decisions by the D.C. Circuit and Supreme

Court have treated a showing that a single plaintiff has standing as sufficient."  *Id.* (first citing

*Bowsher v. Synar*, 478 U.S. 714, 721 (1986); then citing *Sec'y of the Interior v. California*, 464

U.S. 312, 319 n.3 (1984); then citing *Belizan v. Hershon*, 495 F.3d 686, 689, 694 (D.C. Cir.

35

2007); then citing *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1266 (D.C. Cir. 2004); and then citing *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1286, 1297 (D.C. Cir. 2007)).

In relevant respects, this case is on all fours with *Bauer*. The litigation presents a "prime candidate" for consolidation for all purposes because "the parties raise only questions of law that can be decided on the administrative record" or attachments incorporated into the pleadings. *Id.* The amended complaint in the *Alley Cat Allies* action, Dkt. 54 (Am. Compl.), and the complaint in the *Save-A-Gato* action, Compl., *Save-A-Gato*, No. 25-cv-1873 (D.D.C. June 13, 2025), ECF No. 1, raise identical claims and arguments. Due to the consolidation, Plaintiffs filed only a single summary judgment motion, Dkt. 69, and Defendants filed a single cross-motion, Dkt. 70. As in *Bauer*, "[t]he extent of th[e] overlap" in this litigation "is perhaps best captured by the fact that, even if the Court were to hold that [ACA] lacks standing—and, to be clear, the Court is not deciding that question—it would make no difference to the Court's consideration of the pending motions, to the relief the Court would grant, or to any other aspect of this litigation." *Bauer*, 325 F. Supp. 3d at 91.

Defendants nonetheless argue that the general rule—that is, that only one plaintiff must satisfy the requirements of standing—does not apply here. Dkt. 70-1 at 31. This case differs from *Bauer*, on Defendants' telling, because ACA and SAG "were offered" the option of joinder "but[,] instead, . . . chose to initiate *a new separate lawsuit*" and to, then, move for consolidation. *Id.* (emphasis in original). Defendants do not explain, however, why this should matter for purposes of assuring that the consolidated litigation poses a live case or controversy suitable for judicial resolution. What matters for present purposes is whether at least one plaintiff in the consolidated litigation has Article III standing to raise each claim and to seek each form of relief

36

at issue.  Supreme Court and D.C. Circuit precedent establish, moreover, that it makes no difference whether that one plaintiff is joined by other plaintiffs in a single complaint or by other plaintiffs in the consolidated litigation.  Defendants fail to cite to any precedent even suggesting that a plaintiff who was given the option of filing an amended complaint or filing a new complaint and then seeking consolidation stands in a different stead than a plaintiff who was never given this choice.  Indeed, there is no reason to believe that the plaintiffs in *Bowsher*, *California*, *Nuclear Energy Institute*, or *Public Citizen* could not have, if they had decided to do so, joined together in a single complaint in each of those cases, rather than filing separate actions, which were then consolidated.

The Court's conclusion that it need only determine that one plaintiff has standing does however, come with an important qualification.  As Defendants note, Dkt. 75 at 15, and as Plaintiffs concede, Apr. 30, 2026 Hrg. Tr. (Rough at 71), if Plaintiffs are successful on the merits, and then seek separate attorney's fees, other separate relief, or separate enforcement of the Court's judgment, each Plaintiff will need to establish its own standing.  *See*, *e.g*., *Garnett v. Zeilinger*, 485 F. Supp. 3d 206, 215 (D.D.C. 2020) ("Other courts have held that each plaintiff must have standing in order to recover attorney's fees." (citing *Shaw v. Hunt*, 154 F.3d 161, 166 (4th Cir. 1998)).  Similarly, if Plaintiffs are unsuccessful on the merits and only one Plaintiff seeks to appeal, that Plaintiff will need to establish its own standing.  *See Hall*, 584 U.S. at 77 ("constituent cases retain their separate identities at least to the extent that a final decision in one is immediately appealable by the losing party").  At that juncture, whether the cases ought to be consolidated for all purposes and whether a single Plaintiff's standing is sufficient to sustain an appeal in each constituent case are questions for the Court of Appeals, and not this Court.  Those

questions may never arise and, in any event, have no bearing on the Court's jurisdiction to resolve the parties' pending cross-motions for summary judgment.

**2.**

Although the parties agree that SAG has Article III standing, the Court has an independent duty to ensure that it has jurisdiction before turning to the merits of the present dispute. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). The Court agrees that SAG has standing.

To establish Article III standing, SAG bears the burden of establishing the following three, "irreducible" elements: (1) that it has suffered or will imminently suffer an injury in fact that is concrete and particularized, (2) that a causal connection exists between that alleged injury and the "conduct complained of"—that is, "the injury has to be fairly traceable to the challenged action," and (3) that it is "likely . . . that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (citation modified). But because SAG's claims seek to vindicate the organization's procedural rights—that is, SAG alleges that the NPS was required to consult with Puerto Rico and San Juan since the Paseo allegedly lies outside the boundaries of the Site, that the EA and FONSI were inadequate, that the NPS should have prepared an EIS, and that the NPS failed adequately to explain its reasoning—the usual "immediacy and redressability requirements" are relaxed. *New Hampshire v. Holder*, 293 F.R.D. 1, 6 (D.D.C. 2013) (three-judge court). SAG still bears the burden of demonstrating that the challenged action has caused or will likely cause it to suffer a concrete and non-speculative harm. But once SAG makes this showing, it can satisfy the immediacy and redressability requirements by demonstrating that "there is some possibility that the requested relief will prompt the injury-causing party to

reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

Although SAG asserts both associational and organizational standing, *see* Dkt. 69-1 at 21–25, the Court can begin, and end, with organizational standing. To start, SAG has shown that the challenged action is likely to cause the organization to suffer a concrete injury, as that requirement is explicated in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ("*Havens*"). In *Havens*, a fair housing organization claimed that the defendants' discriminatory housing practices "perceptibly impaired" the organization's ability to "provide counseling and referral services for low-[]and moderate-income homeseekers," forcing it "to devote significant resources to identify and counteract" the alleged discriminatory practices. *Id.* at 379 (citation modified). The Supreme Court held that the organization had Article III standing to challenge the housing practices. As the Court explained, "there [could] be no question that the organization . . . suffered injury in fact" because it established a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—[that] constitute[d] far more than simply a setback to the organization's abstract social interests." *Id.*

The *Havens* framework is not, of course, a free pass to standing in cases brought by organizations that oppose a challenged policy. An organization that seeks to establish *Havens* standing may not, for example, rely on a "self-inflicted budgetary choice," *Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) ("*ASPCA*") (citation modified), or an effect on the "organization['s] lobbying activities," *Ctr. for Law & Educ. v. U.S. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005). Nor is it sufficient to show, without more, that the policy at issue is contrary to the organization's mission. Rather, the

organization must show that the challenged action "directly affect[s] and interfere[s] with" its "core business activities," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024), and that it will need to use "its resources to counteract that injury" or that it will incur other tangible losses, *ASPCA*, 659 F.3d at 25.

In the unique circumstances presented here, SAG readily satisfies this demanding burden. "SAG was created in 2004 to humanely manage the community cat population around historic Old San Juan, particularly around the Paseo." Salicrup Decl. ¶ 4, *Save-A-Gato*, No. 25-cv-1873 (D.D.C. June 13, 2025), ECF. No. 1-2 at 2; *but see* J.A. 1371 (SAG letter indicating that "it is a nonprofit organization started in 1997"). The 2023 Plan, if effectuated, will terminate the NPS's MOUs with SAG, will preclude SAG from engaging in future TNR efforts at the Paseo, and will remove both the cats and the feeding stations, *see* J.A. 868–69 (summarizing Alternative 3 as removing the cats and the feeding stations after six months), which are necessary to trap, neuter, vaccinate, and monitor the cats in the Paseo, *see* J.A. 858 ("TNR programs often involve the development of feeding stations because feeding the cats can help volunteers trap the cats and monitor the population."). The 2023 Plan, accordingly, "directly affect[s] and interfere[s] with" SAG's "core business activities" of operating and administering its longstanding Paseo TNR program. *All. for Hippocratic Med.*, 602 U.S. at 395. Ending the TNR program constitutes far more than "a setback to the organization's abstract social interests." *Id.* at 394–95. Rather, as SAG's Secretary attests, the 2023 Plan will "effectively end SAG's primary organizational purpose for existing in San Juan." Salicrup Decl. ¶ 4. Because SAG's explicit purpose is to operate the TNR program in the Paseo, *id.*, replacing the TNR program with the 2023 Plan will cause SAG direct, concrete, and cognizable harm.

Redressability is also straightforward.  To the extent this is a procedural injury case, the redressability requirement is relaxed, *Lujan*, 504 U.S. at 572 n.7, and SAG must only "demonstrate that a revisitation of the procedural requirement would redress the alleged injury because the agency *could* reach a different conclusion," *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 374 (D.C. Cir. 2026) (emphasis in original) (citation modified).  If Plaintiffs were to succeed on their claims that the NPS was required to consult with Puerto Rico and other interested parties prior to regulating the Paseo or were to succeed on their NEPA and APA claims, a vacatur of the 2023 Plan would require further consultations or a further "hard look," which could prompt the NPS to reconsider allowing SAG to continue the TNR program at the Paseo.  *See Massachusetts*, 549 U.S. at 518; *Marsh*, 490 U.S. at 373–74.

The Court, accordingly, finds that SAG has Article III standing to challenge the 2023 Plan and, correspondingly, the termination of the TNR program.

**B.      Statutory Authority/Consultation Claim**

Turning to the merits, Plaintiffs' first claim focuses on the scope of the NPS's authority to regulate the cat population on the Paseo, although that claim has evolved over the course of litigation.  As originally framed—and as described in Plaintiffs' complaints—their first claim turned on two propositions:  First, they maintained that "portions of the [Site] remain the property of Puerto Rico and," accordingly, "are non-federal lands" over which the NPS retains authority "only to the extent compatible with the nonfederal interests of Puerto Rico" and only after "ensuring compatibility with Puerto Rico Laws."  Dkt. 54 at 44 (Am. Compl. ¶¶ 148–49).  Second, they argued that "the boundaries of the [Site]," pursuant to the 1949 designation, "[do] not include the areas beyond the existing fortress walls," and that because the Paseo lies outside the fortress walls, the "NPS lacks the power or authority to regulate the Paseo."  *Id.* (Am. Compl. ¶¶ 146–47).

41

In their opening summary judgment brief, Plaintiffs argued that the Organic Act of Puerto Rico, Pub. L. No. 64-368, § 7, 39 Stat. 951, 954 (1917), granted "authority and ownership to Puerto Rico over" any lands not reserved by the United States for public purposes, "including the shoreline where the Paseo is now located." Dkt. 69-1 at 26. The proposition that "the government of Puerto Rico" was granted rights to all public lands in Puerto Rico "not reserved by the President of the United States prior to July 1, 1903," pursuant to the "authority vested in him" by the Act of 1902, is noncontroversial. 48 U.S.C. § 746. But as Defendants explain in their opposition and cross-motion for summary judgment, Plaintiffs err in suggesting that authority over the Paseo passed to the government of Puerto Rico based on the President's failure to reserve the land at issue in 1903. Dkt. 70-1 at 31–32. To the contrary, on June 30, 1903, President Roosevelt reserved the land from "the most northerly corner of the San Antonio Bastion . . . *to the sea*" and "thence westerly and southerly *along the sea* and San Juan Bay passing Morro Castle, Santa Elena Battery, San Augustine Battery to an angle in the scarf wall which is about 100 feet northerly from the western gate of the City of San Juan." Dkt. 70-3 at 4 (General Order No. 97 at 3 (1903)) (emphasis added).

