**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALLEY CAT ALLIES INCORPORATED,

   Plaintiff, and

SAVE-A-GATO, INC.,

    Consolidated Plaintiff,

     v.

UNITED STATES NATIONAL PARK
SERVICE, *et al.*,

    Defendants.

No. 1:24-cv-876-RDM

(consolidated with No. 1:25-cv-1873)

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR STAY PENDING APPEAL, OR IN THE ALTERNATIVE, FOR**
**ADMINISTRATIVE STAY**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

STANDARD OF REVIEW FOR STAY PENDING APPEAL ..................................................... 4

ARGUMENT ...................................................................................................................... 5

I.   NPS'S IMPLEMENTATION OF THE 2023 PLAN IN JUNE POSES
     IMMINENT, IRREPARABLE HARM. ......................................................................... 5

II.  PLAINTIFFS WILL LIKELY SUCCEED IN CHALLENGING THE 2023 PLAN
     ON APPEAL. ........................................................................................................... 8

     A.   Plaintiffs are likely to succeed on their NEPA and APA claims on appeal. .......... 8

          1.   NPS did not consider any alternatives to its preconceived plan to
               remove and kill the Paseo cats, let alone a reasonable range of
               alternatives. ........................................................................................ 10

          2.   NPS did not meaningfully or reasonably compare the effectiveness
               of its proposal to remove all community cats from the Paseo versus
               TNR. ................................................................................................... 15

               a.   NPS's failure to meaningfully compare the impacts and
                    effectiveness of TNR with its remove-and-kill Plan violated
                    NEPA's core requirement. ............................................................ 15

               b.   NPS ignored the success of the Plaintiffs' trap-neuter-
                    return program. ........................................................................... 16

               c.   NPS failed to address significant issues with its removal-
                    and-kill Plan. ............................................................................... 20

          3.   NPS violated both NEPA and the APA by failing to address the
               cultural importance of the Paseo cats and the reliance interests of
               Plaintiffs and community members who have cared for them for
               decades. .............................................................................................. 23

     B.   Plaintiffs are likely to succeed on their challenge to NPS's failure to
          consult and cooperate with local authorities in developing the 2023 Plan. ......... 27

III. THE EQUITIES AND PUBLIC INTEREST FAVOR STAYING THE
     DECISION AND NPS'S 2023 PLAN. ........................................................................ 30

CONCLUSION .................................................................................................................. 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akiachak Native Cmty. v. Jewell*,
  995 F. Supp. 2d 7 (D.D.C. 2014) ........................................................................................4, 5

*Am. C.L. Union v. F.C.C.*,
  823 F.2d 1554 (D.C. Cir. 1987) .............................................................................................10

*Am. Pub. Gas Ass'n v. United States Dep't of Energy*,
  72 F.4th 1324 (D.C. Cir. 2023) ..............................................................................................14

*Am. Rivers v. FERC*,
  895 F.3d 32 (D.C. Cir. 2018) ..................................................................................................23

*Brady Campaign to Prevent Gun Violence v. Salazar*,
  612 F. Supp. 2d 1 (D.D.C. 2009) .............................................................................................5

*Cap. Power Corp. v. FERC*,
  156 F.4th 644 (D.C. Cir. 2025) ..............................................................................................27

*Carlson v. Postal Regul. Comm'n*,
  938 F.3d 337 (D.C. Cir. 2019) ..........................................................................................23, 24

*\*Center for Biological Diversity v. National Marine Fisheries Service*,
  628 F. Supp. 3d 189 (D.D.C. 2022), *aff'd*, No. 22-5295, 2024 WL 3083338
  (D.C. Cir. June 21, 2024) ....................................................................................................8, 22

*Cigar Ass'n of Am. v. FDA*,
  317 F. Supp. 3d 555 (D.D.C. 2018) ........................................................................................27

*\*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991) .......................................................................................9, 10, 11

*Citizens for Resp. & Ethics in Wash. v. Office of Admin.*,
  593 F. Supp. 2d 156 (D.D.C. 2009) ........................................................................................30

*Conserve Sw. Utah v. U.S. Dep't of the Interior*,
  No. 26-317, 2026 WL 569034 (D.D.C. Mar. 1, 2026) (Moss, J.) ............................................5

*D.C. v. Masucci*,
  13 F. Supp. 3d 33 (D.D.C. 2014) ............................................................................................30

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
  390 F. Supp. 3d 128 (D.D.C. 2019) ..........................................................................................4

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)................................................................................................10, 28

*Feld Ent., Inc. v. A.S.P.C.A.*,
    523 F. Supp. 2d 1 (D.D.C. 2007) ........................................................................................5

*Flaherty v. Bryson*,
    850 F. Supp. 2d 38 (D.D.C. 2012) ....................................................................................11

*Food & Water Watch v. FERC*,
    28 F.4th 277 (D.C. Cir. 2022)..............................................................................................9

*\*Fund for Animals, Inc. v. Espy*,
    814 F. Supp. 142 (D.D.C. 1993)..............................................................................6, 7, 30

*\*Fund For Animals v. Clark*,
    27 F. Supp. 2d 8 (D.D.C. 1998)...................................................................................7, 30

*\*Fund For Animals v. Norton*,
    281 F. Supp. 2d 209 (D.D.C. 2003).............................................................................5, 8

*Gresham v. Azar*,
    950 F.3d 93 (D.C. Cir. 2020).............................................................................................10

*Judulang v. Holder*,
    565 U.S. 42 (2011)..............................................................................................................10

*Mann v. Washington Metro. Area Transit Auth.*,
    185 F. Supp. 3d 189 (D.D.C. 2016).....................................................................................4

*Mayo v. Jarvis*,
    177 F. Supp. 3d 91 (D.D.C. 2016).....................................................................................13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..............................................................................................................14

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
    783 F.3d 1301 (D.C. Cir. 2015)...........................................................................................9

*Nasdaq Stock Mkt., LLC v. SEC*,
    38 F.4th 1126 (D.C. Cir. 2022)..........................................................................................10

*Nat. Res. Def. Council, Inc. v. Adm'r, Energy Rsch. & Dev. Admin.*,
    451 F. Supp. 1245 (D.D.C. 1978), *aff'd in relevant part sub nom.*, 606 F.2d
    1261 (D.C. Cir. 1979) ...............................................................................................14, 26

*Nat. Res. Def. Council, Inc. v. EPA*,
    859 F.2d 156 (D.C. Cir. 1988)...........................................................................................26

*Nat'l Parks Conservation Ass'n v. Semonite,*
 916 F.3d 1075 (D.C. Cir. 2019) .................................................................................24

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n,*
 896 F.3d 520 (D.C. Cir. 2018) ...................................................................................25

*Protect Our Cmtys. Found. v. LaCounte,*
 939 F.3d 1029 (9th Cir. 2019) ...................................................................................13

*Pub. Citizen v. Nat'l Highway Traffic Safety Admin.,*
 848 F.2d 256 (D.C. Cir. 1988) .....................................................................................9

*\*Pub. Emps. for Env't Resp. v. U.S. Fish & Wildlife Serv.,*
 177 F. Supp. 3d 146 (D.D.C. 2016) ......................................................................15, 16

*Reytblatt v. U.S. Nuclear Regul. Comm'n,*
 105 F.3d 715 (D.C. Cir. 1997) ...................................................................................13

*Sault Ste. Marie Tribe of Chippewa Indians v. Haaland,*
 25 F.4th 12 (D.C. Cir. 2022) .........................................................................................8

*\*Sierra Club v. FERC,*
 867 F.3d 1357 (D.C. Cir. 2017) ...............................................................................8, 9

*Sierra Club v. Watkins,*
 808 F. Supp. 852 (D.D.C. 1991) .................................................................................15

*Theodore Roosevelt Conservation P'ship v. Salazar,*
 661 F.3d 66 (D.C. Cir. 2011) ......................................................................................15

*\*Union Neighbors United, Inc. v. Jewell,*
 831 F.3d 564 (D.C. Cir. 2016) ..........................................................................9, 10, 14

*Van Ee v. E.P.A.,*
 202 F.3d 296 (D.C. Cir. 2000) .....................................................................................9

**Statutes**

5 U.S.C. § 701 *et seq.* ............................................................................................ *passim*

16 U.S.C. § 1246(h)(1) ........................................................................................28, 29

42 U.S.C. § 4321 *et seq.* .......................................................................................... *passim*

**Other Authorities**

40 C.F.R. § 1502.16(b) ...............................................................................................24

40 C.F.R. § 1508.1(g)(4) .............................................................................................24

iv

81 Fed. Reg. 88609, 88610 (Dec. 5, 2016) .................................................................................12

Executive Order 13751 .............................................................................................................12

NPS Director's Order #45, § 3.1................................................................................................29

**Introduction**

Plaintiffs respectfully request that the Court stay its decision in this case—and the 2023 Plan[1] of the National Park Service ("NPS") to trap, remove, and kill the cats who make their home on the Paseo del Morro ("Paseo")—pending appeal. If the Court does not grant that request, Plaintiffs alternatively request that the Court grant an administrative stay to give Plaintiffs the opportunity to seek and obtain a stay from the Court of Appeals. Finally, Plaintiffs ask the Court to issue a decision on this motion by <u>Friday, June 26</u>, after which Plaintiffs understand that NPS will begin removing and subsequently killing[2] cats remaining on the Paseo.