In light of the 1903 reservation by President Roosevelt, *id.*, Plaintiffs now concede that "the Paseo is on land owned by the United States." Dkt. 73 at 13; *see also* Apr. 30, 2026 Hrg. Tr. (Rough at 30) (acknowledging that the Paseo is "federal property"). Understandably, they do not argue, for example, that Puerto Rico owns the land on which the Paseo sits because President Roosevelt's reservation of federal land was premised on the then-existing shoreline or that any accretion of land along the shoreline falls beyond the 1903 reservation. *Cf. State of Cal. ex rel. State Lands Comm'n v. United States*, 805 F.2d 857, 863 (9th Cir. 1986) (discussing interest of the United States "as a riparian or littoral owner"). Nor can they dispute that, pursuant to

42

President Roosevelt's 1903 reservation, the federal government owns the land around the Morro Castle, Santa Elena Battery, and the San Augustin Battery up to—and along—the sea.

Plaintiffs now argue only that the Paseo lies outside of the Site's boundaries. They contend, in particular, that the 1976 Redesignation Order, "plainly delineates the boundaries . . . as the 'fortresses' and 'ancient city walls;'" that the "adjacent land" described in Exhibit A to the Redesignation Order includes only another area of the Site known as the Esplanade, not the Paseo; and that the map attached as Exhibit B to the Redesignation Order "clearly shows the Park following the fortification walls, and not encompassing the shoreline on which the Paseo is located." Dkt. 73 at 14–15. Because the Paseo lies outside of the Site's boundaries, Plaintiffs assert, the consultation or cooperation obligations imposed by the National Trails System Act apply, precluding the NPS from unilaterally regulating the Paseo. *Id.* at 16.

Plaintiffs' argument fails for two reasons.

**1.**

First, Plaintiffs misread the 1976 Redesignation Order and accompanying exhibits. They make much ado of the fact that the text of the Redesignation Order focuses on the fortresses and walls: Specifically, it designates "the fortresses of El Morro and San Cristobal, ancient city walls, El Canuelo, on Cabras Island, and all adjacent land described in 'Exhibit A.'" 41 Fed. Reg. at 51670. And they observe, without objection from Defendants, that the "adjacent land described in 'Exhibit A'" refers to the Esplanade. *See* Dkt. 73 at 14–15. Based on these premises, Plaintiffs maintain that the Redesignation Order excludes everything outside the fortification walls. The problem for Plaintiffs, however, is that the Redesignation Order refers to "*all* adjacent land described in 'Exhibit A,' *and shown* in the diagram marked 'Exhibit B'

annexed hereto and made a part thereof." 41 Fed. Reg. at 51670 (emphasis added).  Exhibit B, in

turn, is a map that shows the "Historic Site Boundary" tracing the shoreline.

Plaintiffs do not dispute that Exhibit B not merely confirms the description set forth in

Exhibit A but has independent operative force in describing the boundaries of the Site.  Instead,

they argue that Exhibit B "clearly shows the Park following the fortification walls, *and not*

*encompassing the shoreline on which the Paseo is located*."  Dkt. 73 at 15 (emphasis added).  To

the extent Plaintiffs argue that the map does not show the Paseo, that is undisputed; the Paseo did

not exist until the 1990s.  But that does little to advance Plaintiffs' contention that the Site does

not extend to the shoreline, and that contention cannot be squared with Exhibit B, which plainly

shows the "Historic Site Boundary" following the shoreline to the west, along the Bay of San

Juan, up to the northern end of the peninsula:



Dkt. 70-7 at 6.  This conclusion is further supported by the Site's official Boundary Establishment Drawing from 1984, which Plaintiffs do not address, which marks the western boundary of the "area property of the National Park Service" as extending to and following along a line clearly identified as the "approximate shore line."



Dkt. 70-9 at 4 (capitalization altered).

Plaintiffs are correct that the 1976 Redesignation Order boundary generally "follow[s] the fortification walls."  Dkt. 73 at 15.  They are incorrect, however, that this means that the Site does not include the shoreline.  As Defendants explain, the shoreline was "formerly limited . . . between the San Juan Gate and the Bastion," Dkt. 70-1 at 16, and the waters of the San Juan Bay interacted directly with the fortification walls in the early 20th century, until 1977, when the NPS began placing rip-rap—that eventually became the Paseo—to maintain the fortress walls, J.A. 314, 1111–12.  The following photograph, taken in 1903, shows that the fortification walls and shoreline were, at one time, coterminous:

45



J.A. 1112.  Exhibit B to the 1976 Redesignation Order merely shows that this overlap continued until 1976, just preceding when the NPS began to place rip-rap along the shore.  More recent NPS boundary maps—maps created after the NPS began to place the rip-rap along the shore, moreover, confirm that the Site extends to the shoreline.  *See* Dkt. 70-9 at 2–3.  The Court thus concludes that the Site's western boundaries *are* coterminous with the shoreline, and that the Paseo, which sits along the shoreline, is within the Site's boundaries.

At oral argument, Plaintiffs suggested that the Site's boundaries could not have included the land on which the Paseo sits because the Paseo did not exist at the time of the Site's redesignation.  Apr. 30, 2026 Hrg. Tr. (Rough at 37–38).  Plaintiffs also gesture at this argument

in their opening brief, although in the context of their now-withdrawn contention that Puerto

Rico owns the shoreline and their mistaken premise that the 1949 Site designation was the last

designation of the Site. *See, e.g.*, Dkt. 69-1 at 25 ("It makes sense that the Paseo is not within

Park boundaries, as it did not exist in 1949 when the Park was established."). But there is no

dispute that the Paseo sits along the shoreline, *see, e.g.*, *id.* at 13 ("area that became the Paseo

originally existed outside the fortification walls as shoreline"); Dkt. 70-1 at 16 (describing rip-

rap and jeep trail that eventually became the Paseo as being "along the formerly limited shoreline

between the San Juan Gate and the Bastion"), and Plaintiffs' argument has always rested on the

premise that the "the boundaries of the Park did not include the shoreline that would eventually

become the Paseo," Dkt. 69-1 at 12. Because the Court is unpersuaded by Plaintiffs' contention

that the Site ends at the fortress walls, and does not extend to the shoreline, that argument fails.

Finally, to the extent that Plaintiffs now contend that, even if the Site boundary extends to

the shoreline, that boundary became fixed in 1976, and any extension of the shoreline or

accretion of land since 1976 necessarily lies outside the Site, that argument differs from what

appears in their complaints and in their briefs. They say nothing about how changes in

shorelines abutting a national park or historic site affects the boundary of the park or site, and

they say nothing about the common law of property. Nor—having conceded that President

Roosevelt's reservation of public lands for the benefit of the United States extends "to the sea"

and having failed to respond to or acknowledge whatsoever the 1968 GSA transfer of the

relevant property from "the shoreline of San Juan Bay . . . [along] the meanders of the shoreline

of San Juan Harbor" to the NPS with the specific purpose that the lands become part of the Site,

Dkt. 70-4 at 4—do Plaintiffs offer any theory, or even conjecture, about what agency, if not the

NPS, has authority to manage the Paseo. Having premised their argument on the contention that

the boundary of the Site is defined by the fortress walls, and not by the shoreline, it is now too late to argue that the shoreline was fixed in 1976 and that as a matter of common law, statute, or administrative law, any expansion of the shoreline after 1976 lies beyond the boundaries of the Site.

Because Plaintiffs have failed to carry their burden of demonstrating that the Paseo lies beyond the boundaries of the Site, their contention that the NPS lacks authority to regulate the free-ranging cat population found on the Paseo fails.  Although the NPS does not treat the Paseo itself as a "unit" of the National Park System, *see* 2006 Management Policies § 9.2.2.7 (National Trails), the Site as a whole is a "unit," Nat'l Park Serv., *National Park System: National Historic Sites*, https://perma.cc/5HUK-WVYF, and, thus, because the Paseo is within that "unit," the NPS may regulate it to the extent "necessary or proper for the use and management of [the Site]," 54 U.S.C. § 100751(a), and to the extent "necessary and proper to carry out" the historical preservation and maintenance of the Site, *id.* § 320102(l).  Plaintiffs fail to identify any provision of the NPS Organic Act, the Historic Sites Act, or the National Park Service Act as a whole that requires the NPS to consult or to cooperate with, or otherwise receive consent from, state or other local entities before it exercises this regulatory authority over "areas included in [the] [s]ystem," *id.* § 100501, or land within National Park System boundaries, *id.* § 100751(a); *id.* § 320102(l).

Nor do they identify anything in the National Trails System Act that curtails the NPS's authority over trails within a unit of the National Park System; to the contrary, the National Trails System Act authorizes the Secretary to "*utilize authorities related to units of the national park system . . . in carrying out his administrative responsibilities for* [trails]."  16 U.S.C. § 1246(i) (emphasis added).  The NPS, accordingly, did not exceed its statutory authority by

48

adopting the 2023 Plan simply because the Plan regulates the Paseo as part of, and for the proper use, management, and preservation of, the Site.

**2.**

In any event, the Paseo's location within Site boundaries is immaterial to the question whether the NPS exceeded its statutory authority in regulating the Paseo as a national recreation trail. That is because the NPS may, pursuant to the National Trails System Act, regulate the Paseo as a recreation trail that it administers on federal lands within its jurisdiction.

As noted above, Plaintiffs concede that the Paseo sits on federally owned land. Dkt. 73 at 13. As Plaintiffs now acknowledge, Congress granted the President authority to reserve public lands in the Act of 1902, 32 Stat. at 731; President Roosevelt exercised that authority to reserve the land "to the sea" and "along the sea," Dkt. 70-3 at 4 (General Order No. 97 at 3 (1903)); and neither Congress nor the President has taken any action to transfer the land up "to the sea" to Puerto Rico or to any other sovereign or entity. Nor do Plaintiffs dispute that, in 1968, the GSA transferred the property at issue, which "meanders [along] the shoreline of San Juan Harbor," from the Army to the NPS to become part of the Site. Dkt. 70-4 at 2–4. Like the 1903 Presidential reservation of land, the 1968 transfer to the NPS clearly encompasses the entire area up to the shoreline. Finally, Plaintiffs do not dispute that "[t]he Paseo was designated a national recreation trail in 2001." J.A. 854.

From all of this, it follows that the land on which the Paseo sits is federal land within the jurisdiction of the NPS. It also follows that the Paseo is "within [a] federally administered area[]" within the meaning of the National Trails System Act, 16 U.S.C. § 1246(h)(1). And it follows that, as a national recreation trail "within [a] federally administered area[]," the Secretary of the Interior and the NPS are required to "provide for [its] development and maintenance," *id.*,

49

and shall "[i]n order to maintain good conduct on and along the trail[] . . . and to provide for the proper government and protection of such trail[], . . . prescribe and publish such uniform regulations as they deem necessary," *id.* § 1246(i).  This resolves Plaintiffs' first claim.