Plaintiffs yesterday filed their notice of appeal, and Plaintiffs will move the Court of Appeals to stay the 2023 Plan pending appeal, if needed. But Plaintiffs ask that this Court stay its decision and the Plan given that NPS has indicated it plans to begin removing community cats from the Paseo after June 26, and NPS has admitted most will not be able to be rehomed—meaning that Paseo cats would be killed soon after. The harm thus is imminent and irreparable.

Further, there is a significant chance that the D.C. Circuit will find fault with NPS's extraordinary decision to abandon a collaborative program that Plaintiffs have worked hand-in-hand with NPS to implement over the past two decades—the evidence-based Trap-Neuter-Return ("TNR") program—in favor of capturing and killing the Paseo community cats. As this Court's

---

[1] The Plan includes the August 2023 Free-Ranging Cat Management Plan Environmental Assessment ("EA") and the November 2023 Finding of No Significant Impact ("FONSI").

[2] NPS prefers the term "euthanize" to mask the cruel reality of this final step of its Plan. But "euthanize" means "to kill a *sick or injured* animal or person . . . so that they die without pain." Oxford Advanced American Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/american_english/euthanize (last visited June 8, 2026) (emphasis added); *see also* Merriam-Webster Dictionary (defining "euthanasia" as "the act or practice of killing or permitting the death of *hopelessly sick or injured* [persons or animals]"), https://www.merriam-webster.com/dictionary/euthanasia (last visited June 8, 2026) (emphasis added). Plaintiffs will use the term that most accurately describes NPS's plan to cause the death of healthy cats: killing.

May 20 Memorandum Opinion makes clear, there are very weighty legal issues regarding NPS's compliance with its obligations under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, in formulating the Plan, considering alternatives, and responding to comments from the many stakeholders that opposed the Plan and proposed viable alternatives. Plaintiffs identified many errors in the 2023 Plan in their summary judgment briefing, including (to name but a few) that NPS did not meaningfully consider alternatives to removing all and killing most of the Paseo community cats; NPS pre-decided the outcome of its alternatives analysis by wrongly claiming from the outset that it could not legally adopt any TNR-based alternative; NPS barely acknowledged and failed to address comments about the cultural and historical significance of the Paseo cats, as well as Plaintiffs' reliance interests as the entities that have fed and cared for them for decades; and NPS wrongly concluded that it has sole authority to decide the fate of the Paseo cats rather than consulting with Puerto Rican authorities as it has done in the past—and is required to do by statute. While this Court did not agree, Plaintiffs need only succeed on one argument for the D.C. Circuit to vacate the 2023 Plan as unlawful, unreasoned, unsupported by the record, or all of the above.

Finally, the equities and public interest factors of the stay-pending-appeal analysis also favor Plaintiffs. The cats of the Paseo and the people who support them and value their presence have everything to lose from implementation of NPS's Plan, while the government loses nothing from continued maintenance of the status quo that has been in place since 2005.

This Court should accordingly stay its Memorandum Opinion and the 2023 Plan pending appeal. Because NPS plans to begin removing and killing cats after June 26, Plaintiffs ask this Court to grant a stay pending appeal, or alternatively an administrative stay pending the disposition of a stay motion in the D.C. Circuit, no later than June 26.

**Background**

The legal, procedural, and factual background of this case is set forth at length in Plaintiffs' summary judgment briefs. Plaintiffs know this Court is well familiar with that background, which is discussed in its May 20 Memorandum Opinion.[3] Plaintiffs accordingly will not repeat that information here, but refer the Court to their prior filings.

However, there are recent developments of which the Court should be aware. On June 1, NPS sent a letter to Plaintiff Save-A-Gato ("SAG") instructing it to cease-and-desist providing TNR services and informing it that SAG personnel may not access the Paseo to provide food, water, and care to the cats—which it has been doing for over twenty years—as of Monday, June 8. Attach. A. On June 5, SAG requested that NPS either allow it to continue providing food and care to the cats so long as some remain on the Paseo, or at least grant a short extension of the cease-and-desist deadline so that SAG can teach NPS staff how to manage the feeding stations, which NPS has never done at this unique location. Attach. B. On June 7, NPS refused SAG's reasonable request via letter. Attach. C.  Since then, NPS has taken over all feeding of the Paseo cats, barring SAG from assisting. Thus far, NPS's feeding operations have been deficient, including because

---

[3] To be clear, there are parts of the Court's discussion of the case and factual background with which Plaintiffs do not agree. For example, Plaintiffs strongly disagree with the Court's description of the TNR program and its effectiveness over the nearly two decades that Plaintiffs have been implementing that program to manage the community of cats at the Paseo. Plaintiffs maintain and believe the record amply demonstrates that TNR works in practice and has worked at the Paseo. Plaintiffs also disagree with certain of the Court's statements regarding NPS's actions under the 2023 Plan; for example, NPS' improper attempt to bypass its chosen Alternative 3 (use of animal welfare group) as required under the 2023 Plan. The Plaintiffs have now affirmatively offered to take the role contemplated in Alternative 3 and have been rejected by NPS without any basis. Plaintiffs reserve their right to address those issues in further motions practice or via a new suit. Here, Plaintiffs will focus on the reasons that a stay of the Plan pending appeal is appropriate and necessary to prevent irreparable harm.

NPS has provided no or limited water to the cats; has provided no wet food for older or infirm cats that cannot digest dry food; and has not protected the food provided from being infested by ants.

On June 8, NPS granted SAG permission to attempt to trap and transfer cats from the Paseo between June 9 and 26. NPS has further represented, including through DOJ counsel, that NPS will not begin removing cats from the Paseo itself until after June 26. But NPS's grant of authorization for SAG to attempt to transfer cats from the Paseo in the interim is severely constrained by the conditions NPS has imposed, including that SAG may only attempt to trap cats between 7 am and 5 pm—when conditions are bright and hot and it is very difficult to attract cats into metal traps—and that SAG may not control the feeding of the cats so as to entice them to take bait from the traps.

## Standard of Review for Stay Pending Appeal

A court should grant a motion to stay pending appeal if the moving party can show: (1) likelihood of success on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) that the issuance of a stay would not substantially harm other parties, as compared to the harm from denying a stay (i.e., where the balance of the equities lies as between the parties and relief sought); and (4) the public interest in granting the stay. *See Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 12 (D.D.C. 2014).

"[T]hese factors are considered on a sliding scale, such that a strong showing of one factor may offset a relatively weaker showing on another[.]" *Mann v. Washington Metro. Area Transit Auth.*, 185 F. Supp. 3d 189, 194 (D.D.C. 2016). "A party does not necessarily have to make a strong showing with respect to the first factor (likelihood of success on the merits) if a strong showing is made as to the second factor (likelihood of irreparable harm)." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 390 F. Supp. 3d 128, 131 (D.D.C. 2019) (citation omitted); *see also*

4

*Akiachak Native Cmty.*, 995 F. Supp. 2d at 14 ("given that . . . the other factors weigh heavily in favor of [movant], the [c]ourt finds that [movant's] low likelihood of success on the merits is not fatal to its motion for a stay"). Conversely, a strong showing of likelihood of success can outweigh a weaker showing on other prongs of the four-factor analysis. *Conserve Sw. Utah v. U.S. Dep't of the Interior*, No. 26-317, 2026 WL 569034, at *8 (D.D.C. Mar. 1, 2026) (Moss, J.).