Plaintiffs nonetheless maintain that (1) the National Trails System Act, 16 U.S.C. §§ 1246(a)(1)(A), (h), and 1243(b)(i–iii), impose a mandatory obligation on the NPS to cooperate or to consult with the Commonwealth of Puerto Rico and its political subdivisions, and (2) that Sections 3.1 and 3.12 of Order No. 45 require the NPS to "cooperate with other land managers, nonprofit organizations, and user groups to facilitate appropriate trail use in accordance with the laws and policies applicable to such trails," Order No. 45 §§ 3.1, 3.12, and limit the NPS's regulatory authority to trails that are subject to an "agreement" with "a local authority," Dkt. 69-1 at 28–31.  As Plaintiffs conceded at oral argument, however, 16 U.S.C. § 1246(a)(1)(A), which requires "consult[ation] with the heads of all other affected State and Federal agencies," applies only to the administration of "a trail pursuant to section 1244(a) of this title," and 16 U.S.C. § 1244(a), in turn, governs national scenic and historic trails, not national recreation trails, which are governed by 16 U.S.C. § 1243.  *See* Apr. 30, 2026 Hrg. Tr. (Rough at 23–24, 26).  Because the Paseo was designated as a national recreation trail in 2001, J.A. 854, the consultation requirement found in 16 U.S.C. § 1246(a)(1)(A) does not apply.

As for 16 U.S.C. § 1246(h), the relevant clause provides

> The Secretary charged with the administration of a national recreation, national scenic, or national historic trail *shall provide for the development and maintenance of such trails within federally administered areas* and *shall cooperate with and encourage the States to operate, develop, and maintain portions of such trails which are located outside the boundaries of federally administered areas.*

16 U.S.C. § 1246(h)(1) (emphasis added).  Plaintiffs agreed at oral argument that "[their] position that consultation with the state is required by statute is contingent on [their] being able

to demonstrate . . . that the trails at issue are located 'outside the boundaries of federally administered areas.'"  Apr. 30, 2026 Hrg. Tr. (Rough at 27).  For the reasons explained above, Plaintiffs cannot do so.  Instead, they attempt to equate "federally administered area"—the statutory phrase—with "Park boundaries"—a phrase that does not appear in 16 U.S.C. § 1246(h)(1).  Nor do Plaintiffs offer any support for their contention that, if the Paseo lies "outside of Park boundaries," it must also be "located outside the boundaries of federally administered areas."  Dkt. 69-1 at 28; *see also* Apr. 30, 2026 Hrg. Tr. (Rough at 26–27).  Not only does that contention violate the rules of logic (the fact that all national parks are federally administered areas does not mean that all federally administered areas are national parks), but it also ignores the statutory text.  *See, e.g.*, 16 U.S.C. § 1243(b) ("As provided in this section, *trails within park*, forest, and other recreation *areas administered by the Secretary of the Interior* or the Secretary of Agriculture *or in other federally administered areas* may be established and designated as 'National Recreation Trails' by the appropriate Secretary" (emphases added)); *id.* § 1246(h)(1), (i) (distinguishing regulatory authority as operative "within federally administered areas" rather than within the boundaries of the National Park System).

When asked at oral argument why, if Plaintiffs agreed that the Paseo was on "federal property," it was not also a "federally administered area" within the meaning of the statute, Plaintiffs demurred, pointing instead to cooperative agreements between the NPS and the Puerto Rico Tourism Company or between the NPS and the Plaintiffs.  *See* Apr. 30, 2026 Hrg. Tr. (Rough at 30–31) ("all I know is the Park Service entered into a cooperative agreement with the Puerto Rico tourism company"); *id.* at 34 (referencing cooperative agreement); *id.* at 32 ("Court: [SAG is] doing work on property that is administered by the Park Service, which is the reason [SAG] needed an MOU, because [it] can't just go onto Park Service Property.  Counsel: Right.").

51

But the fact that a statute *permits* the NPS to enter into cooperative agreements, 16 U.S.C. § 1246(h)(1) ("*may* enter written cooperative agreements with the States or . . . private organizations . . . to operate, develop, and maintain any portion of such a trail either within or outside a federally administered area."), and the fact that the NPS has done so, does not—absent a statutory direction or contractual undertaking—require the NPS to consult with interested parties before undertaking a different approach to the relevant problem.

Plaintiffs' invocation of 16 U.S.C. § 1243(b)(i–iii) for the proposition that "consent" or "written consent is . . . required," Dkt. 69-1 at 27, or that the NPS is "required to obtain the 'consent of States, their political subdivisions, or other appropriate administering agencies' when trails are outside Park boundaries," Dkt. 73 at 16, also fails. Plaintiffs do not specify the *object* of the required consent, and Section 1243 makes clear that it pertains to the "establish[ment] and designat[ion] [of] national recreation trails," not the regulation or administration of such trails. 16 U.S.C. § 1243(a). Plaintiffs have not claimed and do not claim that the Paseo was *designated* improperly or that the manner in which the NPS *designated* the Paseo exceeded its statutory authority: they have only challenged the NPS's administration and management of the Paseo.

Finally, Plaintiffs' reliance on Order No. 45 is unavailing for several reasons. As an initial matter, the claim does not pertain to the NPS's statutory authority and, instead, is best understood as resting on *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and challenging the NPS's supposed departure from its own binding regulations. *Battle v. Fed. Aviation Admin.*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others."). But even reframed in this manner, the argument fails. To be sure, Section 3.1 of Order No. 45 requires the NPS to "cooperate with other land managers, nonprofit organizations, and

52

user groups to facilitate appropriate trail use in accordance with the laws and policies applicable to such trails, and to the extent that trail management and use would not cause unacceptable impacts." Order No. 45 § 3.1. But even if Order No. 45 was binding on the NPS in the manner required to assert an *Accardi* claim, which the Court has reason to doubt, *see, e.g.*, *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536–39 (D.C. Cir. 1986) (concluding that enforcement guidelines were not "binding norms" subject to *Accardi*, because they constituted a general policy guiding future exercise of discretion rather than substantive rules establishing standards of conduct with the force of law); Order No. 45 § 4 ("This Director's Order is intended only to improve the internal management of the NPS, and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States . . . "), the NPS provided the public—including Plaintiffs—"with several opportunities to comment during the planning process" and, indeed, it received and reviewed over two thousand comments. J.A. 1090. Nothing contained in Order No. 45 grants any "nonprofit organization" or "user group" a veto right with respect to the NPS's management of a national recreation trail that is located on federal property, within the bounds of a national park, and that is in a federally administered area. Nor do Plaintiffs identify any "law[]" or "polic[y]" applicable to the trail that the 2023 Plan allegedly violates or any "unacceptable impact[]" that the 2023 Plan will cause. Order No. 45 § 3.1.

Plaintiffs' reliance on Section 3.12 of Order No. 45 is even further afield. That section notes that the NPS's regulations contained in parts 1 through 5 of Title 36 of the Code of Federal Regulations apply to trails sitting on land "[i]n State or local ownership, or privately owned, and administered by the NPS for trail purposes pursuant to an agreement with the landowner, to the extent that such regulations are consistent with the agreement." Order No. 45 § 3.12. Plaintiffs

53

conclude that "[t]his means that the [Department of the Interior's] Code of Federal Regulations only apply to National Recreation Trails if an agreement has been entered into with a local authority and then only as consistent with such agreement."  Dkt. 69-1 at 29 (emphasis omitted). Understandably, Plaintiffs abandon this argument in their response brief, having conceded that the Paseo sits on federal land owned and administered by the NPS, and is therefore not limited by the cited language, which applies only to trails owned by a state or local government or by a private party.  Indeed, Section 3.12 states, in no uncertain terms, that the relevant parts of the Code of Federal Regulations "apply to trail corridors where the lands and waters underlying such corridors are . . . [f]ederally owned and administered by the NPS."  Order No. 45 § 3.12.

*    *    *

The Court, accordingly, concludes that the NPS did not exceed its statutory jurisdiction in promulgating the 2023 Plan, both because the Paseo lies within the Site's boundaries and because it has been designated as a national recreation trial located on federal land and is administered by the NPS.

## C.    NEPA and Arbitrary and Capricious Claims

Counts II through IV of Plaintiffs' complaints assert NEPA and arbitrary and capricious claims.  Plaintiffs allege that the NPS prepared an inadequate EA/FONSI, that it was required to (but did not) prepare an EIS, and that the 2023 Plan is arbitrary and capricious because the NPS failed to explain its changed understanding of its wildlife management authorities or its decision to end the TNR program, failed to respond to comments regarding the cats' cultural significance the efficacy of the 2023 Plan, and concerns about the 2023 Plan's conflict with local laws, and failed to consider Plaintiffs' reliance interests.  *See* Dkt. 54 at 45–49 (Am. Compl. ¶¶ 151–72).

Plaintiffs' summary judgment arguments, however, are difficult to sort out.  They lump together various arguments under the NEPA banner, *see generally* Dkt. 69-1 at 32–52, but, as

Defendants note, some of Plaintiffs' arguments do not relate to the NPS's discussion or analysis of the 2023 Plan's environmental impacts, Dkt. 70-1 at 43, 48, but, instead, assert that the NPS has misinterpreted its authorities or has failed to justify its decision on the merits.  Plaintiffs claim, for example, that Defendants' failure to respond to comments regarding the cats' cultural significance required "an EIS," Dkt. 69-1 at 52, as did their failure to address comments about the efficacy of the NPS's selected plan, *id.* at 47–49.  Although some of Plaintiffs' arguments raise standalone NEPA claims, it is not clear where Plaintiffs' NEPA claims end and their non-NEPA APA claims begin.

In any event, most of Plaintiffs' arguments start with the premise that the NPS erred in interpreting, or in explaining its interpretation of, its relevant authorities.  The Court will, accordingly, begin there, then turn to Plaintiffs' challenges to the NPS's NEPA analysis, and, finally, will consider their arbitrary and capricious challenges to the NPS's decision on the merits.

       1.      *The NPS's Interpretation of Wildlife Management Authorities*

As an initial matter, Plaintiffs maintain that the NPS relied on a faulty definition of "invasive species" and failed to explain its conclusion that the free-ranging cats at the Paseo constitute an invasive species.  *See* Dkt. 69-1 at 34–35.  They further argue that the NPS erred in concluding that various cited authorities on wildlife management precluded it from considering continuing the TNR program.  *Id.* at 35–37.  The Court considers each argument in turn.

       a.  Invasive Species Designation

To start, the Court is unpersuaded that Defendants applied an incorrect or inappropriate definition of "invasive species" or that, in light of the record, they failed adequately to justify their decision to designate the free-ranging cats an invasive species at the Site.

The NPS relied on the definition of invasive species contained in Executive Order 13751, which amended Executive Order 13112.  Combining two definitions from the earlier Executive Order ("invasive species" and "alien species"), Executive Order 13751 defines "invasive species" to mean "a non-native organism whose introduction causes or is likely to cause economic or environmental harm, or harm to human, animal, or plant health" within "a particular ecosystem," Exec. Order No. 13751, 81 Fed. Reg. at 88610.  *See* J.A. 1094 (FONSI applying Executive Order 13751); J.A. 906, 1123 (citing both Executive Orders as part of Appendix to EA and FONSI documenting applicable laws, regulations, and policies); J.A. 1069–70 (the NPS's response to comments regarding designating cats an invasive species under Executive Order 13751).  The Executive Order requires all federal agencies to use their programs and authorities to "prevent the introduction, establishment, and spread of invasive species," to "detect and respond rapidly to eradicate or control populations of invasive species," and to "monitor invasive species populations accurately and reliably."  Exec. Order No. 13751, 81 Fed. Reg. at 88610.