"Especially in cases of extraordinary public moment, [a party] may be required to submit to delay not immoderate in extent and not oppressive in its consequences, if the public welfare [] will thereby be promoted." *Feld Ent., Inc. v. A.S.P.C.A.*, 523 F. Supp. 2d 1, 5 (D.D.C. 2007) (quoting *Dellinger v. Mitchell*, 442 F.2d 782, 786 (D.C. Cir. 1971)). This is such a case. A delay in implementation of NPS's plan to remove all and kill many of the Paseo community cats is warranted to avoid irreparable harm, protect the public interest, and ensure that the Court of Appeals has the opportunity to review the lawfulness of NPS's 2023 Plan before it is too late.

<u>**Argument**</u>

**I.      NPS's implementation of the 2023 Plan in June poses imminent, irreparable harm.**

NPS's Plan to remove and kill the community cats living in Paseo del Morro indisputably constitutes "irreparable injury which cannot be quantified in any way at all . . . [NPS] would be killing animals, and [] there is no way of rectifying that injury if, in fact, two months down the line . . . the court concludes that the agency has acted in . . . an illegal fashion." *Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 221 (D.D.C. 2003) (quoting *Fund for Animals v. Glickman*, No. 99-cv-245, Tr. Hr'g Mot. for T.R.O. at 58 (Feb. 12, 1999)); *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009) ("When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury."). Even if some subset of cats are able to be rehomed—which

5

NPS admitted repeatedly in the record is unlikely given the weak adoption market in Puerto Rico due to economic conditions coupled with already overcrowded shelters, *see* JA 893—the killing of dozens of cats or more cannot possibly be undone or that harm rectified. *See Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993) (finding irreparable harm because the killing of 10 to 60 wild bison would constitute a permanent injury).

NPS's grant of permission for SAG to attempt to trap and transfer cats from the Paseo between June 9 and 26 does not eliminate this threat of irreparable harm. It is highly unlikely that SAG will be able to transfer all cats from the Paseo during those 17 days—particularly since NPS has barred SAG from conducting trapping activities in the evening, night, and early morning hours, which Plaintiffs know from experience and animal protection organizations routinely advise[4] is when trapping efforts are most likely to succeed. And, as both NPS and this Court recognized, other cats can readily access the Paseo,[5] and no doubt will increasingly do so as fewer of the cats that have historically occupied that area remain. NPS's plan to begin implementing the 2023 Plan after June 26 thus continues to pose irreparable harm because it will result in the removal and killing of community cats, even if SAG is able to remove and protect some subset of cats.

Further, the harm from implementation of NPS's Plan is not just irreparable for the cats facing removal from their home and likely death at the hands of NPS's contracted removal agent. It is an irreparable loss for the surrounding community members who care deeply for and derive pleasure from seeing and interacting with the cats, and will be distressed at both the cats' transfer

---

[4] *E.g.*, Best Friends Animal Society, ("Dusk is usually the best time to set traps"), *at* https://bestfriends.org/pet-care-resources/how-use-humane-cat-traps-tnvr (accessed June 10, 2026); Care Feline TNR ("Dawn and Dusk are the best times for trapping cats"), *at* https://www.carefelinetnr.org/before-you-trap (accessed June 10, 2026).

[5] *See* JA 870 (NPS admission that "[n]ew cats come into the colony from other populations and from being abandoned by owners"); Mem. Op. at 80 ( "the Site is not a closed system").

from the Paseo and the knowledge that many will be killed due to the lack of shelter space in Puerto Rico. *See Fund For Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (concluding that plaintiffs demonstrated irreparable harm given the "aesthetic injury the . . . plaintiffs would suffer from seeing or contemplating the [animals] being killed"); *see also Espy*, 814 F. Supp. at 151 (finding irreparable harm because plaintiffs enjoyed the wild bison "much the same way as a pet owner enjoys a pet, so that the sight, or even the contemplation, of treatment in the manner contemplated of the wild bison, . . . would inflict aesthetic injury upon the individual plaintiffs").

NPS received over 2,500 comments from the public opposing removal of the cats and emphasizing the joy they bring to community members and visitors—many of whom come specifically for the cats—as well as the value the community places on the cats as a longstanding and unique cultural asset.[6] *E.g.*, JA 335 ("Our cats are part of our community . . . and provide tourists and residents true joy when they see them[.]"); JA 336 ("The cats in El Morro pose no threat to anyone and delight locals and tourists alike."); JA 325 ("I have been going . . . to El Viejo San Juan just to see the cats . . . . I love walking around the Paseo to watch them[.]"); JA 454 ("We visit Puerto Rico specifically for these[] cats!"). This overwhelming public opposition to the 2023 Plan reflects the immense value that the public places on the Paseo cats—and demonstrates that the loss of the cats will be an immense and irreparable harm to the community.

Implementation of NPS's 2023 Plan to remove all cats from the Paseo thus poses imminent, irreparable harm to the community as well as the cats themselves. That harm can be forestalled by a stay pending appeal, which would allow community cats to remain in their traditional home on

---

[6] This was further underscored by the only representative of Puerto Rico to officially comment on this action. Puerto Rico's Congressman Pablo José Hernández affirmed the: "cultural and historic importance of the community cats of the Paseo[.]" *See* Dkt. 77-1.

the Paseo, to be cared for by Plaintiffs (at no expense to NPS) and enjoyed by local community members and visitors alike, pending the D.C. Circuit's review of NPS's 2023 Plan.

## II.    Plaintiffs will likely succeed in challenging the 2023 Plan on appeal.

In the summary judgment briefing, Plaintiffs raised substantial challenges to the 2023 Plan under NEPA and the APA. Plaintiffs also challenged, under statutes and regulations addressing NPS's authority to manage designated NPS Sites and recreational trails, NPS's failure to consult with Puerto Rican authorities when formulating the Plan despite having done so consistently for decades—including about management of the Paseo and the community cats who live there.

These are substantial statutory and regulatory issues, any one of which the D.C. Circuit may view differently from this Court when it reviews each of those issues *de novo*. *See Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 25 F.4th 12, 17 (D.C. Cir. 2022) ("We review the grant of summary judgment de novo 'and therefore, in effect, review directly the decision of the agency.'") (citing *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004)). It is thus likely that Plaintiffs will succeed on the merits of their challenge to the Plan before the Court of Appeals, and so this factor of the stay analysis also weighs in their favor.

### A.    Plaintiffs are likely to succeed on their NEPA and APA claims on appeal.

NEPA requires agencies to take a "hard look" at the environmental impacts and consequences of a proposed action. *See Sierra Club v. FERC*, 867 F.3d 1357, 1367–68 (D.C. Cir. 2017). That includes impacts on animals and ecosystems, *see Norton*, 281 F. Supp. 2d at 229, as well as cultural, historical, and social impacts, *see Center for Biological Diversity v. National Marine Fisheries Service*, 628 F. Supp. 3d 189, 198 (D.D.C. 2022) ("NEPA's implementing regulations . . . require an agency to address the direct and indirect effects—not only ecological,

8

but also 'aesthetic, historic, cultural, economic, social, or health' effects . . . of the proposed action"), *aff'd*, No. 22-5295, 2024 WL 3083338 (D.C. Cir. June 21, 2024).