Plaintiffs contend that the NPS should have, instead, applied a standard set forth in a Department of the Interior's Invasive Species Advisory Committee document, *see* Invasive Species Advisory Comm., U.S. Dep't of Interior, *Invasive Species Definition Clarification and Guidance* (2006), https://perma.cc/LAK6-CKN5 ("ISAC Document"), which they contend requires agencies to "compar[e] negative effects caused by a non-native organism to its potential societal benefits," Dkt. 69-1 at 34; *see also id.* at 35 ("NPS'[s] own guidance required [it] to compare the societal benefits of the community cats to their environmental impacts *prior* to declaring them an invasive species." (emphasis in original)).  The Court is unpersuaded.

To start, Plaintiffs incorrectly characterize the ISAC Document as the "NPS'[s] own guidance" or the "[Department of the Interior]'s own guidelines."  *Id.*  To understand this

mistake, some background is necessary.  Executive Order 13112 established the National Invasive Species Council ("Council"), co-chaired by the Secretary of the Interior, the Secretary of Agriculture, and the Secretary of Commerce.  *See* Exec. Order No. 13112, 64 Fed. Reg. at 6184.  The Council is responsible for providing "national leadership regarding invasive species" and for establishing management plans for the implementation of the executive order.  *See id.* at 6184–85.  Executive Order 13112 also required the Secretary of the Interior, pursuant to his obligations as a co-chair of the Council, to create an advisory committee to "recommend plans and actions at local, tribal, State, regional, and ecosystem-based levels to achieve the goals and objectives of the [m]anagement [p]lan." *See id.* at 6184.  That advisory committee is the Invasive Species Advisory Committee ("ISAC").  *See ISAC White Papers*, U.S. Dep't of Interior, https://perma.cc/R5HM-S2WH.

The ISAC Document that Plaintiffs rely on is simply a white paper submitted by the ISAC to the Council, which, at the time, was "engaged in evaluating and updating the 2001 Management Plan and [was] developing comments for a revised action plan as required by [Executive Order] 13112."  ISAC Document at 1.  It sets forth recommendations to the Council, noting that "ISAC recommends that [the Council] adopt the clarifications presented in this white paper."  *Id.* at 2.  The ISAC document defines "invasive species" in the same way that Executive Order 13112 did.  *Id.* ("An invasive species is a non-native species whose introduction does or is likely to cause economic or environmental harm or harm to human, animal, or plant health.").  The "clarification" that the advisory committee recommended was that, "for policy purposes, to be considered invasive, the negative impacts caused by a non-native species [should be] deemed to outweigh the beneficial effects it provides."  *Id.* at 6; *see also id.* at 2 (noting that the question whether a non-native species is "causing harm" should be evaluated by "comparing negative

effects caused by a non-native organism to its potential societal benefits"). Plaintiffs cite to no evidence that the ISAC recommendation was adopted by the Council or the Department of the Interior. Since the ISAC document was issued in 2006, moreover, Executive Order 13751 amended Executive Order 13112, without including the ISAC's proposed clarification, and the Council has published several new management plans. *See NISC Work and Management Plans*, U.S. Dep't of Interior, https://perma.cc/F7JA-XGFU.

In sum, then, the invasive species standard upon which Plaintiffs rely is not a binding definition or standard; it is a policy recommendation from an advisory committee. Plaintiffs provide no reason why the NPS was bound to apply a pre-Executive Order 13751 "non-regulatory policy interpretation" of "invasive species" included in a white paper submitted by an advisory committee, ISAC Document at 1, rather than the definition set forth in Executive Order 13751, which the NPS reasonably treated as operative, *see* J.A. 906; Apr. 30, 2026 Hrg. Tr. (Rough at 43). It follows that the NPS did not employ the wrong definition of invasive species, and that it did not commit a procedural error by failing to apply Plaintiffs' preferred definition.

Nor did the NPS err in failing adequately to explain its decision to designate the free-ranging cats as an invasive species. *See* Dkt. 69-1 at 34 ("NPS failed to evaluate whether the community cats met [the Department of the Interior]'s guidelines to qualify as an invasive species, instead simply concluding, without any supporting evidence or analysis, that the free-ranging cat is an invasive species in any habitat." (citation modified)). Under the operative definition of an "invasive species"—that is, "a non-native organism whose introduction causes or is likely to cause economic or environmental harm, or harm to human, animal, or plant health" within "a particular ecosystem," Exec. Order No. 13751, 81 Fed. Reg. at 88610—the NPS was required to consider whether the free-ranging cats were "non-native" to the Site and, if so,

58

whether they are causing or are likely to cause harm to the environment, humans, animal or plant health.  The NPS reasonably concluded that the free-ranging cats are non-native and pose relevant threats.

To start, there is no dispute that free-ranging cats are a non-native species in Puerto Rico. Apr. 30, 2026 Hrg. Tr. (Rough at 10); J.A. 861.  Thus, all that is in dispute is whether the NPS reasonably concluded that "introduction [of the cats] causes or is likely to cause economic or environmental harm, or harm to human, animal, or plant health" at the Site.  Exec. Order No. 13751, 81 Fed. Reg. at 88610.  The 2023 EA explains in detail that "[c]ats are an invasive species that become predators when allowed to roam across the landscape."  J.A. 860.  It relies on studies demonstrating that cats "[have] contribut[ed] to the extinction of at least 63 native species," "push[] [native wildlife] out of their native range," and "carry numerous other diseases that can be harmful to native wildlife," such as toxoplasmosis, rabies, bartonellosis, plague, and parasites.  J.A. 860–61, 885 (citing studies about zoonotic diseases and cats' predatory behavior); J.A. 918–19 (documenting studies regarding zoonotic diseases).  The 2023 EA also cites to a study that has concluded that, "[i]n island environments, free-ranging cats are directly responsible for extinctions" and to a Fish and Wildlife Service report that has identified free-ranging cats as "[o]ne of the main threats to [recently hatched] and juvenile Puerto Rican boas." J.A. 885 (citing studies at A.R. 5185, 5948).  The EA's references include a plethora of studies on feral cats' impacts on native wildlife, disease transmission, and ecosystems, *see generally* J.A. 899–905, 920–22, including referencing the Global Invasive Species Database, which lists the feral cat as an invasive species in Puerto Rico.  *See* J.A. 891 (noting that "[c]ats are one of 158 recorded invasive species in Puerto Rico"); J.A. 914, 916 ("The Global Invasive Species Database lists 158 invasive species in Puerto Rico").

In light of the substantial scientific literature on the adverse impacts of free-ranging cats on native species, wildlife ecosystems, and public health, which the NPS discussed throughout the 2023 EA, it was reasonable for the NPS to conclude that "[t]he impacts of free-ranging cats on wildlife are well documented and are likely occurring at the park," which contains "native flora and fauna," J.A. 861; *see* J.A. 923–29 (Appendix E to the EA which lists native plants and animals identified at the Site). That is all that was required of the NPS by Executive Order 13751 to conclude that the free-ranging cats are an invasive species. The Court has little difficulty concluding that the EA adequately explained, with "supporting evidence [and] analysis," Dkt. 69-1 at 34, the NPS's decision to treat the free-ranging cats as an invasive species at the Site.

### b. Interpretation of the NPS's legal authority

Plaintiffs also argue that the NPS erred in concluding that various cited authorities on wildlife management precluded it from considering continued TNR. *Id.* at 33–37. In Plaintiffs' view, Executive Orders 13112 and 13751, 36 C.F.R. § 2.2(a)(2), and the NPS's 2006 Management Policies each authorize the NPS "to use and allow management options such as TNR that include controlling, containing, and preventing further spread of exotic and invasive species," and therefore "it was arbitrary and capricious . . . for NPS to, without meaningful analysis or justification, conclude [that] it was legally barred from even considering the continuation of the TNR program." *Id.* at 37.

Plaintiffs are correct that at least some of the cited wildlife management authorities allow the NPS to consider a TNR program as an invasive species management tool. As explained above, *supra* Part I.A.4., although both the Executive Orders and the 2006 Management Policies require the NPS to control invasive species, both confer broad discretion on the NPS to choose an appropriate manner to do so. Executive Order 13751 requires agencies to "use relevant

60

agency programs and authorities to . . . detect and respond rapidly to eradicate *or* control populations of invasive species," and it also recognizes that "administrative, budgetary, and jurisdictional limits" may constrain agencies.  Exec. Order No. 13751, 81 Fed. Reg. at 88610 (emphasis added).  Similarly, the 2006 Management Policies merely provide that "[a]ll exotic plant and animal species that are not maintained to meet an identified park purpose will be managed—up to and including eradication."  2006 Management Policies § 4.4.4.2 (Removal of Exotic Species Already Present).  Plaintiffs are also correct that an agency's "refusal to meaningfully consider [options] based on its incorrect and conclusory assertion that its hands [are] tied" or that "it has no authority" to do so can be arbitrary and capricious.  *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 480 F. Supp. 3d 256, 279 (D.D.C. 2020), *aff'd*, 5 F.4th 68 (D.C. Cir. 2021).

The NPS did not, however, misconstrue the Executive Orders or the 2006 Management Policies and did not conclude that it lacked the authority even to consider the TNR alternative; to the contrary, it considered the relevant options and concluded that the TNR option would not achieve the goal of bringing "the park into compliance with existing authorities for invasive species, wildlife, and feeding animals within the park."  J.A. 870.  In pressing a contrary view, Plaintiffs focus on the following sentence from the 2023 EA: "the [NPS] is unable to select this alternative for implementation because it violates NPS regulations and policies related to invasive species, wildlife, and feeding animals within the park," J.A. 865.  *See* Dkt. 69-1 at 33, 37–39 (citing this sentence repeatedly).  Plaintiffs take this to mean that the NPS concluded that "its existing authorities prohibited even consideration of any alternative that allowed SAG's TNR program to continue at the Park."  *Id.* at 33.  That, however, is not what the EA says.

61

In discussing the no-action alternative—that is, the option of continuing to work with "SAG (or another animal welfare organization) on the management of free-ranging cats through the TNR program," J.A. 865—the EA starts by correctly describing the 2006 Management Policies as providing "that invasive species will be managed—up to and including eradication—where control is prudent and feasible, and where the invasive species impacts resources, hampers management of the park unit, or poses a health or safety hazard," J.A. 865 (citing 2006 Management Policies § 4.4.4.2 (Removal of Exotic Species Already Present)).  The EA also correctly observes that "feeding of animals is prohibited by NPS regulations."  J.A. 865 (citing 36 C.F.R. § 2.2).  It then concludes that the NPS is unable to select the no-action alternative because it is contrary to NPS policies and regulations related to invasive species and feeding animals within the park.  J.A. 865.  But the EA does not stop with this conclusory assertion; it directs the reader to a further discussion of "why a TNR program cannot be selected," J.A. 865, and that further analysis explains in detail why a long-term TNR program has not worked and will not work.  J.A. 870.