Taking a "hard look" means that the agency must meaningfully consider and discuss all relevant issues, such that it can come to a fully informed and well-considered decision. *See Sierra Club*, 867 F.3d at 1367–68; *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1324–25 (D.C. Cir. 2015); *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 (D.C. Cir. 1988) (court must ensure "that no arguably significant consequences have been ignored"). That hard look must include consideration of a reasonably robust set of differing alternatives, and the agency must meaningfully compare the impacts of those alternatives. *See Van Ee v. E.P.A.*, 202 F.3d 296, 309 (D.C. Cir. 2000) (the agency must "rigorously explore and objectively evaluate the projected environmental impacts of all reasonable alternatives"). "The alternatives to the proposed action are 'the heart of the [EIS],'" *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 575 (D.C. Cir. 2016) (quoting 40 C.F.R. § 1502.14), and the agency is not permitted to cast and compare the alternatives so as to simply "fulfill [its] own prophecies." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

Courts "review NEPA claims under the Administrative Procedure Act's familiar arbitrary-or-capricious standard." *Food & Water Watch v. FERC*, 28 F.4th 277, 285 (D.C. Cir. 2022). That standard is thus the lens through which compliance with NEPA's requirements is judged.

Under the APA, courts must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." 5 U.S.C. § 706. An agency acts arbitrarily and capriciously when it "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise[.]" *Gresham v. Azar*, 950 F.3d 93, 99 (D.C. Cir. 2020) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Nasdaq Stock Mkt., LLC v. SEC*, 38 F.4th 1126, 1135 (D.C. Cir. 2022) (agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" (quoting *State Farm*, 463 U.S. at 43)). These reasoned decision-making requirements are "unwavering." *Judulang v. Holder*, 565 U.S. 42, 45 (2011).

The APA also requires agencies to respond to all significant comments raised by the public. *Am. C.L. Union v. F.C.C.*, 823 F.2d 1554, 1581 (D.C. Cir. 1987) ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public.") (citation omitted). And if an agency changes its view of the law or the facts as compared to a prior action, it must acknowledge that it has done so and provide a reasoned explanation for the change. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

NPS failed to comply with NEPA and the APA repeatedly when formulating the 2023 Plan; below, we highlight three core failures that the D.C. Circuit will likely view as fatal to the Plan.

      1.     <u>NPS did not consider any alternatives to its preconceived plan to remove and kill the Paseo cats, let alone a reasonable range of alternatives.</u>

"The alternatives to [a] proposed action are 'the heart of the [EIS],'" *Union Neighbors United, Inc.*, 831 F.3d at 575 (quoting 40 C.F.R. § 1502.14), yet NPS failed to consider any real alternative when it "fulfill[ed] [its] own prophec[y]" in adopting the 2023 Plan to kill the Paseo community cats. *Citizens Against Burlington, Inc.*, 938 F.2d at 196.

Two of NPS's three supposed alternatives (Nos. 2 and 3) were identical in substance. Both call for removing all Paseo community cats. Both call for killing most of those cats.[7] The only

---

[7] NPS admits that "[t]he animal care facilities in Puerto Rico are consistently overwhelmed" and there is a "lack of kennel space" to support these cats, so most if not all will be killed. JA 893.

difference was who would do the removal and killing of the cats; Alternative 2 called for NPS to hire its own contractor, while Alternative 3 (added in response to public outcry) sought a community organization to "volunteer" to do the same thing at its own expense. *See* Mem. Op. at 25–26, Dkt. 78. That means that NPS posted only two substantively different options: continued TNR, and removal and killing of the cats. That is not "a reasonable *range* of alternatives" from which the agency can select an option that best "meet[s] the purpose and need of the proposal." 42 U.S.C. § 4332(C)(iii) (emphasis added); *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 72 (D.D.C. 2012) (discounting an "alternative [that] is in fact no alternative at all" under NEPA).

As for NPS's Alternative 1—continued TNR, which NPS called the "no-action" alternative, though it in fact assumes continued action by Plaintiffs to care for the Paseo cats—NPS destined it to fail from the outset. As NPS repeatedly made clear in the EA and FONSI, NPS believed from the outset that it could not lawfully choose the no-action alternative. *See, e.g.*, JA 865, 870 (NPS opining that the TNR program "violates NPS regulations and policies" and cannot "bring the park into compliance with existing authorities"). When there is "only one alternative . . . [that] would accomplish the goals of [the agency's] action," the NEPA analysis "become[s] a foreordained formality." *Citizens Against Burlington, Inc.*, 938 F.2d at 196. Indeed, NPS said the quiet part out loud: "The no-action alternative provides a basis for comparison, but [NPS] is *unable to select* this alternative for implementation because it violates NPS regulations and policies related to invasive species, wildlife, and feeding animals within the park." JA 865 (emphasis added). When "taking no action would result in a plain violation" of law, it "is in fact no alternative at all[.]" *Flaherty*, 850 F. Supp. 2d at 72.

11

NPS erred in at least three ways by positing TNR as an alternative for purposes of the NEPA analysis but refusing to truly consider that option—despite its successful use to control the Paseo cat population and keep the cats and their environment healthy for over two decades.

*First*, NPS was wrong as a matter of law to think it could not adopt any alternative that included allowing the cats to continue to live on the Paseo as they have for many years and managing them with evidence-based action like TNR, as opposed to removing them all. NPS's own management policies note that eradication is an *option*, but only if it is prudent and feasible.[8] JA 1226 (2006 Management Policies § 4.4.4.2). That comports with Executive Order 13751, directing agencies "to eradicate *or control* populations" of invasive species.[9] 81 Fed. Reg. 88609, 88610 (Dec. 5, 2016) (emphasis added). Moreover, in making that choice, NPS is supposed "to avoid causing significant damage to . . . cultural resources[.]" JA 1226. The legal authorities NPS relies on thus make clear that NPS is not legally compelled to try to eradicate every "invasive species" in all locations and instances—and if ever there was an instance where control, rather than eradication, of a community of animals was called for, the record makes clear this is it.

*Second*, based on its erroneous assertion that it was legally barred from continuing TNR, NPS wrongly refused to identify and consider other TNR-based alternatives proposed by commenters. These included implementation of an enhanced TNR program to more proactively manage the Paseo cats, better protect their feeding stations, and make other improvements to both the cat and human environments on the Paseo. *See, e.g.*, JA 790–792 (discussing comments addressing the benefits of TNR, proposed additions to the TNR program, and potential drawbacks

---

[8] To the contrary, NPS previously committed to "contribute and coordinate with the Municipality of San Juan and non-profit organizations for the humane[] control of the feral cat population currently inhabiting the Paseo[.]" *See* MOU between Puerto Rico Tourism Company and the U.S. National Park Service San Juan National Historic Site. Dkt. 69-2, Ex. 1 at 4 (emphasis added).

[9] As discussed further below, NPS is also wrong to label the Paseo cats as an invasive species.

12

of non-TNR solutions). In turn, studies in the record supported these proposed TNR-based options as evidence-based and viable alternatives to removing and killing Paseo community cats. *See, e.g.*, JA 1407–1408 (finding that TNR is "a valuable humane cat management tool" and "that lethal control will fail to eliminate cat populations unless it is possible to consistently achieve high removal rates for long periods of time and control new cat immigration into the area"). Thus, NPS's erroneous legal view artificially cabined its alternatives analysis in violation of NEPA, leaving NPS no other real options to compare with its preferred (and seemingly predetermined) plan of eliminating the Paseo cats. And its refusal to consider and meaningfully respond to the thoughtful other options proposed by commenters, such as enhanced TNR to better manage the Paseo cat population, also violates the basic APA mandate to substantively respond to significant comments. *See, e.g.*, *Reytblatt v. U.S. Nuclear Regul. Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997).

*Third and finally*, NPS's insistence that it could not select Alternative 1 or any alternative that did not aim to eliminate all cats from the Paseo was based on its mistaken and unsupported designation of the Paseo community cats as an invasive species that harms other wildlife. That designation is based almost entirely on NPS's say-so, coupled with references to generic studies that NPS claims show how cats (in general) can harm wildlife. NPS admits there is no site-specific analysis of the cats' impact on the Paseo environment or site-specific natural resources assessment. JA 886 ("[T]he effects of the freeranging cats on the wildlife and wildlife habitat in the park have not been studied[.]"). This normally would doom an agency's decision regarding species impacts or management—and indeed it should here. *See Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1039 (9th Cir. 2019) ("[A] site-specific project demands site-specific analysis."); *see also Mayo v. Jarvis*, 177 F. Supp. 3d 91, 111 (D.D.C. 2016) ("Typically, a site-specific EIS will be necessary to supplement the environmental analysis of a programmatic impact statement.")