Although recognizing that "TNR programs are supported by many animal welfare organizations and communities," the EA considers and rejects that approach on the merits.  J.A. 870.  It explains that "TNR is most effective in a closed system" and requires "an exceptionally high rate" of sterilization to succeed.  J.A. 870 (citing study at A.R. 4986).  When, in contrast, "a population . . . is not isolated, such as the [population] at the park, TNR is not effective."  J.A. 870.  Using a TNR program at the Site is problematic because "[n]ew cats come into the colony from other populations and from being abandoned by owners," and "it is typical for free-ranging cats to travel among populations."  J.A. 870.  Moreover, even if a long-term TNR program might "be able to reduce free-ranging cat populations in some instances, TNR does not address other

62

impacts of having free-ranging cats on the landscape, including disease transmission, predation, and odors from urine and feces in public areas." J.A. 870 (citing study at A.R. 4145). And perhaps most significantly, the NPS tried the TNR program, and, rather than controlling or eradicating the cat population, the population grew from 120 cats when the NPS entered into the initial MOU with SAG to "nearly 200" cats in 2021. J.A. 870. The EA concludes its analysis of the no-action alternative as follows:

> Employing a long-term TNR program as a stand-alone tactic would require that the feeding stations remain in use, and based on recent counts showing an increasing population, the cats would persist in the park and may even continue to increase in abundance. The TNR program on its own is unable to bring the park into compliance with existing authorities for invasive species, wildlife, and feeding animals within the park. For this reason and the others stated above, TNR as a stand-alone and long-term method of removing cats was dismissed.

J.A. 870.

As the agency's thorough analysis demonstrates, the NPS did not simply reject the use of a TNR program out of hand on the thought that the agency was legally barred from taking that approach. Rather, it concluded that the approach would not achieve the policy and legal objectives of controlling or eradicating the cat population and that, under these circumstances, permitting the continued feeding of the cats would violate the agency's regulations.[8]

---

[8] Although at times the NPS uses language that connotes a positive legal obligation to control invasive species, it is not relying on any statutes (or more than one regulation, 36 C.F.R. § 2.2) to support that view. Instead, as is evident from the EA and FONSI, the NPS is implementing the direction contained in Executive Orders 13112 and 13751, as well as its 2006 Management Policies. Although the NPS's use of language (asserting, for example, that the TNR program "*violates* NPS regulations and policies" or would not "bring the park into compliance with *existing authorities*," J.A. 865, 870 (emphases added)) is arguably imprecise, for the reasons explained above, the NPS's meaning is reasonably discernible. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (citation modified). Notably, Plaintiffs do not contend that the NPS erred in relying on the Executive Orders as an appropriate source of the agency's mandate to control or eradicate invasive species.

63

Nor can any imprecision in the NPS's explanation of its reasoning justify setting aside the EA and FONSI.  The Supreme Court and D.C. Circuit have long recognized that a reviewing court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (same); *Epsilon Elecs., Inc. v. U.S. Dep't of the Treasury, Off. of Foreign Assets Control*, 857 F.3d 913, 924 (D.C. Cir. 2017) (same).  Here, the NPS's reasoning is easily discerned: it declined to continue the TNR program because, after almost two decades, TNR had failed to reduce permanently the free-ranging cat population at the Site, which grew by over fifty percent.

The NPS's conclusion represents a scientific and predictive judgment regarding the TNR program's effectiveness in furthering the agency's obligation to control invasive species, and it turns on policy-laden choices regarding the NPS's management approach.  *Cboe Glob. Mkts., Inc. v. Sec. & Exch. Comm'n*, 155 F.4th 704, 716 (D.C. Cir. 2025) (noting that the court's standard of review is "particularly deferential" in a case which "implicates competing policy choices . . . and predictive market judgments." (citation modified)).  Plaintiffs have several qualms with these determinations and choices, which the Court will consider in the following sections, but the NPS did not misinterpret its governing regulations or other policies as depriving it of legal authority to consider or continue TNR.

2.    *NEPA Arguments*

Plaintiffs raise only two arguments that fall squarely within the ambit of NEPA.  First, they contend that the NPS "failed to consider any alternatives that would continue or modify and improve the existing TNR program," even though TNR programs presented "viable and feasible alternatives that could satisfy NPS'[s] purpose and need statement."  Dkt. 73 at 18.  Second, they argue that the NPS failed to undertake an adequate comparative analysis between the alternatives

it chose.  *See, e.g.*, Dkt. 69-1 at 49 ("NPS'[s] failure to adequately evaluate the comparative environmental effects between its preferred . . . alternative and TNR programs was thus arbitrary and capricious."); Dkt. 73 at 20 ("NPS . . . made no real effort to compare and contrast the environmental effects of selecting the no-action alternative of maintaining the existing TNR program[.]").  Neither argument succeeds.

### a.  Reasonable Alternatives

With respect to Plaintiffs' first argument, the Court notes as a preliminary matter that the NPS did consider and include the no-action alternative, which would have continued SAG's TNR program, in its 2023 EA's comparative analysis of the environmental impacts.  In addition to the no-action alternative, moreover, the NPS considered other modified TNR programs and reasonably dismissed the use of any TNR program, even with modifications, as a feasible means of addressing the problem at hand.

NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(H).  CEQ regulations in place at the time the NPS completed its 2023 EA/FONSI required the agency to consider a no-action alternative as a baseline for comparing reasonable alternatives as well.  40 C.F.R. § 1502.14(c) (2023).  "Although a consideration of alternatives is required regardless of whether the agency issues a FONSI, the relevant regulations provide that the consideration of alternatives in an [EA] need not be as rigorous as the consideration of alternatives in an EIS."  *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1323 (D.C. Cir. 2015); *compare* 40 C.F.R. § 1501.5(c) (2023) (instructing the agency to "briefly discuss" reasonable alternatives in the EA) *with id.* § 1502.14(a), (b) (2023) (instructing the agency to "[e]valuate reasonable alternatives to the proposed action" and "[d]iscuss each alternative considered in detail").  "The agency 'bears

65

the responsibility for deciding which alternatives to consider' and need only follow a 'rule of reason,' which governs 'both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them.'" *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 61 (D.D.C. 2022) (emphases in original) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991)). "[A] reviewing court must be at its most deferential" "when an agency . . . decides what [alternatives] qualif[y] as . . . feasible." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 182 (citation modified). Whether an alternative is reasonable must be viewed "in light of the agency's objectives," *Myersville Citizens for a Rural Cmty.*, 783 F.3d at 1323 (citation modified), which is usually contained in the EA's purpose and need statement, *see* 40 C.F.R. § 1502.13 (2023) ("The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.").

The Court, accordingly, begins with the NPS's purpose and need statement, which explains that the NPS was considering how best to

> address free-ranging cat populations within San Juan National Historic Site to improve the safety of its visitors and employees, protect park resources and reduce impacts to native wildlife species associated with free-ranging cats, alleviate nuisance issues, align the visitor experience with the purpose of the park, and bring the park into compliance with existing authorities for invasive species.

J.A. 854. These are all reasonable objectives. *See Citizens Against Burlington*, 938 F.2d at 196 (stating that courts will defer to agency's definition of objectives so long as the agency "look[s] hard at the factors relevant to the definition of purpose" but the agency may not "unreasonably narrow" the objectives to compel selection of one alternative). The NPS considered continuing SAG's TNR (no-action alternative), retaining a removal agency (Alternative 2), and inviting animal welfare organizations to remove the cats for six months and perhaps a year (Alternative 3

and selected action), and considered and dismissed from further consideration removing feeding stations only, trapping and relocating the cats, ground shooting, using frightening devices or biological control and poisoning, creating a sanctuary, improving educational outreach, providing veterinary services to cat owners, and using the cats as a tourist attraction. J.A. 864–73. Accordingly, the three alternatives that the NPS considered—along with the additional "alternatives and alternative elements" that were "considered but dismissed," J.A. 869 (capitalization altered)—readily satisfied NEPA's requirement that the agency "study, develop, and describe appropriate alternatives," 42 U.S.C. § 4332(H).

Plaintiffs do not dispute that the NPS's purpose and need statement was reasonable, Dkt. 69-1 at 33, nor do they identify any alternative elements that went unconsidered. Instead, they argue that the "NPS incorrectly applied [its] purpose and need statement to conclude that NPS was required to eliminate SAG's TNR program entirely," *id*., and that the NPS failed "to evaluate the environmental impacts of reasonable and feasible alternatives, including SAG's existing TNR program," *id.* at 38. But, as explained above and as the Court will explain further below, the NPS did not conclude that it was "required to eliminate" the TNR program and did not ignore the environmental impacts of the program, *see* J.A. 877–95 (comparing TNR program's environmental impacts to Alternatives 2 and 3); it simply concluded that continuing the TNR program would be ineffective and would not achieve the objectives of the Plan, J.A. 870. The fact that the NPS did not select the no-action alternative does not mean that the agency failed to consider it; to the contrary, the NPS only declined to select that option after giving it due consideration, comparing its environmental consequences with that of the other alternatives, and concluding that it would not succeed.

67

In a slight variation on the same argument, Plaintiffs also maintain that the NPS "arbitrarily exclud[ed] . . . improving the TNR program as a legitimate alternative," Dkt. 73 at 19; *see also* Dkt. 69-1 at 40 (noting the NPS's rejection of "implementing a revised TNR program"), and ignored literature that demonstrated TNR's effectiveness and "capab[ility] in meeting NPS'[s] stated purpose and need 'to address the free-ranging cat populations' at the Park." Dkt. 69-1 at 41; *see id.* (citing the Zito study at J.A. 1407–08, 1420).  Both contentions are at odds with the record.  The NPS acknowledged this literature and its conclusions, *see* J.A. 870 (citing the Zito study), but also pointed to "scientific literature [in the record that] disputes these claims," *id.* (citing studies at J.A. 1152, 1349 and A.R. 3741, 4986).

More importantly, the NPS did, in fact, consider "suggestions to modify the current conditions," such as minimizing or improving feeding stations, creating cleaning plans, deploying litter boxes, installing hand-washing stations, and limiting cat food output, J.A. 872, as a possible alternative but dismissed it from further consideration because the NPS concluded that such an alternative did not further the stated purposes and needs of the 2023 Plan.  J.A. 872. This conclusion was not arbitrary.  As explained above, the NPS concluded that TNR was not effective in an open system like the Site given cat migration habits, and it pointed to evidence that TNR had not been effective at the Site in light of the increase in the cat population at the Site since 2005.  J.A. 870.  Based on this analysis, the NPS concluded that "long-term TNR . . . on its own is unable to bring the park into compliance with existing authorities for invasive species, wildlife, and feeding animals within the park," and that, even if a TNR program might control the cat population, it "would not address other impacts of having free-ranging cats on the landscape, including disease transmission, predation, and odors from urine and feces in public areas."  J.A. 870.  The NPS further explained that even if the TNR program might be improved

by some of the suggested modifications—placing litter boxes to reduce odors, improving feeding stations to exclude rats, and reducing cat feed—these suggestions were dismissed because they would not further "the [NPS]'s goal of complying with its existing authorities for invasive species and wildlife." J.A. 872. In other words, the NPS engaged in reasoned consideration of the issue and concluded that an improved or modified TNR program would not achieve at least some of the stated purposes for the project. J.A. 870, 872. It is not the Court's role to second-guess that assessment.

Plaintiffs misread the NPS's purpose and need statement as only seeking to manage the cat population. *See, e.g.*, Dkt. 69-1 at 43 ("if NPS'[s] true purpose and need was to better manage the community cat population"); *see also id.* at 41 (noting the NPS's purpose and need as "address[ing] the free-ranging cat population" and TNR's effectiveness in furthering that need). But that is not what the statement says; it says that "[t]he purpose of and need for th[e] plan is to address free-ranging cat populations within [the Site] *to* improve the safety of its visitors and employees, protect park resources and reduce impacts to native wildlife species . . . , alleviate nuisance issues, align the visitor experiences with the purposes of the park, and bring the park into compliance with existing authorities for invasive species." J.A. 854 (emphasis added). Given the multiple goals the NPS sought to effectuate by "address[ing] free-ranging cat populations," the NPS reasonably considered both the likely effectiveness of the various alternatives and elements in reducing the cat population *and* their likely effectiveness in reducing the cat population in a manner that furthers these other purposes. Because there is "no obligation to include . . . [an] alternative that would not bring about the ends of the federal action," *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011) (citation

modified), the NPS's exclusion of an improved or modified TNR program from further consideration did not violate NEPA.