13

(cleaned up); *Nat. Res. Def. Council, Inc. v. Adm'r, Energy Rsch. & Dev. Admin.*, 451 F. Supp. 1245, 1258 (D.D.C. 1978) ("[S]ite-specific EIS's will usually be necessary to supplement the environmental analysis of a programmatic impact statement.") (cleaned up), *aff'd in relevant part sub nom.*, 606 F.2d 1261 (D.C. Cir. 1979). NPS provides no reason why it could not undertake a site-specific study of the community cats impacts; the .75 mile trail is hardly impossible to survey. It was unreasonable for NPS to rely on generic studies to label the Paseo community cats as an invasive species without studying how those cats interact with their environment and balancing their positive impacts (such as control of the rat population) with any claimed negative impacts.

NPS's fundamentally erroneous view that the Paseo cats are an "invasive species" that it is legally compelled to eradicate, such that NPS could not lawfully adopt Alternative 1—or any variant of TNR, or any alternative that did not call for elimination of all Paseo cats—infected the entire NEPA analysis. Having identified only one alternative to elimination of all cats (continued evidence-based TNR), but decided it could not legally select that alternative, NPS defaulted to what had been its plan all along: removing all and killing the Paseo community cats. This is not the meaningful consideration of a reasonable range of alternatives required by NEPA. *Union Neighbors United, Inc.*, 831 F.3d at 575. And it simultaneously fails to meet the APA's fundamental requirements that agency decisions be well-reasoned, demonstrating consideration of all significant issues and comments, rather than a rubber-stamp exercise in approving a decision reached before the process even started. *State Farm*, 463 U.S. at 43; *Am. Pub. Gas Ass'n v. United States Dep't of Energy*, 72 F.4th 1324, 1335–36 (D.C. Cir. 2023) ("The Court is 'not a rubber stamp,' however, and 'must ensure the agency considered all of the relevant factors.'") (citation omitted). Thus, NPS failed to fulfill its duty under NEPA to take a hard look at a reasonable range

14

of viable alternatives, electing instead to fulfill its own prophecy by choosing to remove and kill the Paseo cat population.

2.      NPS did not meaningfully or reasonably compare the effectiveness of its proposal to remove all community cats from the Paseo versus TNR.

NEPA requires that an agency evaluates and compares the potential impacts of a reasonable range of alternatives to its proposed action before it may select a preferred course of action. *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 69 (D.C. Cir. 2011). That comparison must "be sufficient to demonstrate reasoned decisionmaking." *Sierra Club v. Watkins*, 808 F. Supp. 852, 872 (D.D.C. 1991) (citation omitted). That standard applies with equal force to EAs and environmental impact statements. *Pub. Emps. for Env't Resp. v. U.S. Fish & Wildlife Serv.*, 177 F. Supp. 3d 146, 156 (D.D.C. 2016). Here, NPS failed to reasonably compare its two alternatives—TNR versus removal and killing of the Paseo cats.

a.      *NPS's failure to meaningfully compare the impacts and effectiveness of TNR with its remove-and-kill Plan violated NEPA's core requirement.*

Here, NPS failed the threshold requirement of identifying a reasonable range of alternatives. But even assuming NPS had cleared that bar (it did not), NPS separately and independently failed to meaningfully compare the effectiveness and environmental impacts of the ongoing TNR program, or the enhanced version proposed by Save-A-Gato and numerous other commenters, against the effectiveness and environmental impacts of its plan to remove all cats from the Paseo. That failure is not a technicality. It strikes at the core reason behind NEPA's alternatives-analysis requirement: to ensure that the agency actually knows what it is choosing and what it is rejecting before it acts. This Court failed to hold NPS to its responsibility of truly assessing which of the alternatives before it was most likely to achieve its goals, which NPS described in its purpose and need statement as including "improve the safety of its visitors and

15

employees . . . reduce impacts to native wildlife . . ., alleviate nuisance issues, align the visitor experience . . ., [comply] with existing authorities for invasive species." JA 841.

NPS's failure to engage in any genuine comparative analysis was not inadvertent. NPS stated explicitly in the 2023 EA that it was "unable to select [TNR] for implementation because it violates NPS regulations and policies related to invasive species, wildlife, and feeding animals within the park." JA 865. NPS therefore made no serious effort to compare and contrast the environmental effects of maintaining or improving the existing TNR program against those of its preferred removal plan. NPS admitted in its own 2023 EA that there is no "comprehensive natural resources inventory" for the Park and that "the effects of the free-ranging cats on the wildlife and wildlife habitat in the park have not been studied," leaving NPS able only to characterize projected impacts subjectively. JA 886. This was not the reasoned agency decision-making pursuant to evidence-based analysis that NEPA demands. Had NPS truly assessed the comparative impacts of removal of all Paseo community cats against other reasonable approaches, "it might have settled upon a different 'preferred alternative.'" *Pub. Emps. for Env't Resp.*, 177 F. Supp. 3d at 157.

>           b.      *NPS ignored the success of the Plaintiffs' trap-neuter-return program.*

Ample record data and comments showed that the TNR program administered by Plaintiffs has in fact been very effective over the two decades it has been in place. That record begins with the 2005 Memorandum of Understanding ("MOU") between NPS and Save-A-Gato, which established the formal framework for the TNR program and set the baseline population. The 2005 MOU recorded that "[t]he population count of feral cats along the Paseo del Morro is one hundred twenty (120) cats and this number will be used as the baseline." JA 251. That same MOU required quarterly surveys with NPS representatives, written reporting, and provided that NPS would

16

"continue to allow unlimited access" for feeding, trapping, and surveys—reflecting a formal, structured program to which NPS was itself a party. *Id.*

The measurable results of that program were significant. By 2008, just three years after the baseline was established, the 2008 MOU recorded that "[t]he population count of feral cats along the Paseo del Morro is ninety-five (95) cats as of the date of the signing of this memorandum"—a reduction of twenty-five cats, or more than twenty percent of the baseline population. JA 253. The 2008 MOU further reflected that "[t]he reduction of the feral cat population . . . has been and will be attained by natural attrition"—precisely the mechanism that TNR is designed to produce. *Id.* That documented population reduction occurred in an open environment subject to regular influxes of abandoned pets and migrating cats, making the achievement all the more significant.

The program's effectiveness is also reflected in the composition of the Paseo cat population. The NPS scoping newsletter describes the ongoing management program as including "Trap, spay/neuter, tag (ear-tip) cats once altered" and "Remove untagged cats from the park," a protocol designed to allow field identification of sterilized animals. JA 317. And members of the public confirmed in scoping comments that the protocol was working: one commenter observed that "all I have seen have their clipped ears, meaning they are spayed or neutered." JA 393. The result is a colony composed predominantly of healthy, sterilized, and vaccinated animals— precisely the outcome that a well-functioning TNR program is designed to achieve. NPS itself has acknowledged that, under the current cat management program, there has been no disease transmission between cats and humans or any other wildlife. JA 886. That is a meaningful and concrete measure of program success—one NPS failed to weigh when evaluating its preferred alternative, and one this Court overlooked when assessing NPS's compliance with NEPA.

17

Multiple studies and sources that NPS purportedly relied upon in developing the 2023 Plan confirm that TNR successfully curtails a cat population if adequate sterilization levels are achieved within that population. *See* JA 1349; *see also* NPS_0004649 at 4653; NPS_0005029 at 5033. Yet NPS never measured sterilization levels in the Paseo cat population to determine whether TNR was being implemented efficaciously, or whether a bolstered program could perform more effectively. That failure is compounded by NPS's own admission that it made only "limited efforts" to support the existing TNR program prior to promulgating the 2023 Plan. JA 865. NPS thus condemned the TNR program as ineffective without conducting the very analysis the scientific literature it relied on indicates would be required to make that determination.

NPS's entire case against the effectiveness of the TNR program rests on a single data point: the result of a 2021 camera-trap survey. The NPS scoping newsletter, *Free-Ranging Cat Management Plan*, states that "[t]he National Park Service conducted a camera trap survey at the park in 2021 . . . . This survey identified at least 200 individual cats at the park, including kittens and pregnant or recently pregnant females." JA 318. The Court then relied on this figure to uphold NPS's rejection of the TNR program and any alternatives based on it as ineffective. That reliance was misplaced for two independent and mutually reinforcing reasons.