### b.  Comparative Analysis and FONSI

Plaintiffs separately challenge the comparative analysis that the NPS conducted among the three alternatives and the agency's finding of no significant impact.  When evaluating whether an agency has conducted a legally sufficient EA and has reasonably issued a FONSI, the D.C. Circuit considers whether the agency's NEPA analysis: "(1) identif[ies] accurately the relevant environmental concerns, (2) take[s] a hard look at the problem in preparing its Environmental Assessment, (3) make[s] a convincing case for any finding of no significant impact, and (4) show[s] why, if there is an impact of true significance, there are sufficient changes or safeguards in the project to reduce the impact to a minimum, which would obviate the need for an Environmental Impact Statement entirely."  *Am. Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018).  As the administrative record demonstrates, Plaintiffs' contention that the NPS failed to satisfy these requirements is unavailing.

To start, Plaintiffs' repeated assertion that the NPS "did [not] compare the environmental consequences of continuing SAG's TNR program with the impacts associated with its selected alternative," Dkt. 69-1 at 39; *see also id.* at 49; Dkt. 73 at 20, is incorrect.  For each category of environmental consequences that the NPS considered—visitor experience, wildlife and wildlife habitat, and the free-ranging cats themselves—it engaged in a meaningful comparison of the environmental consequences between the no-action alternative—continuing SAG's TNR program—and Alternatives 2 and 3.

As for the visitor experience, the NPS acknowledged the "spectrum of preferences" among visitors regarding the cats' presence in the Park, with some visitors complaining about the cats' intrusion (such as odor and visual disruption) on the cultural landscape, while others

70

enjoyed the cats' presence.  J.A. 878.  The NPS concluded that "[u]nder Alternative 1, management of free-ranging cats would remain the same as current conditions, and the visitor experience within the park would be unchanged," while "Alternatives 2 and 3 would ultimately remove cats from the park, thus removing a potential disease vector from the park, benefiting all visitors," but that "[b]oth alternatives may require short-term closures of parts of the park during trapping efforts, which would have temporary adverse effects on visitation."  J.A. 882.  The NPS also noted that "[t]he impact of the action alternatives would vary depending on the visitor's perspective on cats in the park," with Alternative 3 offering a slightly better scenario from the perspective of many commenters, because it would likely result "in fewer cats being euthanized."  J.A. 882–83.  What matters for present purposes is that, despite Plaintiffs' suggestion to the contrary, the NPS considered the issue and concluded that Alternatives 2 and 3 could have "an adverse or beneficial impact on visitors."  J.A. 883.

As for wildlife and wildlife habitat, although the NPS acknowledged that it "has never completed a natural resources assessment," J.A. 883, it used citizen scientist data to survey the wildlife, plant life, and other invasive species at the Site, J.A. 883–85, including rats and iguanas that have been observed eating at the feeding stations, J.A. 885.  The NPS concluded that the no-action alternative would continue to have the same impacts on wildlife and wildlife habitat, including "displacement, predation, and potential disease transmission, as well as supplemental feeding of other invasive species (i.e. rats and iguanas) through continued use of the feeding stations" J.A. 889, and "unauthorized feeding where people leave piles of kibble or cans of cat food in the park," J.A. 886.  As for Alternatives 2 and 3, the NPS concluded that the removal of the free-ranging cats would benefit native wildlife inside the Site through the removal of an invasive predator and potential disease vector in the Site, J.A. 889, while Alternative 3 could

71

have some indirect, "incremental adverse" impact on wildlife and wildlife habitat outside the park "depending on the actions of the animal welfare organization" if such organization chooses to relocate the cats in another area, J.A. 889. The NPS concluded, however, that these impacts would be mitigated in part through the implementation plan, which would require the animal welfare organization to comply with Puerto Rican animal welfare and invasive species laws. J.A. 889.

With regards to the free-ranging cats themselves, the NPS concluded that the no-action alternative would have both beneficial and adverse effects for the free-ranging cats, which would remain at the Paseo and receive care from SAG, but which "would remain outdoor cats, exposed to the elements, communicable diseases, competition, and fighting, among other stressors." J.A. 892; *see* J.A. 894. It also concluded that Alternatives 2 and 3 would have adverse effects on the free-ranging cats at the Site, given that many cats that are trapped and removed would be humanely euthanized. J.A. 892–95. As for Alternative 3, the NPS noted additional possible adverse effects resulting from the animal welfare organization's release or relocation of the Paseo cats to other parts of San Juan and Puerto Rico, as the cats might then face competition, resource scarcity, and a lack of veterinary care. J.A. 894. The NPS concluded, however, that given the number of cats in San Juan and Puerto Rico, Alternative 3 would not materially impact the overall population of free-ranging cats in Puerto Rico. J.A. 895.

Based on this comparative analysis and the record as a whole, the FONSI concluded that the proposed action would not impose "significant impacts to resources that would require" an EIS. J.A. 1095. Although Alternative 3 would have beneficial and adverse impacts on the visitor experience based on the "visitor[s'] perspective on cats in the park," the NPS concluded that because the selected action will restore the Site's intended interpretation, reduce health risks

72

related to disease transmission, and not noticeably affect the cat population in San Juan or Puerto Rico, "the selected action will not result in significant adverse impacts on visitor experience, and will have overall beneficial effects."  J.A. 1096.  The NPS further concluded that the selected action's removal of the cats would benefit wildlife and wildlife habitat and would not result in significant adverse impacts.  J.A. 1097.  Finally, the FONSI acknowledged the likelihood of humane euthanasia as a result of the selected action and concluded that it would adversely impact the free-ranging cats at the Site—although not the cat population in San Juan as a whole—but found that the relevant Management Policies require the NPS to manage invasive species, up to and including by eradication.  J.A. 1097.

In sum, then, the NPS took a "hard look" at the relevant environmental consequences of its selected action and explained why it has made a finding of no significant impact.  Throughout the 2023 EA, it also explained how it would mitigate (or attempt to mitigate) adverse effects.  *See Am. Rivers*, 895 F.3d at 49.  Plaintiffs raise two objections, neither of which is persuasive.

First, they argue that the NPS could not have engaged in a NEPA-compliant comparative analysis between the no-action alternative and the proposed action (Alternative 3) because the NPS lacked site-specific studies or a "natural resources inventory" to assess the environmental impacts of the cats on the Site.  Dkt. 73 at 20.  For many of the same reasons why the NPS did not need site-specific studies to conclude that the free-ranging cats were likely to cause harm at the Site and were thus an invasive species, the NPS did not need site-specific studies to draw conclusions about the cats' likely environmental impact on the Site as part of its 2023 EA.  CEQ regulations allow agencies to "make use of any reliable data sources," and agencies "are not required to undertake new scientific and technical research."  40 C.F.R. § 1502.23 (2023).  NEPA only requires the "government to identify and assess in advance the *likely* environmental

73

impact of its proposed actions." *Sierra Club*, 803 F.3d at 36 (D.C. Cir. 2015) (emphasis added) (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004)).

The NPS acknowledged in the 2023 EA that "the park does not have a comprehensive natural resources inventory, and the effects of the free-ranging cats on the wildlife and wildlife habitat in the park have not been studied," and, as a result, it "discuss[ed] the impacts of the alternatives qualitatively, using scientific literature for support where available." J.A. 886. As explained above, the NPS described, cited to, and relied on substantial scientific literature regarding free-ranging cats' predatory behavior and potential as disease vectors, *see* J.A. 860–61, 885, 899–905, 918–21, to conclude that the cats (and by extension, the no-action alternative) would likely have an adverse impact on wildlife and wildlife habitat within the Site, while having both beneficial and adverse impacts on the visitor experience, J.A. 880, 885–86, 889.

Plaintiffs fail to identify any errors or faulty assumptions that the NPS made or any unreliable studies the NPS invoked in reaching its conclusions about the likely environmental impacts of the Paseo cats. Nor have Plaintiffs identified anything in the administrative record from which the NPS could reasonably have concluded that the Paseo cats have materially different predatory behaviors or potential to carry zoonotic diseases than free-ranging cats everywhere else. In the absence of countervailing evidence, the NPS did not run afoul of NEPA by relying on existing scientific literature, instead of conducting site-specific studies, in assessing the Paseo cats' (and thus, the no-action alternative's) likely environmental impacts, and the conclusions the agency drew regarding the Paseo cats' likely impacts were reasonably explained.

Second, Plaintiffs maintain that the 2023 EA's comparative analysis and the FONSI were flawed because the NPS failed to respond to comments regarding Alternative 3's efficacy. They argue, in particular, that the "NPS failed to address a problem laid out in the administrative

record: that owned cats are still frequently abandoned in the City of San Juan, and across Puerto Rico . . . , and that the abandoned cats migrate into the Park." Dkt. 69-1 at 41. Plaintiffs also stress that "many commenters pointed out to NPS" that the NPS's proposed action "would not work, and instead [would] result in nearly endless removal efforts" due to the "Vacuum Effect." *id.* at 42. The vacuum effect describes the process by which the removal of a species from a particular ecosystem can cause that species' population to rebound in that ecosystem to fill the ecological niche. J.A. 1127. Plaintiffs claim that the NPS's failure to address or to respond to these comments undermined its comparative analysis of the environmental consequences. Dkt. 69-1 at 42.

This is a novel NEPA claim. A claim that the NPS failed to respond to comments in the record regarding the efficacy of the chosen alternative ordinarily bears on the substance and propriety of the agency's action or the adequacy of the notice-and-comment process, not the adequacy of the NEPA analysis. But Plaintiffs put a different spin on the usual approach and argue that the vacuum effect and the pet abandonment problems were important elements of the "environmental consequences," which the commentors brought to the agency's attention, and the NPS violated NEPA by failing to consider these comments, which Plaintiffs claim raise the "high likelihood that [the] proposed action would actually result in greater adverse environmental consequences." *See* Dkt. 69-1 at 48; *see also id.* at 42 (arguing that "scientific controversy surrounding the Vacuum Effect" bore on the NPS's "comparative[] evaluat[ion] [of] the environmental consequences"); *id.* at 48 (arguing that the vacuum effect's "scientific and factual controversy" warranted an EIS). The Court will follow Plaintiffs' lead and will consider these arguments under the NEPA framework.

75

As an initial matter, the administrative record leaves no doubt that the NPS acknowledged that Puerto Rico and San Juan have a serious pet abandonment problem, exacerbated by several factors such as lack of access to veterinary care, natural disasters, and understaffed and overcrowded shelter space. J.A. 891, 915, 1062 ("The [NPS] acknowledges that pet abandonment contributes to the issues at the park."). Even more to the point, it considered the pet abandonment problem as part of its comparative analysis. *See* J.A. 892 (under no-action alternative, cat population could "grow slightly due to abandonment of unaltered pet cats"). The 2023 EA/FONSI's summary of the NPS's response to comments also included a section specifically responding to comments regarding the pet abandonment problem. It noted that the NPS already implements various security measures to prevent pet abandonment at the Site and that it "is in the process of installing a new lighting system along the Paseo." J.A. 1102. But it cautioned that "these efforts to reduce pet abandonment in the park are somewhat separate from actual cat management, as retaining the cats and providing feeding stations in the park conflict with NPS regulations and policies." J.A. 1102.