*First*, NPS's own methodology for tallying the cat population was deeply flawed. NPS itself admits numerous challenges in its 2021 camera survey, including limited camera placement, camera angle issues, and changes in conditions at feeding stations. JA 909–913. These issues collectively forced NPS to abandon its intended mark-recapture methodology mid-survey—the standard scientific approach—and substitute a cruder individual-identification method that created a risk of double-counting the same animals. *See id.* But that method also had its issues, including multi-day data gaps, poor image quality (e.g., JA 912–913), and the inability to individually

18

identify cats with similar appearances (e.g., black cats). *See* JA 909; *see also* JA 796 (sample of comments highlighting flaws in methodology). This resulted in dozens of cats designated as distinct having the same exact description. *See* NPS_0001436 at 1452–71. This inconsistent, incomplete, and methodologically unsound camera survey data cannot support the weight NPS (and this Court) placed on it as the sole reason to condemn a nearly two-decade, evidence-based TNR management program in favor of removing and killing the Paseo community cats.

*Second*, even accepting NPS's count as accurate, it does not demonstrate TNR has failed. It demonstrates that TNR has largely succeeded. NPS's highest claimed figure of approximately 196 cats living on the Paseo at one point represents an increase of fewer than 80 individuals over almost 18 years in an open environment that NPS itself acknowledges is subject to continuous influxes of abandoned pets and migrating cats. That is not evidence of program failure. It is evidence of sustained program success.

NPS's own scoping newsletter undermines its position, admitting that "[n]ew cats come into the colony from other populations" and "[c]ats may also be abandoned in areas where volunteers feed them[.]" JA 318; *see also* JA 870 (NPS admission that "[n]ew cats come into the colony from other populations and from being abandoned by owners"). This Court itself acknowledged: "the Site is not a closed system." Mem. Op. at 80. Any assessment of the effectiveness of TNR as compared to removal-based alternatives must account for that fundamental fact. Public comments amplified this point. One commenter stated: "The main problem today is not the current cat population, it is abandonment . . . every week people abandon cats in the areas of paseo and the pink house." JA 376. Another explained that any population increase was attributable to "gente externa . . . ha continuado abandonando gatos en el área"— outside individuals who continued to abandon cats in the area. JA 345–346. Yet NPS made no

effort to disaggregate population changes attributable to any perceived deficiency in the TNR program from those attributable to abandonment and migration from surrounding areas. That analytical failure—separating the controlled variable from the uncontrolled one—renders NPS's comparative analysis not merely incomplete but methodologically unsound.

That Plaintiffs have been able to keep the cat population on the Paseo from increasing to the many hundreds or thousands possible in an open system that continuously receives abandoned and migrating cats is, by any objective measure, a testament to the program's effectiveness, not evidence of its failure. NPS itself even admitted as much, noting: "The current population of nearly 200 cats *may not be significantly larger*[.]" JA 859 (emphasis added). And NPS admits that the Paseo cat population is currently stable and likely to remain stable with continued TNR. JA 892 ("based on the history of cats at the park under this program, the population at the park would remain stable or grow slightly"). And it is undisputed that, thanks to the TNR program, the Paseo cat community is comprised of mostly neutered or spayed, vaccinated, and healthy cats. JA 1086 (NPS's summarizing *unrefuted* comments stating that "most of the cats in the colony are vaccinated, altered . . . [and] pose little threat to the public."); *see also* JA 1003 (raising concern that cats removed from Paseo would be replaced by unvaccinated, unsterilized cats).

NPS irrationally ignored this substantial evidence that the TNR program has been successful in achieving the goal of keeping the Paseo cat community numerically stable and healthy, instead focusing entirely on one unreliable data point (which itself indicates only modest population growth) from an admittedly imprecise cat count. That is not reasoned decision-making.

        c.      *NPS failed to address significant issues with its removal-and-kill Plan.*

On the other side of the comparative analysis required by NEPA, overwhelming record evidence demonstrates that NPS's removal-and-kill plan will be far less effective than the existing

20

TNR program and will not achieve NPS's stated goal of eliminating all cats from the Paseo. It instead will produce consequences which are substantially more harmful than those presented by the current managed population. This conclusion flows directly from the well-documented phenomenon known as the "Vacuum Effect."

The Vacuum Effect is not a contested or peripheral scientific proposition. It is an elementary principle of animal ecology, extensively documented in scientific literature, and raised by numerous commenters during the public scoping process. As one commenter explained: "If cats are removed . . . it creates a territorial opening or vacuum . . . more cats WILL take their place. . . . Catching and removing (or killing) cats is therefore futile. . . . [TNR] is the only way to stabilize cat populations." JA 348. Other commenters warned that removal would "[c]rearian un efecto de vacío que invitaría mas gatos a ocupar esa area . . . y estarían sin esterilizar"—meaning "create a vacuum effect that would invite more cats to occupy the area . . . and they would be unsterilized." JA 327. These are not speculative concerns. They are the predictable, scientifically grounded consequences of removing an established animal colony from an open habitat. Indeed, the Vacuum Effect concern was raised by the Association of Veterinarians for Animal Rights, a 12,000-member organization comprised of veterinarians and thus uniquely situated to speak to the impact of NPS's Plan. JA 1378. It is also simply common sense. The physical realities of the Paseo make the Vacuum Effect inevitable; the Paseo is surrounded by parks, public squares, and residential streets that are home to substantial populations of free-ranging cats. There is no physical barrier—no wall, fence, or other impediment—preventing those cats from moving to the Paseo once the current stable colony is removed. The Vacuum Effect was thus a clear environmental impact that had to be addressed in the 2023 Plan, particularly since it was raised by multiple commenters.

NPS, for its part, admitted in the 2023 EA that adverse effects would "likely" result from the Vacuum Effect, including that "cats from the city would likely enter the park after the existing cats are removed," thereby generating a continuing cycle of "removal" and killing. JA 887. Having acknowledged the Vacuum Effect and its likely consequences, NPS was obligated to meaningfully examine and address those consequences in its comparative analysis. It did not.[10] Nor did NPS explain how it might possibly prevent other cats from migrating to the Paseo once the current, stable population is removed. Instead, NPS stated in the FONSI only that "there is scientific literature both supporting and refuting the vacuum effect" and that it would "incorporate a variety of management techniques . . . to reduce the potential for a new colony forming at the park." JA 1105. NPS did not identify what "management techniques" would be employed or why they would be effective, and it did not address the fundamental question of how NPS's removal plan— operating in the open, uncontrolled environment of the Paseo—would prevent the inevitable movement of new, unvaccinated, unsterilized cats into the area. Instead, NPS simply concluded that TNR was not an option "because it violates NPS regulations and policies[.]" JA 865. NPS's conclusory dismissal of the vacuum effect was "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ctr. for Biological Diversity*, 628 F. Supp. 3d at 210 (citation omitted).

Without the TNR program and the veterinary care that Plaintiffs currently provide, the new Paseo cat population will rapidly expand beyond the current managed population, and that new population will not be vaccinated, which would contradict NPS's stated goal of disease prevention.

---

[10] Instead, NPS tried to spin the vacuum effect to its benefit, suggesting that "[b]y eliminating cats . . . [NPS will provide] an ecological niche for other wildlife to occupy, including native wildlife that *may have been displaced* by the presence of the cats." JA 887 (emphasis added). NPS's own language shows that it is speculating, and there is no record basis to think that unnamed "other wildlife" will return to the Paseo rather than free-ranging cats currently living in nearby areas.

22

*See* JA 854. NPS's Plan makes no credible provision for preventing this outcome. NPS's scoping letter states only that "[t]he removal agency would use best professional judgment to manage the humane capture and removal of the cats." JA 317. In other words, NPS will leave it to its contractor to address the repeated incursion of new cats into the Paseo. As one commenter observed, that "vague" language is "troublesome" and "could lead to a horrible ending[.]" JA 352.