In response to comments asserting that pet abandonment is the "root" cause of the cat overpopulation at the Site and that the TNR program has been successful despite this extraneous variable, J.A. 1102, the NPS took a more nuanced view. It acknowledged that pet abandonment contributes to the problem but added that "the TNR program at the park may also be contributing to pet abandonment, as people see that the cats are fed and provided some veterinary care and consider abandoning their cats at the park a better option than surrendering them to one of Puerto Rico's overwhelmed municipal shelters." J.A. 1102. In the FONSI, the NPS further pointed to the additional security and educational measures that it planned to take "[t]o reduce the potential for pet abandonment in the park," J.A. 1091, and found that Alternative 3 would help it meet the

76

agency's purpose and need in part because "[r]emoving the feeding stations will discourage animal abandonment within the park, which violates NPS regulations governing introduction of animals into a park unit," J.A. 1093.

The NPS also considered and responded to comments about the vacuum effect.  The 2023 EA acknowledged that some research, including research from ACA, suggests that TNR programs "stabilize[] local populations by preventing the vacuum effect," J.A. 870 (citing studies at J.A. 1126, 1407, and 1146 and A.R. 4672, 4681, and 5012), but the agency pointed to "other scientific literature [that] disputes these claims."  J.A. 870 (citing studies at J.A. 1152, 1349 and A.R. 3741, 4986).  The NPS also noted one study that demonstrated that using an integrated pet management approach in addition to removal efforts, such as the varied management techniques proposed by Alternatives 2 and 3, would mitigate the potential for the vacuum effect.  J.A. 887 (citing to the 2010 Hildreth study at A.R. 4665).  "Through this integrated approach and continued monitoring, the [NPS] would prevent a new free-ranging cat colony from forming in the park."  J.A. 887.  Finally, the FONSI responded to comments regarding the vacuum effect, noting both that "there is scientific literature both supporting and refuting the vacuum effect" and that it "intends to incorporate a variety of management techniques . . . to reduce the potential for a new colony forming at the park," including continued monitoring and removal.  J.A. 1105.

The NPS was not required to agree with Plaintiffs' submission that these comments or issues provide conclusive or scientific evidence of the relative efficacy of SAG's TNR program or the proposed action.  Dkt. 69-1 at 45, 46 ("NPS failed to adequately address these criticisms of its claim [that] the TNR program was not working."); Dkt. 73 at 29 ("comments regarding the Vacuum Effect[] demonstrat[ed] that the NPS'[s] preferred alternative would not eliminate cats from the Paseo.").  To the contrary, based on the mixed scientific literature on the vacuum effect,

77

J.A. 870, the NPS was not required to treat the vacuum effect as an unpreventable or inevitable phenomena that it could not attempt to mitigate based on studied integrated pet management approaches, J.A. 887. "NEPA does not require the agency to weigh environmental consequences in any particular way." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 173. Defendants responded to comments about these issues, acknowledged their potential or likely impact on the alternatives in the EA, and reasonably explained both why these issues did not change their environmental analysis and how their selected alternative plans to mitigate pet abandonment and the vacuum effect. To require anything more would neglect the "bedrock principle" of "[d]eference" required in NEPA cases. *Id.* at 185.

The Court, accordingly, concludes that Plaintiffs have failed to carry their burden of demonstrating that the NPS violated NEPA.

3.    *Arbitrary and Capricious Arguments*

Plaintiffs' final set of arguments raises a host of arbitrary and capricious challenges to the agency action. None is persuasive.

a.    Failure to Justify Change in Policy and Plaintiffs' Reliance Interests

Plaintiffs claim that the NPS failed to justify both its change in position "to end the TNR program" and its "change in position that its existing authorities suddenly prohibited any form of TNR." Dkt. 73 at 23. At oral argument, Plaintiffs added that the NPS also purportedly changed its position regarding the desirable level of population control: while the NPS previously sought to "control" the cat population, Apr. 30, 2026 Hrg. Tr. (Rough at 18), the NPS now, without explanation, seeks to "eliminate them," *id.* These changes, Plaintiffs maintain, implicate their "reliance interests in continuing the TNR program," Dkt. 69-1 at 46, and they challenge the NPS's failure to account for those interests.

The APA does not require that "every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance." *Fox Television Stations*, 556 U.S. at 514. "[T]the requirement that an agency provide reasoned explanation for its action," however, will "ordinarily demand that [the agency] display awareness that it *is* changing position" and provide an explanation for why it is doing so. *Id.* at 515. Although "the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate," an agency must do so if "its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Id.* (citation omitted). As for reliance interests, the agency must "assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020), although the "Supreme Court precedent requiring the consideration of reliance interests before agencies shift policies . . . does not set a high bar," *MediNatura, Inc. v. FDA*, 496 F. Supp. 3d 416, 458 (D.D.C. 2020), *aff'd*, 998 F.3d 931 (D.C. Cir. 2021).

Here, as the record demonstrates, the NPS's 2023 Plan constitutes neither a change in the NPS's interpretation of its legal authorities nor a change in its policy regarding cat management; it represents only a change in the method of effectuating a longstanding policy after the prior method, the TNR program, proved ineffective. To the extent the agency changed course, moreover, it acknowledged the change and explained why it was appropriate.

First, Plaintiffs argue that the "NPS abruptly decided to reverse course, concluding that the decades-old TNR program at the Park was suddenly unlawful and violated NPS'[s] 'existing authorities,'" even though these authorities have "existed in substantially the same form since the

79

first 2005 MOU with SAG." Dkt. 69-1 at 45. They further argue that, "[a]t best, NPS may claim that the TNR program is not effectively controlling the population of the community cats on the Paseo," but that "that assertion is untethered from NPS'[s] conclusion that it is prohibited by law from allowing any TNR program, regardless of effectiveness, on the Paseo." *Id.*

That argument misreads the EA, which did not "change" the NPS's interpretation of existing authorities, but instead concluded that the TNR program had failed to achieve its objective, most notably because the Site is not a closed system, J.A. 870. The EA further explained that "[e]mploying a long-term TNR program as a stand-alone tactic would require that the feeding stations remain in use, and based on recent counts showing an increasing population, the cats would persist in the park and may even continue to increase in abundance." J.A. 870. In short, continuing the TNR program would not "violate[] NPS policies and regulations," J.A. 865, in the abstract; it would do so because the program would not control—and, indeed, would likely "continue to increase"—an invasive species, J.A. 870.

Nor did the EA represent an unexplained change in position regarding the ban on feeding animals at the Site. As the EA explains, "[a]lthough feeding of animals is prohibited by NPS regulations [36 C.F.R. § 2.2], the feeding stations *have been allowed* at the park for management of the free-ranging cats through the TNR program with the intent to reduce and ultimately eliminate both the cats and feeding stations in the park." J.A. 865 (emphasis added). In other words, the NPS concluded that it was permissible to employ feeding stations as a means of controlling the population but that it is impermissible to continue to feed the cats when doing so would not control the population and would permit "other invasive species (iguanas and rats) [to] continue to opportunistically eat at the cat feeding stations," J.A. 886. The NPS "provid[ed] [the] more detailed justification" required, explaining that "its new policy rests upon [new]

80

factual findings" or policy judgments about the ineffectiveness of the TNR program. *Fox Television Stations*, 556 U.S. at 515.

Second, Plaintiffs argue that the NPS changed is policy from one that merely sought to limit the number of cats on the Paseo to one that sought their eradication. Apr. 30, 2026 Hrg. Tr. (Rough at 18). For support, Plaintiffs point to the NPS's use of the word "control" in a December 2014 MOU with the Puerto Rico Tourism Company, and its failure to use words like "eliminate" or "eradicate," in its MOUs with SAG. *See* Apr. 30, 2026 Hrg. Tr. (Rough at 15, 16, 22). This argument appears nowhere in Plaintiffs' briefs and, in any event, it offers far too thin a reed to support Plaintiffs' contention that the NPS had an established, prior policy of maintaining or keeping a stabilized population of *some* cats at the Site. The record is replete with evidence that the NPS has always sought to reduce the Site's cat population to the extent possible. After the Paseo was designated a national recreation trail, the NPS entered into cooperative agreements with the APHIS to trap and remove the cats from the Site. *See generally* J.A. 145–172. Those agreements expressed an aim "to maintain a cat-free . . . environment." J.A. 151. In 2003, the NPS also agreed to cooperate in a Commonwealth-wide wildlife management plan that included lethal and nonlethal methods of controlling the free-ranging cat population in Puerto Rico and the Site. J.A. 173–249. Among other things, that program was intended to "[r]educe and eliminate feral and free-ranging cat populations to the greatest extent possible, on properties with a federal [wildlife services] program." J.A. 187 (2003 APHIS EA). Nothing contained in the 2004 MOU with the Puerto Rico Tourism Company, which also aimed to remove the cats from the Site, *see* J.A. 858, or in the 2005 and 2008 MOUs with SAG, *see* J.A. 251–53, changed this policy. To the contrary, the MOUs with SAG barred the introduction of new cats, required the removal of those feral cats "that have not been tagged" as neutered or spayed, and anticipated the

81

"reduction of the feral cat population . . . by natural attrition," J.A. 253—that is, no new cats would be introduced, those present would be neutered or spayed, and, if successful, that would resolve the problem. The NPS's 2023 characterization that its "intended goal [has been] reducing the cat population to zero," Dkt. 70-1 at 18, accordingly, is not, as Plaintiffs say, a "post hoc justification[]," Dkt. 73 at 24.

Nor is the Court persuaded that the NPS has interfered with any reliance interest of the type that would require agency consideration and that was unaccounted for in the 2023 EA or FONSI. "[T]he agency's 'duty' to explain itself 'exists in tandem with the nature of the reliance interests at issue.'" *Scotts Valley Band of Pomo Indians v. Burgum*, 808 F. Supp. 3d 1, 22 (D.D.C. 2025) (citing *Am. Petrol. Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1060 (10th Cir. 2023)). "[U]nidentified and unproven reliance interests," moreover, "are not a valid basis on which to undo agency action." *Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020).

Here, the Court does not doubt that Plaintiffs have invested substantial time, labor, and resources in managing and administering the TNR program over the last 20 years. But it is not enough to claim a reliance interest based on Plaintiffs' interest in continuing the old policy and their contention that the Plan "undoes" their past work pursuant to that policy. *See, e.g.*, Dkt. 69-1 at 46 (explaining Plaintiffs' reliance interest as "continuing the TNR program" and identifying SAG volunteers' comments in the record on "years of work the plan would undo"). Instead, Plaintiffs must show (1) that they have undertaken separate and significant investments, commitments, planning, or obligations in reliance of the NPS's original policy of using a TNR program, rather than other methods, to address the free-ranging cat problem at the Site and (2) that the agency knew about and failed to consider how ending the TNR program would affect those interests. *Regents of the Univ. of Cal.*, 591 U.S. at 33; *see, e.g.*, *Encino Motorcars, LLC v.*

82

*Navarro*, 579 U.S. 211, 222, 218 (2016) (noting "decades of industry reliance on the Department's prior policy" which the "Department gave little explanation for . . . abandon[ing]"). Plaintiffs' argument fails to make either showing.