In short, the record indicates and NPS does not contest that, if NPS proceeds with the Plan, it will have to have its contractor continuously remove and kill a succession of new, unvaccinated, and unsterilized Paseo cats, creating an endless cycle of harm to the San Juan cat population and the community that enjoys and supports them as part of the unique cultural fabric of the city. NPS refused to meaningfully consider and respond to these scientifically sound and data-supported concerns. It thereby again failed to comply with its obligations under NEPA, which requires it to take a "hard look" at the problem, meaningfully compare alternatives, and "ensure that agency decisionmaking is fully environmentally informed[.]" *Am. Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018). And NPS simultaneously failed to comply with the APA, which requires it to respond to "'significant points' and consider 'all relevant factors' raised by the public comments.'" *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (citation omitted).

        3.      <u>NPS violated both NEPA and the APA by failing to address the cultural importance of the Paseo cats and the reliance interests of Plaintiffs and community members who have cared for them for decades.</u>

By dismissing the cultural significance of the Paseo cats and ignoring serious reliance interests in the TNR program, NPS violated NEPA and the APA thrice over. First, under NEPA, NPS ignored the cultural significance of the Paseo cats. Second, NPS failed to respond to comments on the cultural significance of the cats in violation of the APA. Third, NPS ignored the substantial reliance interests born from decades of administering the TNR program.

NEPA requires that NPS seriously consider—not shrug off—the historic and cultural implications of eliminating the TNR program in favor of killing the Paseo cat population. *See* 42 U.S.C. § 4331(b)(4); *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) ("Congress has declared that preserv[ing] important historic, cultural, and natural aspects of our national heritage constitutes an important goal of [42 U.S.C. § 4331(b)(4)]" (citation omitted)). And when NPS adopted the 2023 Plan, the CEQ regulations expressly mandated that when "the agency determines that economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment." 40 C.F.R. § 1502.16(b); *see also* 40 C.F.R. § 1508.1(g)(4) (defining "effects" to include ones that are "aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative"). Failing to address the impacts of removing the Paseo cats on local culture, history, and heritage after those impacts were brought to NPS's attention also violates the APA, which requires agencies to respond to comments raised by all interested stakeholders. *See Carlson*, 938 F.3d at 344 (citing *State Farm*, 463 U.S. at 43).

The administrative record was extraordinary in its breadth and focus on the cultural history of the cats: Puerto Ricans objected en masse to NPS's 2023 Plan, identifying the cats as a revered part of the history and culture of the Paseo. *See, e.g.*, JA 326 ("*Estos gatos son parte de la cultura puertorriqueña. Son parte de la comunidad.*" (translating to "These cats are part of Puerto Rican culture. They are part of the community.")); *id.* 443 ("The cats of Old San Juan are as traditional as mofongo."); *id.* 469 ("It is unconscionable that NPS would do anything to kill the most beloved and historical part of a vibrant city."); *id.* ("The cats have been there for 500 years, as long as the buildings have existed, and are a charming part of the beautiful old city.").

NPS rejected these comments out-of-hand in contravention of NEPA and the APA.

24

*First*, NPS violated NEPA by giving short shrift to the comments explaining the cultural significance of the Paseo cats. While this Court noted that NPS acknowledged those comments, *see* Mem. Op. at 86–87, that acknowledgement began and ended with NPS reducing all comments relating to the cultural significance of cats to: "Commenters in support of retaining the free-ranging cats at the park stated that . . . removing them would be a destruction of history and culture." JA 878–879. That bare acknowledgement is not a hard look at the concerns raised about the social and cultural impacts of the Plan; that is a swift dismissal. This backhand treatment of serious cultural and historically based concerns cannot be squared with NEPA and its purposes. *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 529 (D.C. Cir. 2018) ("NEPA's procedural mandate was intended to vindicate" the public interest in protecting "vulnerable but as-yet-unidentified historical, cultural, or religious sites[.]").

This shrug in response to commenters' serious concerns about the removal of a valued piece of their culture is apparent across the record. In response to comments that "the cats are linked to the arrival of the Spanish in San Juan, approximately 500 years ago," "are unique in that they have adapted to living on the island of San Juan and provide an example of how an ecosystem can come into balance within human habitation, and have been part of that environment "for centuries and should be considered part of the urban ecosystem, San Juan's cultural heritage, and the experience at the park," NPS stated only that it "acknowledges that the cats are held in *sentimental* regard for many residents and visitors[.]" JA 1111 (emphasis added). This one-sentence brush-off of scores of comments outlining a 500-year history of cats existing on and being valued in public spaces in Puerto Rico flies in the face of Congress's "hard look" mandate.

*Second*, NPS violated the APA by refusing to meaningfully respond to these comments, and instead insisting that it had no authority to consider the concerns and interests raised. "The

fundamental purpose of the response requirement is . . . to show that the agency has indeed considered all significant points articulated by the public[.]" *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 188 (D.C. Cir. 1988). Here, NPS responded to commenters' objection and concerns by repeatedly and formulaically asserting that NPS "*must* bring the park into compliance with existing authorities[.]" JA 1111 (emphasis added). NPS thus answered commenters' concerns by saying, in essence, that it could not consider them. There is no indication that NPS actually evaluated the comments it requested on its plan to remove and kill the Paseo cats before it decided that it "must" adopt the 2023 Plan. This Court concluded that NPS checked the box in terms of its obligation to respond to significant comments by acknowledging the comments exist, Mem. Op. at 86–88, but real consideration and a meaningful response, not just acknowledgement, is what the APA requires. *Nat. Res. Def. Council, Inc.*, 859 F.2d at 188–89 ("The fundamental purpose of the response requirement is, of course, to show that the agency has indeed considered all significant points articulated by the public; in addition, agency responsiveness aids in the Congressionally sanctioned process of judicial review of agency action.").

*Finally*, NPS acted arbitrarily and capriciously in ignoring the serious reliance interests engendered by decades of administering the TNR program. SAG's entire organizational purpose is to administer the TNR program on the Paseo. See Dkt. 1-2, Salicrup Decl. ¶ 4. ACA, in turn, pioneered the TNR program and has supported it for decades. Dkt. 54-1, Pedrolie Decl. ¶¶ 12–19. Both organizations have many members and supporters who have dedicated their time and resources to protect, sustain, and support the culturally significant Paseo cats. And beyond the reliance interests of Plaintiffs and their members, there are those of the local community, members of which expressed that, on top of appreciating the cats, "the community is used to taking care of them[.]" JA 325. The record does not indicate that NPS seriously considered these interests before

26

adopting its ill-considered Plan to remove and kill the Paseo community cats, thus violating the APA. *See Cap. Power Corp. v. FERC*, 156 F.4th 644, 653 (D.C. Cir. 2025) (agencies act arbitrarily when they "fail[] to reasonably explain why" regulated entities' reliance concerns "[a]re unfounded, immaterial, or outweighed by countervailing policy concerns").

### B.    Plaintiffs are likely to succeed on their challenge to NPS's failure to consult and cooperate with local authorities in developing the 2023 Plan.

Plaintiffs are also likely to succeed on appeal in pursuing their claim that NPS had a statutory obligation to consult with Puerto Rican authorities before promulgating the Plan. This too presents the sort of "serious legal question" that warrants a stay pending appeal where Plaintiffs have made a strong showing of imminent, irreparable harm absent a stay. *See, e.g., Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018) (noting that the showing of a serious legal question "could help tip the scales") (cleaned up).

This Court focused on the federal government's ownership of the land on which the Paseo sits. Mem. Op. at 42–43. But that is not determinative of whether NPS has complete control over the Paseo such that it need not consult with Puerto Rican authorities to remove the cats—and the long history of joint management by Puerto Rican authorities and NPS belies that recent claim.

Since the Paseo came into existence in the mid-1990s, it has been funded and managed as much or more by Puerto Rican authorities, including the Puerto Rico Tourism Company, as by NPS.[11] JA 854 (Paseo was paved with funds from PRTC); Dkt. 54-4 at 2–3 (PRTC is responsible for landscaping, security, and trash removal on the Paseo); JA 294 (access to Paseo is governed by an agreement between NPS and the Puerto Rican government). Further, a series of MOUs between

---

[11] The PRTC was established by Executive Order of the Governor of Puerto Rico in 1970 to promote and manage tourism. *See* https://tourism.pr.gov/50th-anniversary-2/ (last visited June 8, 2026).