First, Plaintiffs have failed to identify any investment, commitment, planning, or obligation that SAG or ACA undertook based on the mistaken belief that SAG's TNR program would continue. The record contains no evidence relating to ACA's interests, and, it was not a party to the 2005 or 2008 TNR MOUs. J.A. 251–53. As to SAG, the record, of course, includes the MOUs, but it also indicates that both SAG and the TNR program have been run entirely by volunteers, Dkt. 54 at 27 (Am. Compl. ¶ 92); Salicrup Decl. ¶ 8, *Save-A-Gato*, No. 25-cv-1873 (D.D.C. June 13, 2025), ECF. No. 1-2 at 3, undercutting any suggestion that SAG entered into long-term employment contracts or other agreements that might extend into the future. Moreover, although SAG has shown that the agency action will harm its "primary organizational purpose," Dkt. 73 at 22, and although that consideration is sufficient to establish organizational standing, not every "organizational purpose" qualifies as a cognizable "reliance interest." A reliance interest requires some cognizable harm flowing from a reasonable expectation that the TNR program will continue in the future. *See Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 139 (D.D.C. 2025) (considering reliance interests such as the need "to shutter programs or close altogether and furlough or lay off swaths of Americans" as a result of challenged action), *vacated and remanded on other grounds sub nom. Glob. Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025). Here, it is possible that SAG took some action, such as

83

contracting or hiring, that relied on such an expectation, but, if so, it appears nowhere in the record.[9]

Second, in any event, Plaintiffs have failed to identify anything in the administrative record that informed the NPS of the asserted reliance interest, short of the obvious fact—which the agency thoroughly considered—that the 2023 Plan entailed ending their TNR program. The record says nothing about any contracts, grants, hiring, or other steps that SAG took in reliance on the expectation that the TNR program would continue. For obvious reasons, the record says nothing, for example, about the grant that ACA made to SAG to support the Paseo TNR program *after* the NPS issued the FONSI. *See supra* n.9. It asks too much to demand that an agency consider and address reliance interests that were never brought to its attention.

As such, the NPS's failure to consider Plaintiffs' continued interest in operating the TNR was not arbitrary and capricious, and to the extent that Plaintiffs' reliance interest in continuing TNR is inextricably intertwined with the change in policy itself, the NPS sufficiently acknowledged and justified its decision to end TNR and select the proposed alternative.

> b.  Failure to Respond to Comments Regarding Cats' Cultural Significance and Puerto Rican Animal Welfare Laws

Plaintiffs' final arguments posit that the NPS failed meaningfully to consider and to respond to public comments regarding (1) a conflict between the proposed action and Puerto

---

[9] Although Plaintiffs do not raise the issue in briefs, the Court notes that it is not convinced that the $18,000 grant that ACA issued to SAG, Dkt. 54-1 at 8 (Am. Compl.) (Pedrolie Decl. ¶ 21); Dkt. 29-1 at 11–15 (Pedrolie Decl. Ex. B), on the eve of litigation, *see* Dkt. 29-1 at 11 (Pedrolie Decl. Ex. B) (grant dated February 14, 2024), after the FONSI had issued and Plaintiffs knew and had participated in the EA and FONSI process, is sufficient. *Scotts Valley Band of Pomo Indians*, 808 F. Supp. 3d at 23 (finding no significant reliance interests where plaintiff took on reliance interests "knowing that legal challenges would likely soon follow").

Rican laws on animal welfare, and (2) the cats' cultural significance at the Site.  Dkt. 69-1 at 51.  The Court is, once again, unconvinced.

Under the APA, agencies are required to respond to those comments that "raise significant problems."  *City of Waukesha v. EPA*, 320 F.3d 228, 257–58 (D.C. Cir. 2003) (citation modified).  They are not, however, required to "discuss every item of fact or opinion included in the submissions made to it."  *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015) (citation modified).  Instead, agencies need only "respond sufficiently to enable [the court] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did."  *Id.* (citation modified).  With this standard in mind, the Court turns to Plaintiffs' arguments.

Plaintiffs' first argument requires only brief discussion because the 2023 EA, FONSI, and response to comments clearly acknowledge, consider, and explain the NPS's reasoning with regards to any possible conflict with Puerto Rican law.  The FONSI states that the NPS was "aware of and considered" Puerto Rico Act Number 154 and Law Number 36, two Puerto Rican laws on animal welfare and animal control, "in the development of the plan."  J.A. 1098; *see also* J.A. 908 (EA summarizing Puerto Rico Act Number 154 and other relevant Puerto Rican laws).  The NPS concluded, however, that it "is required to follow federal laws on federal land," even "if local laws are inconsistent."  J.A. 1098.  The NPS also noted that each of the identified laws permitted euthanasia when conducted humanely by or under the supervision of a veterinarian and subject to approved techniques.  J.A. 1098.  The NPS stressed that it would "strive to" achieve consistency with these laws by requiring that the removal agency or animal welfare organization selected to implement the proposed action comply with local laws where applicable.  J.A. 1098.  The NPS offered similar responses to the public comments that suggested that "[e]uthanization

85

of healthy cats violates [Puerto Rico Act Number 154]" or "Law Number 36." J.A. 1103–04. The agency did not ignore a "significant problem[]," *City of Waukesha*, 320 F.3d at 257–58 (citation modified), or fail to respond to "relevant comments," *Del. Dep't of Nat. Res. & Env't Control*, 785 F.3d at 15 (citation modified), in its considered explanation of why it must apply federal law and how it plans to mitigate any possible inconsistencies by requiring its implementing agency to comply with relevant Puerto Rican laws.

Plaintiffs' second argument fares no better. As the administrative record shows, the NPS acknowledged, considered, and responded to comments regarding the free-ranging cats' historical and cultural significance. Plaintiffs claim that although the "administrative record is replete with comments identifying the cultural significance of the cats," the "NPS, rejected, without meaningful analysis, the significant and overwhelming indication from [members of] the public that they considered the community cats a cultural resource, [and] made its own contrary determination (despite insurmountable evidence) that the community cats had no cultural value." Dkt. 69-1 at 50–51. In Plaintiffs' reply, they clarify their argument, asserting that the NPS did not "meaningfully address[] those comments" or respond to comments about the cats' historic presence *in San Juan for over 500 years* and "on the area that is now the Paseo for at least decades *including prior to the Paseo construction*." Dkt. 73 at 29 (emphases altered). That is incorrect.

The 2023 EA described the Site's historic and cultural resources, which the NPS is obligated to protect and to preserve: the fortifications, fortresses, city walls, archeological resources, and the Paseo itself, J.A. 861, a conclusion fully supported by the record, *see generally* J.A. 1–144, 258–313 (Old San Juan's Historic District Nomination Form, the Site's General Management Plan, and the Site's Foundation Document). The Site consists of "a well-

86

preserved[] complex of Spanish colonial masonry military fortifications" and includes "archeological resources within the park associated with its deep history." J.A. 861. The Paseo is of more modern vintage, dating back to the 1990s, J.A. 854, but "is a contributing element to the historic district," J.A. 861, and "provides visitors an opportunity to experience the natural resources of the park and [to] view the fortification walls from the waterfront," J.A. 855. In contrast, the NPS concluded that "[c]ats were not part of the park experience when the park was created, and cats are not a resource the park is mandated to protect." J.A. 907.

For present purposes, the question is not whether the NPS correctly assessed the cultural significance of the free-ranging cats—which, in any event, constitutes a policy question better committed to the administrative agency than the Court—but whether the NPS adequately considered public comments regarding the question. It did so in the EA and in its responses to public comments, which accompanied the FONSI.

The EA noted that commenters expressed support for retaining the cats as "part of the experience" and argued that "removing them would be a destruction of history and culture," but noted that other commenters disagreed, asserting that "the presence of the cats and cat waste at the Paseo and around the fortifications detracts from the cultural experience." J.A. 878–79.

The NPS's responses to public comments further consider and address the issue of the free-ranging cats' cultural significance. Most notably, the agency responded to comments linking the cats "to the arrival of the Spanish in San Juan, approximately 500 years ago," and arguing that "[t]he cats have been part of the environment of Old San Juan for centuries and should be considered part of the urban ecosystem, San Juan's cultural heritage, and the experience of the park." J.A. 1111. The agency wrote:

> **Agency Response**: . . . Given the length of time that cats have been present in
> San Juan, the natural conditions are unknown, but based on scientific literature,

87

it is safe to conclude that cats have had a substantial impact on native species through predation and displacement. As noted on page 1 of the EA, the Paseo (where the cats are concentrated) was constructed in 1995 as a dirt path that served as a maintenance access route. In 1999, the paved walking path was built, and the Paseo was designated a national recreation trail in 2001. The area adjacent to the fortification wall where the Paseo exists now has evolved. . . . At the turn of the 20th century, the waters of San Juan Bay interacted directly with the southern fortification wall, rendering the area inaccessible to cats. In the 1990s, rip[-]rap was placed adjacent to the wall and the Paseo was constructed. The cats may have been in Puerto Rico since the arrival of the Spanish, but based on this history, they could not have started inhabiting the area adjacent to the fortification walls until the early 1990s. The [NPS] acknowledges that the cats are held in sentimental regard for many residents and visitors; however, the [NPS] must bring the park into compliance with existing authorities on invasive species, abandonment, and feeding wildlife. The cats and the feeding stations are not considered contributing elements to the historic landscape and should not interfere with the interpretation of the fortifications. The plan will not have an appreciable effect on the cats of Old San Juan outside the park's boundaries. Visitors and residents will still be able to interact with and provide care for these cats.

J.A. 1111. Moreover, in response to other comments, the NPS explained that the cats, the feeding station bins, water bowls, and piles of kibble and cat food left along the Paseo "are non-historic visual intrusions to the cultural landscape," and that the "nomination form for the Old San Juan Historic District [J.A. 1–8]" lists the Paseo, but not the cats, "as contributing to the historic district." J.A. 1116.

As these materials demonstrate, the NPS considered and reasonably responded to comments regarding the cats' cultural significance and historic presence in San Juan and on the Paseo. The agency was not required to share the commenters' views that the cats were a cultural resource or to treat these views and values as "insurmountable evidence." Dkt. 69-1 at 51. It was required only to consider these comments and to explain its conclusion that "[t]he removal of the cats and feeding stations would minimize non-contributing elements of the cultural landscape and reduce the potential for free-ranging cats to have adverse impacts on archeological resources." J.A. 861; *see also* J.A. 1093 (FONSI). The EA and FONSI easily clear that hurdle.

\*    \*    \*

After attempting to reduce or eliminate the free-ranging cat population, an invasive

species, on the Paseo using the TNR program, and after careful study, the NPS concluded that

the growing presence of cats detracts from the experience of visitors to a historic site and poses a

risk to public health and other wildlife.  It, accordingly, concluded that more drastic action was

required.  The Court recognizes that Plaintiffs, along with many members of the public, disagree

with the agency's assessment and decision and that, unlike the NPS, they regard the cats as a

valued and non-threatening part of the experience of visiting the Paseo.  The Court's sole role,

however, is to determine whether the NPS complied with NEPA and the APA in reaching its

decision.  Because the NPS did so, Plaintiffs' lawsuits fail as a matter of law.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment, Dkt. 69, is hereby

**DENIED**; and Defendants' motion for summary judgment, Dkt. 70, is hereby **GRANTED.**

A separate order will issue.

 /s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  May 20, 2026

89