NPS and the PRTC confirm that NPS has long recognized its obligation to cooperate with the PRTC and local government to jointly manage the Paseo. *See* Dkt. 69-1 at 6–7 (listing and providing cites for 2014, 2023, and 2025 MOUs). That includes the community cats; NPS agreed, in the 2014 MOU, to "contribute and coordinate with the Municipality of San Juan and non-profit organizations *for the humane*[] *control of the feral cat population currently inhabiting the Paseo*[.]" Dkt. 69-2, Ex. 1 at 4 (emphasis added).

NPS's refusal to consult with Puerto Rican government authorities or the PRTC when deciding whether to continue TNR or remove and instead kill the cats is thus a stunning, unexplained about-face, in violation of the APA obligation to explain any change in the agency's view of its authority and obligations. *Fox Television Stations*, 556 U.S. at 515. And, it is contrary to NPS's statutory obligation to consult to manage the Paseo, which has been designated as a National Recreation Trail. *See* 16 U.S.C. § 1246(h)(1) (requiring the Secretary of the Interior to "*cooperate with and encourage the States* to operate, develop, and maintain portions of such trails which are located outside the boundaries of federally administered areas" and to "initiate consultations with affected States and their political subdivisions to encourage . . . the development and implementation by such entities of appropriate measures" for land practices, among other things) (emphasis added). The Interior Department is specifically authorized to enter into "cooperative agreements with the States or their political subdivisions" to jointly "operate, develop, and maintain any portion of such a trail either within or outside a federally administered area." *Id.* That is precisely how NPS handled the Paseo for decades—until 2023, when it promulgated the Plan without local coordination or consultation.

This Court concluded that NPS could eschew its historic approach to management of the Paseo and go it alone based on its conclusion that the Paseo is part of the adjacent Park Site, and

28

thus cooperation with local authorities is optional. That was an error. Indeed, the Court identified a key reason that the Paseo cannot be within the Site in its opinion: "the Paseo did not exist until the 1990s," long after the Park Site was established in 1949 and redesignated in 1976. Mem. Op. at 44. But the Court then dismissed that key fact as having been stated by Plaintiffs in the context of their initial argument that land under the Paseo is not federally owned. *See id.* But Plaintiffs strenuously and repeatedly argued, in both their opening and reply briefs, that the NPS Site does not include the Paseo regardless of whether it is on federal land. *See* Dkt. 69-1 at 18–19 ("It makes sense that the Paseo is not within Park boundaries, as it did not exist in 1949 when the Park was established."); Dkt. 73 at 8–12. Indeed, Plaintiffs pointed in their Reply to a 1976 re-designation of the Park *provided by the government* that describes the metes and bounds of the Site as aligning with the fortification walls of the San Felipe Del Morro fortress (Dkt. 73 at 9–10, citing Dkt. 70-7). It is undisputed the Paseo lies outside those walls—and thus outside the NPS Site. The Site could not expand without some further act of Congress to change its boundaries.

That the Paseo lies outside the Park Site—as it must since it did not exist when the Site was designated or redesignated in 1976—has thus always been at the heart of the question of whether NPS was required to consult with Puerto Rican authorities before promulgating and implementing its extreme new Plan. And under 16 U.S.C. § 1246(h)(1), NPS must cooperate with Puerto Rican authorities to manage this recreational trail just outside of the federal Site.[12]

There are thus many reasons that the Court of Appeals could conclude that NPS's Plan to remove and kill the Paseo community cats is unlawful. Considered collectively, this easily meets

---

[12] NPS Director's Order #45, § 3.1 – Management Policies (May 24, 2013), confirms that conclusion, noting that recreational trails can be administered by NPS, but "not as units of the national park system," and "[i]n all cases," by "cooperat[ing] with other land managers, nonprofit organizations, and user groups[.]" *At* https://www.nps.gov/subjects/policy/upload/DO_45_5-24-2013.pdf.

the requirement to demonstrate a likelihood of success on the merits on appeal, justifying this Court's grant of a stay pending appeal.

## III.     The equities and public interest favor staying the decision and NPS's 2023 Plan.

The equities could not more clearly favor staying the Plan and preserving the status quo pending appeal. If implemented, the Plan will cause substantial and irreversible harm to humans and animals alike. The Paseo community cats will not only lose their home; they will be killed. Plaintiffs' members, who have cared for and supported these cats for many years, investing substantial time and resources to do so, will lose both their investment in the San Juan community and the individual cats they have nurtured. And the many members of the public, residents of San Juan and visitors alike, who visit and enjoy the Paseo cats will lose their companionship, along with a fundamental part of the local culture and community. On the other hand, there is no harm to the government from maintaining the status quo until the Court of Appeals can weigh the merits of this case. *See Citizens for Resp. & Ethics in Wash. v. Office of Admin.*, 593 F. Supp. 2d 156, 159 (D.D.C. 2009). The equities thus plainly favor protecting the cats and Plaintiffs' long-time investment in the TNR program by maintaining the status quo though a stay pending appeal.

The public interest also weighs overwhelmingly on the side of staying the 2023 Plan. To begin, there is a strong public interest in ensuring the government complies with the law. *See Clark*, 27 F. Supp. 2d at 15; *see also Espy*, 814 F. Supp. at 151–52. The public interest particularly favors maintaining the status quo rather than allowing NPS to begin removing and killing cats because the former option imposes no costs on NPS, while the latter requires expenditure of public funds. *See D.C. v. Masucci*, 13 F. Supp. 3d 33, 41 (D.D.C. 2014) (public interest considerations favored a stay because "it is in the public interest for government costs to be minimized") (internal quotation marks and citation omitted). Plaintiffs have been and remain willing to continue

30

incurring the costs associated with the TNR program, of which NPS has been a beneficiary for the past two decades. Additionally, there is a particularly strong public interest in staying the NPS Plan pending appellate review of its lawfulness given the widespread public opposition to that plan.

Thousands of members of the public opposed the Plan during the comment period. *E.g.*, JA 1582–1583, 1589, 1614–1615. Many more condemned the Plan in petitions, statements, and other venues. For example, in a letter to NPS, Resident Commissioner Pablo José Hernández Rivera warned that removing the cats could result in euthanasia of many animals and the arrival of new cats, further perpetuating the problem that NPS claims to want to solve. *See* Dkt. 77-1. With the public overwhelmingly opposed to the Plan, there is an evident and strong public interest in not permitting NPS to remove and kill the Paseo cats until the Court of Appeals can weigh in.

Conversely, there is no public interest in allowing NPS to implement the Plan to remove and kill the community cats in the near term. NPS may point to its oft-stated concerns regarding the impact of the cats on the Paseo "visitor experience" and landscape, but NPS admits the cats have lived on the Paseo as long as the Paseo has existed (JA 854; Dkt. 70-1 at 7–9); that it has relied on Plaintiffs to feed, care for, and manage the community cats for over two decades (Dkt. 70-1 at 39); and that, just as Puerto Rican funds were used to build the Paseo, a Puerto Rican organization, not NPS, maintains the Paseo (JA 854; Dkt. 54-4). Further the administrative record is devoid of meaningful comments from visitors complaining about the community cats affecting their "experience." Continuing the status quo by leaving the community cats in their home on the Paseo and the TNR program—which includes feeding and veterinary care in addition to the removal and adoption of those cats that can be rehomed—in place while this case is considered on appeal is thus the option aligned with the public interest. All four factors of the stay analysis thus favor staying implementation of the 2023 Plan pending appeal.

31

## Conclusion

The Court should stay its decision and the 2023 Plan pending appeal to avoid immediate and irreparable harm: the removal and killing of the community cats that live on the Paseo and contribute to the unique cultural environment that San Juan residents and visitors alike value.

Dated: June 10, 2026                                  Respectfully submitted,


                                                      /s/ *Amanda Shafer Berman*
                                                      Amanda Shafer Berman, D.C. Bar #497860
                                                      Shennie Patel, D.C. Bar #462600
                                                      Nicholas L. Roberti, D.C. Bar #90031181
                                                      Crowell & Moring LLP
                                                      600 Fifth Street, N.W.
                                                      Washington, D.C. 20001
                                                      (202) 624-2500
                                                      aberman@crowell.com

                                                      *Attorneys for Plaintiffs*